# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                       No. CR 17-0694 JB

APACHE YOUNG,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress the Fruits of Illegal Arrest and Supporting Brief, filed May 10, 2018 (Doc. 43)("Motion"). The primary issues are: (i) whether Albuquerque Police Department ("APD") Officer Jason Harvey detained Defendant Apache Young when he took Young's pocketknife and told Young to wait with another police officer while Harvey inspected the scene and investigated Young's criminal history; (ii) whether Harvey had reasonable suspicion to detain Young after he saw Young on Albuquerque, New Mexico's West Mesa emerge from an empty water tank shirtless and covered in tattoos, and place what Harvey suspected was a firearm in a holster into a pickup truck bed; (iii) whether the circumstances justify the length and manner of Young's detention; (iv) whether the Court should suppress Young's post-arrest statements, because no one Mirandized[1] Young; and (v) whether Harvey violated Young's constitutional rights, because Harvey -- an APD officer -- arrested Young outside Albuquerque's city limits. The Court concludes that:

---

[1] "Mirandizing" refers to a law enforcement officer administering the "procedural safeguards . . . to a criminal suspect prior to 'custodial interrogation,'" <u>United States v. Perdue</u>, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)), that <u>Miranda v. Arizona</u> sets forth, <u>see</u> <u>Miranda v. Arizona</u>, 384 U.S. at 444-45.

(i) Harvey detained Young, because a reasonable person in Young's position would not have felt free to leave; (ii) Harvey had reasonable suspicion to detain Young, because the circumstances' totality suggests that Young might have been involved in a crime; (iii) the circumstances justify the length and manner of Young's detention, because it was reasonable for Harvey to detain Young long enough to determine whether he had outstanding warrants or is a felon; (iv) the Court will not suppress Young's post-arrest statements under Miranda v. Arizona, because Harvey did not interrogate Young; and (v) Harvey was authorized to operate throughout the County of Bernalillo, but, even if he was not so authorized, the arrest did not violate the Constitution of the United States of America. Accordingly, the Court denies the Motion.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly

obtained in violation of defendant's rights under the Fourth and Fifth Amendments.  In this type

of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States

v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)("We need not resolve whether

Crawford [v. Washington, 541 U.S. 36 (2004)]'s[2] protection of an accused's Sixth Amendment

confrontation right applies to suppression hearings, because even if we were to assume this

protection does apply, we would conclude that the district court's error cannot be adjudged

'plain.'")[3]; United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is

beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a

Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has

not yet indicated whether the Confrontation Clause applies to hearsay statements made in

suppression hearings.").  Cf. United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M.

2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention

---

[2]Crawford v. Washington holds that testimonial hearsay is inadmissible at a criminal trial when offered against a defendant unless the hearsay declarant is unavailable and the defendant had a previous opportunity to cross examine the declarant.  See 541 U.S. at 53-54.

[3]United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266 (10th Cir. 2005).  The Court concludes that United States v. Garcia, has persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

hearings").[4]

1.     The West Mesa is a desolate area west of Albuquerque, New Mexico.  <u>See</u> Transcript of Motion to Suppress Proceedings at 3:2-3 (held June 26, 2018), filed August 10, 2018 (Doc. 59)("Tr."); Motion at 2 (asserting this fact).  <u>See</u> <u>also</u> "West Mesa," Wikipedia, available at https://en.wikipedia.org/wiki/West_Mesa (The West Mesa is an elevated landmass lying west of the Rio Grande stretching from south of Albuquerque northward to Bernalillo").

2.     The West Mesa is in Bernalillo County, New Mexico.  <u>See</u> Bernalillo County Water Conservation Development Standards and Guidelines at 4, available at https://www.bernco.gov/uploads/FileLinks/0259d13039274e6fbd3c12361ca869d6/Intro.pdf "The West Mesa Bioregion reaches from the western edge of Bernalillo County to the western edge of the Rio Grande Valley.").

3.     Much of the West Mesa is not in the City of Albuquerque's limits.  <u>See</u> Albuquerque Metropolitan Area map, available at http://documents.cabq.gov/planning/agis/largeformatmaps/CABQ_MetroArea_E.pdf.

4.     To local law enforcement, the West Mesa is known for its use as a place to abandon stolen vehicles, <u>see</u> Tr. at 21:13-16 (Harvey)(asserting that he has "personally recovered hundreds" of stolen vehicles from the West Mesa), shoot firearms, <u>see</u> Tr. at 20:13-17 (Harvey), and distribute drugs, <u>see</u> Tr. at 15:3-4 (Harvey).

5.     Albuquerque police officers are commonly cross-commissioned to operate outside of Albuquerque within the County of Bernalillo.  <u>See</u> Tr. at 19-6-15 (Harvey).

6.     In 2016, Jason Harvey was an officer with the Albuquerque Police Open Space

---

[4]Young does not challenge any of the evidence that the United States introduced on <u>Crawford</u> or Sixth Amendment grounds.

Division.  See Tr. at 17:18-22 (Spiers, Harvey).

7.      Harvey has patrolled the West Mesa since 2002.  See Tr. at 19:20 (Harvey).

8.      Harvey has an identification card from the Bernalillo County Sheriff's Department that states that Manuel Gonzales, the Bernalillo County Sheriff, "hereby commission[s] and appoint[s]" Harvey to be "a special deputy sheriff in and for Bernalillo County . . to do and perform all acts pertaining to this duty."  Special Deputy Commission Card at 2 (Government Hearing Exhibit 3).

9.      The Special Deputy Commission Card's expiration date is December 31, 2018.  See Special Deputy Commission Card at 1.

10.     The Special Deputy Commission Card does not indicate when the card became active.  See generally Special Deputy Commission Card at 1-2.

11.     Every time a new Bernalillo County Sheriff takes office, Albuquerque Police Officers must secure new Special Deputy Commission Cards.  See Tr. at 24:4-12 (Spiers, Harvey).

12.     Harvey was issued the Special Deputy Commission Card shortly after Manuel Gonzales III became Bernalillo County Sheriff.  See Tr. at 24:18-21 (Spiers, Harvey).

13.     Gonzales was elected Bernalillo County Sheriff on November 4, 2014.  See Official Results General November 4, 2014, New Mexico Secretary of State, available at http://electionresults.sos.state.nm.us/resultsCTY.aspx?eid=2&type=CTY&rid=2035&osn=510&map=CTY (showing Gonzales defeating his opponent with 52% of the vote); Fed. R. Evid. 201(b) (stating that a court may take judicial notice "of "a fact that is not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

14.     In 2009, law enforcement found the bodies of eleven women and one fetus buried in an area on the West Mesa.  See Tr. at 22:6-12 (Spiers, Harvey); West Mesa Homicide Investigation, City of Albuquerque, https://www.cabq.gov/police/contact-the-police/west-mesa-homicide-investigation (last visited August 28, 2018); West Mesa Murders, Wikipedia, https://en.wikipedia.org/wiki/West_Mesa_murders (last visited August 28, 2018).

15.     The victims were between 15 and 32 years old, and had gone missing between 2001 and 2005.  See Who is the West Mesa Bone Collector?, Vice,  https://www.vice.com/en_us/article/yvqxn5/who-is-the-west-mesa-bone-collector-0000439-v21n9 (last visited August 28, 2018).

16.     The murders remain unsolved, and APD suspects that a serial killer is responsible. See West Mesa Homicide Investigation, City of Albuquerque, https://www.cabq.gov/police/contact-the-police/west-mesa-homicide-investigation (last visited August 28, 2018)("West Mesa Serial Killer -- $100,000 Reward").

17.     Harvey was the "primary officer" on the West Mesa Murders.  Tr. at 22:6-7 (Harvey)

18.     Harvey has "personally recovered hundreds" of stolen vehicles from the West Mesa.  Tr. at 21:13-16 (Harvey).

19.     When Harvey looks for stolen vehicles on the West Mesa, he looks for vehicles that have its doors open, its hood up, its wheels removed, is burnt, or people are standing nearby it.  See Tr. at 26:13-19 (Harvey).

20.     On November 13, 2016, Harvey drove out to the West Mesa to check for stolen cars or other crime.  See Tr. at 26:13-19 (Harvey).

21.     Harvey stopped on a high vantage point on the West Mesa within a half mile of

the West Mesa Murders burial site.  See Tr. at 25:13-26:2 (Harvey); id. at 22:4-16 (Spiers, Harvey).

22.     The temperature high that day was sixty-six degrees.  See Motion at 2 n.2 (asserting this fact)(citing Albuquerque, USA History November 13, 2016, available at https://www.wunderground.com/history/daily/us/nm/albuquerque/KABQ/date/2016-11-13).

23.     At 2:00 p.m., the temperature was about 63 degrees.  See Albuquerque, USA History November 13, 2016, available at https://www.wunderground.com/history/daily/us /nm/albuquerque/KABQ/date/2016-11-13.

24.     Harvey was on the West Mesa around 2:00 p.m.  See Tr. at 38:5-8 (Spiers, Harvey).

25.     Using his binoculars, Harvey spotted a red pickup truck with its driver's side door open.  See Tr. at 27:4-13 (Spiers, Harvey).

26.     The pickup truck was about a third or a half mile away from Harvey.  See Tr. at 28:2-5 (Spiers, Harvey).

27.     Harvey continued to monitor the pickup truck as he waited for his partner, Officer Pat Smith, to arrive.  See Tr. at 27:22-23 (Harvey).

28.     Once Smith arrived, Harvey and Smith drove together towards the pickup truck. See Tr. at 30:11-21 (Harvey).

29.     When they were about 300 feet from the pickup truck, they saw Young step out of an abandoned water tank.  See Tr. at 30:22-31:4 (Harvey, Spiers).

30.     Young was wearing pants and no shirt.  See Tr. at 38:10 (Harvey); Lapel Cam Video, "Young (Harvey)" at 00:01 (Government Hearing Exhibit 1)("Lapel Video 1").

31.     Young had tattoos on his torso.  See Tr. at 38:14-15 (Harvey); Lapel Video at

00:01.

32.     Harvey thought they "appeared to be prison tattoos." Tr. at 38:14-15 (Harvey) (asserting this fact).

33.     Harvey thought they were prison tattoos, because they "were blue in color, what you would see in prison." Tr. at 39:11-13 (Harvey).

34.     In Harvey's experience, the tattoos that his colleagues have are colorful, while the tattoos that people who have served time have are blue. See Tr. at 40:8-13 (Harvey).

35.     Harvey thought it was odd for someone to be shirtless while on the West Mesa in November. See Tr. at 38:15-17 (Harvey).

36.     Harvey saw an object in Young's right hand, which Harvey thought looked like a hand gun in a black holster. See Tr. at 31:21-32:3 (Harvey).

37.     Harvey watched Young place the black object in the left side of the truck's bed. See Tr. at 32:15-19 (Harvey).

38.     Young began walking from the pickup truck towards Harvey and Smith, which made Harvey wonder why he was choosing to distance himself from the vehicle. See Tr. at 33:14-22 (Harvey).

39.     Harvey and Smith called Young to them, and Young began walking towards them. See Tr. at 35:12-14 (Harvey).

40.     Harvey and Smith walked towards Young and met him halfway between the two vehicles. See Tr. at 35:14-16 (Harvey).

41.     Harvey and Smith asked Young what he was doing on the West Mesa. See Tr. at 35:16-18 (Harvey).

42.     Harvey's lapel video begins in the middle of their conversation with Young. See

Officer Harvey Belt Tapes at 2:1 (Young)(Government Hearing Exhibit 2)("Harvey Tr."); Lapel Video 1 at 00:00.

43.     Harvey told Young that "[w]e're just going to check this out real quick," and then asked whether there are "any guns or weapons we need to know about." Harvey Tr. at 2:12-14 (Harvey).

44.     Young answered: "No sir." Lapel Video 1, at 00:55-00:57 (Young).[5]

45.     Harvey asked whether Young had any weapons on him, and Young took a pocketknife out of his pants pocket, displayed it for Harvey, and said, "a pocketknife." Lapel Video 1, at 00:57-01:01 (Harvey, Young); Harvey Tr. at 2:16-17 (Harvey, Young).

46.     Harvey paused for a moment and said, "[l]et me just hold onto that for a second while we check everything out. And just hang out tight right here, okay?" Harvey Tr. at 2:18-21 (Harvey); Lapel Video 1, at 01:01-01:03.

47.     Young handed Harvey his pocketknife, and Harvey began walking towards the pickup truck, leaving Young with Smith. See Lapel Video 1, at 01:02-01:25.

48.     Harvey looked in the bed of the truck, which was full of various objects, such as shoes, a blowtorch, and a bucket. See Lapel Cam Video, "Young (Harvey) 2," at 00:10-00:40 ("Lapel Video 2").

49.     Harvey used his radio to call in the pickup truck's plate number, and someone identified as Sergeant Perea replied over the radio that it was registered to "Andy Baca." Harvey Tr. at 3:2-7 (Harvey, Perea); Lapel Video 2 at 00:22-00:55 (Harvey, Perea).

_____

[5]The Harvey Tr. indicates that Young said, "Sir?" Tr. at 2:15 (Young). Listening to the Lapel Video 1 audio, however, the Court hears Young say: "No, sir," which makes more sense, given the context. Lapel Video 1, 0:55-0.59 (Young). The Court will so find.

50.     Harvey walked from the pickup truck to the water tank, which was deteriorating, and its metal sides were peppered with bullet holes.  <u>See</u> Lapel Video 2 at 00:50-01:40.

51.     Harvey hopped down into the water tank, looked, and lifted a white board.  <u>See</u> Lapel Video 2 at 01:40-03:00.

52.     Harvey saw a "clear fluid," blood, and fecal matter on the white board.  Tr. at 45:2-8 (Harvey).

53.     When he lifted the white board, the fluid, blood, and fecal matter flowed down the board, which indicated to Harvey that the material was "fresh, it had just happened."  Tr. at 45:19-23 (Harvey).

54.     Harvey also saw a short green tube on the ground, which Harvey described as a "water toy" for children that is about two feet long with "fecal matter and blood" on one end.  Tr. at 45:10-14 (Harvey).  <u>See</u> Lapel Video 2 at 02:25-02:35.

55.     Harvey left the water tank and returned to the pickup truck.  <u>See</u> Lapel Video 2 at 03:14-3:30.

56.     Harvey looked in the back of the pickup truck's bed, this time looking into a narrow space between the side of the truck bed and a plastic bin.  <u>See</u> Lapel Video 2 at 03:40-03:50.

57.     Harvey "could just see the butt of the gun, the grip of it" between the side of the truck bed and the plastic bin.  Tr. at 48:12-16 (Harvey).

58.     Harvey returned to Young and Smith and Smith asked for Young's name, birthdate, and social security number, which Young provided.  <u>See</u> Harvey Tr. at 4:9-19 (Smith, Young); Lapel Video 2 at 04:30-05:30 (Smith, Young).

59.     Harvey asked Young to whom the truck was registered, and Young replied that it

should be registered to Andy Baca.  See Tr. at 4:21-24 (Harvey, Young); Lapel Video 2 at 05:30-05:37 (Harvey, Young).

60.    Harvey said "I'll be right back" and walked back to his squad car leaving Smith and Young together.  Tr. at Harvey Tr. at 4:25-5:1 (Harvey); Lapel Video 2 at 05:37-05:50 (Harvey).

61.    Harvey got into the driver's seat of his squad car and began speaking over the radio with Sergeant Sanchez.  See Harvey Tr. at 5:12-16 (Harvey, Sanchez); Lapel Video 2 at 06:50-7:20 (Harvey, Sanchez).

62.    Harvey described to Sergeant Sanchez his encounter with Young and what he saw in the water tank and stated that "it's almost like he was keistering" something with the tube. Harvey Tr. at 5:18-6:11 (Harvey, Sanchez).

63.    Harvey asked if Sanchez had ever heard of "guy sticking large tubes up them to keister that stuff" and Sergeant Sanchez said that it may be for "smuggling stuff," but wondered why someone would be doing that "in the middle of the desert."  Harvey Tr. at 6:12-15 (Harvey, Sanchez).

64.    Sergeant Sanchez asked Harvey if Young was a felon, and Harvey replied:  "I'm going to guess he is.  He's covered in tats like he is."  Harvey Tr. at 7:1-3 (Sanchez, Harvey).

65.    Harvey next called Dispatch to ask whether any warrants were out on Young, and Dispatch said that there were not.  See Harvey Tr. at 9:6-22 (Harvey, Dispatch).

66.    Dispatch told Harvey that Young is "under a discharge status under probation of parole" but did not know whether it was for a felony.  Harvey Tr. at 9:21-10:9 (Dispatch, Harvey).

67.    Harvey called Sandra Perea who told Harvey that Young was a felon.  See Harvey

Tr. at 10:19-11:9 (Harvey); Tr. at 60:3-9 (Harvey)(asserting this fact).

68.     The Lapel Video 2 captures only Harvey's side of the conversation with Perea:

> Hi, yes, this is Officer Harvey with Albuquerque Police. Hey I'm trying to find out if you've got some information on a subject I'm out with right now. [Long pause.] Young, Apache. [Long pause.] Okay. [Long pause.] He discharged out. And was it for a felony? [Pause.] Does it say what it was for? [Long pause.] Okay. [Pause.] And he did time for it, so he's convicted[.] [Pause.] And what's your name? [Pause.] Sandra Perea with the New Mexico . . . probation and parole. Okay.

Harvey Tr. at 10:19-11:9 (Harvey).

69.     Harvey then asked Dispatch to send a police unit to the area because he is going to try to arrest Young. See Harvey Tr. at 11:21-12:12 (Harvey, Dispatch).

70.     Young's arrest is not captured on video. See Tr. at 84:18-12 (Knoblauch, Harvey). See generally Lapel Video 1; Lapel Video 2; Lapel Cam Video, "Young (Harvey) 3" (Government Hearing Exhibit 1)("Lapel Video 3").

71.     Harvey told Young that "he was being placed in handcuffs until law enforcement could figure out what was going on." Response at 4 (asserting this fact).

72.     Harvey "purposefully did not tell him that that he was under arrest" as to "minimize the possibility that Defendant would become resistant, agitated, and violent." Response at 4 (asserting this fact).

73.     When Harvey began walking to the pickup truck, Young, in handcuffs, "insisted that Officer Harvey couldn't go into the truck." Response at 4-5 (asserting this fact).

74.     Harvey then informed Young that he was under arrest for being a felon in possession of a firearm. See Response at 5 (asserting this fact).

75.     Harvey removed the handgun and holster from the pickup truck bed, and "ran the firearm through the NCIC data base" which "confirmed that it was stolen." Response at 5

(asserting this fact).

76.     After arresting Young, Harvey told Young that police were going to tow away the pickup truck.  See Tr. at 62:22-23 (Harvey).

77.     When Harvey told Young that the pickup truck would be towed, "his behavior changed" and Young became "very upset" and wanted someone to retrieve the pickup truck instead of having it towed.  Tr. at 22:24-25 (Harvey).

78.     Because of Young's reaction, Harvey "decided that there was maybe something else in that vehicle" and he and his supervisor decided to "have the vehicle sealed, towed, and then a search warrant performed."  Tr. at 63:1-10 (Harvey).

79.     Harvey did not place Young inside his squad car; instead he walked Young along a dirt road to hand Young over to another squad car waiting on the road.  See Motion at 4; Lapel Video 3 at 00:01.

80.     Harvey did not Mirandize Young at any time.   See Tr. at 62:11-13 (Spiers, Harvey).

81.     Harvey's lapel video begins recording as he and Young are already walking.  See Lapel Video 3 at 00:01.

82.     As they walked, Harvey and Young have a casual-sounding conversation during which Officer Harvey asks Young about his driving route out onto the West Mesa and whether Young has been out there before.  See Harvey Tr. at 13:6-14:5 (Harvey, Young)[6].

_____

[6]The Harvey Tr. indicates that Harvey was having this conversation with Officer Smith, but the Court concludes this is an error, because the context indicates that the other -- unseen -- speaker is Young and there is no indication that Officer Smith is also walking with Officer Harvey and Young.

83.     Young says that he comes out there "about once a month" and says something about "scrap cigarette money." Harvey Tr. at 14:9-11 (Harvey, Young).

84.     Law enforcement searched the pickup truck pursuant to a warrant. <u>See</u> Tr. at 63:11-14 (Spiers, Harvey).

85.     The search turned up a rifle, a shotgun, and ammunition. <u>See</u> Motion at 5 (asserting this fact).

**<u>PROCEDURAL BACKGROUND</u>**

On March 14, 2017, a federal Grand Jury returned an indictment charging Young with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). <u>See</u> Indictment at 1, filed March 14, 2017 (Doc. 2). Young was arraigned in federal court on April 11, 2017. <u>See</u> Clerk's Minutes at 1, filed April 11, 2017 (Doc. 9). <u>See also</u> Arrest Warrant at 1, filed March 15, 2017 (Doc. 3).

**1.     <u>Motion to Suppress</u>.**

In his Motion, Young first argues that the APD officers made a de facto arrest on Young when they took Young's pocketknife and told him not to leave. <u>See</u> Motion at 5-6. Young also contends that the APD officers were not within their jurisdiction when they made the arrest. <u>See</u> Motion at 6. Second, Young contends that the APD officers arrested him without probable cause and violated Young's rights under the Fourth Amendment to the Constitution of the United States of America. <u>See</u> Motion at 7-8. Young argues, alternatively, that Harvey violated his rights under the Fifth Amendment to the Constitution of the United States of America when he told Young that Young must stay. <u>See</u> Motion at 9. Young contends that, given the circumstances -- namely, that Harvey was in full uniform and displaying a firearm when he told Young to stay and took Young's pocketknife -- "it is not reasonable that anyone would have

thought he was free to go." Motion at 10. Young asserts that, to discourage the APD officers' actions, the "most common and appropriate sanction" for their behavior is to suppress all the evidence. Motion at 10.

Third, Young asserts that he has standing to contest the search of his truck, because he had legitimate possessory interest in the car and an expectation of privacy. See Motion at 11-12. Fourth, Young asks the Court to suppress statements which he made to the APD officers following his arrest, because: (i) the APD officers got his statements as a result of their Fourth Amendment violation; and (ii) the APD officers did not Mirandize[7] him. See Motion at 12. Fifth and finally, Young asks the Court to suppress the fruits of the APD officer's arrest and detention, because the "illegality tainted every piece of evidence the state acquired from Mr. Young since his arrest." Motion at 14.

**2.      The Response.**

The United States responds. See Response by the United States to the Defendant's Motion to Suppress, filed May 22, 2018 (Doc. 47)("Response"). First, the United States asserts

---

[7]Miranda v. Arizona "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'" United States v. Perdue, 8 F.3d at 1463 (quoting Miranda v. Arizona, 384 U.S. at 444). The Supreme Court provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

that Harvey had reasonable suspicion that Young was engaged in criminal activity.  See

Response at 7.  The United States explains that when the APD officers

> observed the Defendant emerge from the water tank they knew only that it was an
> area that served as an attraction for the dumping of stolen vehicles and that had
> served as a burial ground for a number of murdered women and the burial of a
> fetus.[8]  They observed the shirtless Defendant, a muscular, hard-built tattooed
> man, walk towards a pickup truck that had an open driver's side door and place a
> holster and a firearm in the open bed of a pickup truck.
>
> Not knowing what relationship or explanation the Defendant had with the
> truck, the holster and the handgun or for being there shirtless in November,
> Officer Harvey, upon engaging the Defendant, asked him for identifying
> information such as name, date of birth, social security number as well as
> information about the pickup truck.  As a result of Officer Harvey's reasonable
> suspicion that the Defendant was engaged in criminal activity he made an
> investigatory stop of the Defendant.

Response at 7-8.

Second, the United States asserts that the APD officers were authorized "to investigate

cases and to make arrests in the open space area of the West Mesa," because both officers, like

all APD officers, "were then cross-commissioned" with the Bernalillo County Sheriff Office to

do so.  Response at 9.  Third, the United States argues that Harvey's warrantless recovery of the

handgun was legal, because he seized the handgun after he knew that Young was a felon, and

because the handgun was in plain view.  See Response at 10.  Fourth, the United States contends

that the inevitable discovery doctrine applies, because law enforcement would have discovered

the handgun along with the other firearms recovered from the tuck pursuant to a search warrant

executed two days later.  See Response at 11.  The United States adds that Harvey learned that

Young was a felon not from questioning Young, but by independently consulting the National

---

[8]The United States refers to the West Mesa Murders.  See Finding of Fact ("FOF")
¶¶ 14-15, at 6.

Crime Information Center database.  See Response at 11.    Fifth, the United States addresses the

Miranda issue.  See Response at 12-13.  The United States contends that the Court should not

suppress Young's statements, even if he was not Mirandized, because, according to the United

States, Young did not make those statements within the context of an interrogation.    See

Response at 12-13.

### 3.    The Reply.

Young replies to the United States' Response.    See Defendant's Reply to the

Government's Response to Motion to Suppress, filed May 30, 2018 (Doc. 48)("Reply").  In the

Reply, Young disputes several facts that the United States asserts in its Response.  See Reply at

1-2.  For instance, Young states that "[t]he information then and now available" shows that the

APD officers saw Young place a holster -- not a firearm -- in the truck's bed.  Reply at 1.  Young

asserts that he did not give his pocketknife to Harvey voluntarily, but, rather, Harvey "demanded

that the Defendant surrender the little pocketknife."  Reply at 1.  Young disputes that the firearm

was in plain view, asserting that Harvey's lapel video shows only "dark object in the shadows"

of the pickup truck's bed.  Reply at 2.

Turning to reasonable suspicion, Young contends that the United States "fails to specify

what sort of criminal activity might have been afoot nor how the Officers reached that

conclusion."  Reply at 3.  Young adds that "[i]t is well established that a hunch is insufficient."

Reply at 3 (United States v. Rodriguez, 739 F.3d 481 (10th Cir. 2013)).

Next, Young addresses the United States' inevitable discovery argument.  See Reply at 4.

Young contends:

> The search warrant depends entirely on the affidavit which rests entirely on
> information obtained from the illegal search and seizure.    Without this
> information, the affidavit would be nothing more than Officer Harvey saw a

tattooed man with a truck in the West Mesa of Bernalillo County, not enough for
an impartial magistrate, to be sure.

Reply at 4.

Young disputes that Harvey and Smith had authority throughout Bernalillo County.  See
Reply at 4.  Young contends that there is no evidence that Harvey and Smith were so authorized
when they arrested Young.  See Reply at 4-5.  Young asserts that the last time Harvey and Smith
signed oaths of office cards was in 2000, when Joe Bowdich was Bernalillo County Sheriff.  See
Reply at 4.  He contends that Sheriff Gonzales did not appoint either Harvey or Smith.  See
Reply at 4.  Young asserts that, under Bernalillo County Sheriff's Department's Rules and
Regulations, "all sworn personnel are required to renew their cards" when a new sheriff assumes
office.  Reply at 4-5 (citing Bernalillo County Sheriff's Department Rules and Regulations
§ 206-5(B)(1), at 1, filed May 30, 2018 (Doc. 48-2)(stating that "[s]worn personnel will renew
their identification/commission cards . . . [a]t the official change of administration")).  Young
also contends that Miranda warnings are required even if there is not an express interrogation.
See Reply at 5 (citing Rhode Island v. Innis, 446 U.S. 291 (1980)).

Young also asserts that the Court "must . . . assume" that the United States does not
dispute three of Young's arguments, namely: (i) that Officer Harvey's "confiscation of the
Defendant's knife was inherently coercive and a tacit message he was not only not free to go";
(ii) that, "by APD's acceptance of Federal largesse in the form of grants, the Fourth Amendment
is implicated and makes the concerns of whether the Officers were out of their jurisdiction
germane to the inquiry"; and (iii) that suppression is the appropriate sanction to discourage law
enforcement from violating the Fifth Amendment.  Reply at 5.

    4.    **The Hearing.**

The Court held a hearing.  See Transcript of Motion to Suppress Proceedings (held June 26, 2018), filed August 10, 2018 (Doc. 59)("Tr.").  Young began by describing the West Mesa area as "a pretty desolate place" that people use for "recreation" and other activity, such as to drive four-wheelers.  See Tr. at 3:2-8 (Knoblauch).  The United States and Young stipulated that the pickup truck belonged to Young's mother and that she gave Young permission to drive the truck that day.  See Tr. at 7:1-5 (Knoblauch).  Young took the stand.  See Tr. at 8:7-13 (Clerk, Young).  Young said that he was on the West Mesa that day driving around looking for scrap metal and that he went into the water tank "and used the bathroom."  Tr. at 8:19-23 (Knoblauch, Young).  Young explained that he saw the police officers approach him and he walked towards them to meet them.  See Tr. at 9:6-9 (Knoblauch, Young).  Young's attorney, Charles Knoblauch, asked Young whether he felt free to leave after he gave the police officer his pocket knife, and Young said that he did not, "[b]ecause he told me to hold on right there until he checked something out."  Tr. at 10:24-11:5 (Knoblauch, Young).

The United States began cross-examining Young.  See Tr. at 10:18-20 (Spiers).  Young admitted that, when one of the police officers asked him whether he had any weapons on him, Young mentioned only the pocket knife, and not the firearms and ammunition in the truck's bed.  See Tr. at 13:7-12 (Spiers, Young).  The United States then offered its take on the West Mesa area, asserting that it is known for criminal activity, such as for drug transactions and to abandon stolen vehicles.  See Tr. at 15:1-6 (Spiers)("There is . . . a malignant flavor to the area.").

Harvey took the stand.  See Tr. at 16:2-14 (Spiers, Court, Clerk, Harvey).  He asserted that, on November 13, 2016, he was with the Albuquerque Police Open Space Division and that he had jurisdictional authority on the West Mesa.  See Tr. at 17:13-19 (Spiers, Harvey).  Harvey stated that it is common for people to shoot guns on the West Mesa.  See Tr. at 20:13-21

(Harvey).  Harvey stated that he was the "primary officer" on the West Mesa Murders case  and that, on November 13, 2016, he was within a "third to half mile away" from the West Mesa Murders burial site.  Tr. at 22:4-16 (Spiers, Harvey).  The United States moved into evidence an identification card indicating that Harvey was commissioned as a "Special Deputy Sheriff in the Bernalillo County" with an expiration date of December 31, 2018.  Tr. at 22:23-3 (Spiers, Harvey).  Harvey stated that the identification card was active shortly "after he" -- the Court presumes Harvey means Manuel Gonzalez, the Sheriff of Bernalillo County -- "took office."  Tr. at 24:4-12 (Spiers, Harvey).  Young objected to the identification card's admission, because "[w]e still don't know when this card actually was issued."  Tr. at 24:25-25:3 (Knoblauch).  The Court nonetheless admitted the evidence, reasoning that the uncertainty goes to the evidence's weight.  See Tr. at 25:4-7 (Court).

Harvey explained that, on November 13, 2016, he drove up to a high vantage point on the West Mesa.  See Tr. at 25:13-26:2 (Harvey).  Harvey stated that he was on the lookout for vehicles that might be stolen -- e.g., vehicles with their doors open, hoods up, wheels off, burnt, or with people nearby it.  See Tr. at 26:13-19 (Harvey).  Harvey recalled that he spotted with binoculars what would turn out to be Young's red pickup truck roughly a third or a half mile away.  See Tr. at 27:4-13 (Spiers, Harvey), id. at 28:2-5 (Spiers, Harvey).  Harvey stated that he saw that the driver's side door was open.  See Tr. at 27:13-15 (Harvey).  Harvey stated that he looked for anyone around the truck as he waited for his partner to arrive.  See Tr. at 27:22-23 (Harvey).  Harvey stated that people often go to West Mesa to look for rocks or to find metal.  See Tr. at 30:1-3 (Harvey).  Harvey recalls that, when Smith arrived, they began driving to the vehicle; although they had not yet seen anybody near the vehicle, they were alert that they might encounter someone.  See Tr. at 30:11-21 (Harvey).  When Harvey and Smith were roughly three-

hundred feet from the truck, they saw Young leave the abandoned water tank. See Tr. at 30:22-31:4 (Harvey, Spiers). Harvey recalls that he saw "something" in Young's right hand, which looked like a hand gun in a black holster, which Young placed in the left side of the truck's bed. Tr. at 31:21-32:3 (Harvey). See id. at 32:15-19 (Harvey). Harvey said that Young then began walking away from the pickup truck towards them, which made Harvey wonder why he was choosing to distance himself from the vehicle. See Tr. at 33:14-22 (Harvey). Harvey said that they began speaking with Young. See Tr. at 35:24-36:4 (Spiers, Harvey). Harvey explained: "My concern is: is that vehicle stolen? Whose vehicle is it? . . . [W]hat's he doing in the water tank? Because . . . I've had . . . 15 years [experience] patrolling that desert, and I've never seen anybody in that water tank." Tr. at 36:6-11 (Harvey). Harvey recalled that Young was not wearing a shirt, and Harvey thought that it was unusual to not wear a shirt in November out on the West Mesa; Harvey also said that Young was "covered in what appeared to be prison tattoos." Tr. at 38:13-17 (Harvey). Harvey explained that he believed that tattoos were "prison tattoos" because they were blue, as "you would see in prison." Tr. at 39:5-13 (Harvey). Harvey believes blue ink is typical of prison tattoos, because "based on my experience with people that I've arrested in the past that have done prison time, they all have the same . . . blue color ink. They don't have the option of colors in the prison system, as far as I know." Tr. at 40:14-19 (Harvey).

Harvey recounted how he asked Young if he had any guns or weapons on him, and that Young handed Harvey a pocket knife. See Tr. at 41:17-22 (Harvey). Harvey said that they wanted Young to stay with Smith while Harvey looked at the pickup truck and the water tank, because "I didn't want him near the handgun, what I speculated to be the handgun." Tr. at 43:12-14 (Harvey). Harvey said that, when he saw blood and fecal matter on a white board in

the water tank, he thought there might be another person nearby.  See Tr. at 45:17-23 (Harvey).

When Harvey returned to Young and Smith, he looked into the truck bed and saw "the butt of the

gun, the grip of it."  Tr. at 48:8-16 (Harvey).  Harvey said that he then went to his police car and

called to see if the truck was stolen and if there were any outstanding warrants for Young.  See

Tr. at 49:2-10 (Harvey, Spiers).  Once Harvey learned that Young was a felon, Harvey made the

decision to arrest Young for being a felon in possession of a firearm.  See Tr. at 50:1-13

(Harvey).  The United States asked why Harvey did not Mirandize Young; Harvey explained:

> Because, one, I had seen him with the handgun already, so whatever he was going
> to say was irrelevant, because I'd seen him with it.  And then, two, I'd confirmed
> that he was a felon. So at that point, I didn't need to Mirandize him. I already had
> him on felony charges.

Tr. at 51:3-10 (Spiers, Harvey).  The United States asked Harvey whether, at that time, he had

"any interest in developing a statement from him," and Harvey replied:  "No, because I'd already

seen him with [the firearm]."  Tr. at 59:11-13 (Spiers, Harvey).

Harvey stated that Young became "very upset" when he told Young that they would be

towing the truck, which led Harvey to decide to "have the vehicle sealed, towed, and then [get] a

search warrant performed on the vehicle."  Tr. at 62:22-63:10 (Harvey).

On cross examination, Young asked Harvey whether he was free to leave after he gave

Harvey his pocketknife, and Harvey said Young was not free to leave.  See Tr. at 77:14-19

(Knoblauch, Harvey).  The following exchange occurred:

> Q. He was not free to leave, was he?
>
> A. No.
>
>  . . . .
>
> Q. If he tried to leave, you would have stopped him right there? . . .  Not running,
> just said, Okay, I'm out of here, bye?

A. It depends. Because at that point, I'm still investigating what's going on. . . .

Q. Okay. And if Mr. Young had gone to the truck and said: Okay, I'm getting in the truck, bye?

A. I don't know. That situation didn't occur.

Q. Would he have been free to leave?

A. Probably. Because at that point, he wasn't under arrest. He was being detained, but he wasn't under arrest officially yet. I was trying to run that plate as fast as I could and try to figure out who he was, to see if he was a felon. . . . At that point, if he would have told me, . . . I don't want to talk to you, and I want to leave, then I probably would have let him go.

Tr. at 77:19-78:25 (Knoblauch, Harvey). Next, Young asked Harvey whether he knew that certain felony convictions will not deprive a person's right to possesses a firearm, and Harvey answered that he was "not real familiar with all those." Tr. at 81:9-13 (Knoblauch, Harvey). Harvey discussed the objects and fluids found in the empty water tank -- a "water toy," fresh blood and fecal matter -- and said that, at the time, he wondered whether Young was "keistering" narcotics -- i.e., hiding drugs in his anus -- but that, later, it "appeared . . . that he was masturbating in the that water tank." Tr. 81:25-83:7 (Knoblauch, Harvey). Young then asked Harvey about Young's agitated reaction to learning that the truck would be towed, and Harvey admitted that Young's reaction was not recorded on video. See Tr. at 84:3-11 (Knoblauch, Harvey).

Young then called a private investigator named William Elliott to the stand. See Tr. at 86:12-15 (Clerk, Elliott). Elliott asserted that, based on his investigation, the water tank is outside the Albuquerque city limits. See Tr. at 92:25-93:2 (Court).

The United States then argued that there was nothing coercive about the police officers' interaction with Young. See Tr. at 103:23-24 (Spiers). The United States added that, if Young

had not told Harvey that he had a pocket knife, "in all likelihood, the officers wouldn't have patted him down and searched him for it, and it would have been the property that the defendant feels aggrieved about being detained [and] would not have even been an issue for argument." Tr. at 103:24-104:7 (Spiers).

The Court asked the United States when it considers the moment that it arrested Young, and the United States answered, "[n]ot until his formal arrest," and that "everything that preceded the actual arrest and followed from Officer Harvey learning that he was, in fact, a convicted felon was an investigatory stop and detention." Tr. at 106:23-107:6 (Court, Spiers). The Court asked when reasonable suspicion began, and the United States answered that it began as soon as Harvey saw Young, in light of the criminal activities that are known to happen on the West Mesa and because Harvey saw a lone pickup truck with its doors open -- indicating that it might be stolen -- and then seeing Young carrying something that looked like a holstered firearm. See Tr. at 108:13-23 (Court, Spiers). The United States recognized that a power drill in a toolbelt harness might look like a holstered handgun from afar -- and vice versa -- but, given the setting, it makes sense to assume it is a handgun and not a drill. See Tr. at 108:20-109:3 (Spiers). The United States summarized the factors giving rise to reasonable suspicion:

> [T]he defendant . . . was shirtless, tattooed, next to a car, a pickup truck, with an open driver's side door, emerging from a water tank, where no individual had been seen for five minutes prior, carrying what Officer Harvey inferred was a firearm, and then he put it in the truck, and . . . wanted to distance himself from the truck and the offending weapon by coming closer to the officers. And then reasonable suspicion grew in its breadth when Officer Harvey went into the water tank and saw fresh blood and other artifacts that were abnormal to be seen.

Tr. at 109:4-17 (Spiers).

The United States reiterated its view that the Court should not suppress the transcript on Miranda grounds, because, according to the United States, Young made the statements while

"being detained in an investigatory capacity" and not in a custodial interview.  Tr. at 110:2-14 (Spiers).  The United States concluded by asserting that the <u>Rhode Island v. Innis</u> analysis "wasn't calibrated towards an interrogation-style dialogue with the defendant."  Tr. at 111:7-11 (Spiers).

The Court addressed Young's arguments that the officers did not have jurisdictional authority on the West Mesa, wondering how a violation of state law violates the Constitution of the United States of America.  <u>See</u> Tr. at 113:23-114:4 (Court).  Young recognized that this argument does not implicate well-tread constitutional principles, but argued that acting without jurisdictional authority implicates due process concerns and is also "sort of a variation of the Silver Platter doctrine."  Tr. at 113:22-114:5 (Knoblauch).

### 5. **The Amended Response.**

After the hearing, the United States filed the Amended Response by the United States to the Defendant's Motion to Suppress, filed June 28, 2018 (Doc. 52)("Amended Response").  The Amended Response is largely identical to the Response, but, in the Amended Response, the United States addresses Young's argument, at the hearing, that Harvey lacked authority to arrest Young inside Bernalillo County but outside the City of Albuquerque.  <u>See</u> Amended Response at 1.  The United States asserts that, after the hearing, it received a "notarized letter" from the Bernalillo County Sherriff "confirming that Albuquerque Police Department Officer Jason Harvey has been authorized as a Bernalillo County Sheriff's Department Special Deputy since December 11, 2000, to this date, in perpetuity without interruption."  Amended Response at 1-2.  The United States attached to its Amended Response a copy of the letter.  <u>See</u> Letter from Manuel Gonzales III at 1 (dated June 28, 2018), filed June 28, 2018 (Doc. 52-1)("Letter").  In the Letter, Manuel Gonzales III, the Sheriff of Bernalillo County, states that his office issues

"Special Deputy Commissions" to law enforcement officers that grant them "arrest authority" in

Bernalillo County. Letter at 1. He adds:

> Special Deputy Commissions for officers of the Albuquerque Police Department, to whom Special Deputy Commissions had previously been authorized under a previous Sheriff, have been honored and a new identification badge was issued with my signature. Special Deputy Commissions have been perpetual and reoccurring in this manner as the best means of cooperation and effective law enforcement for the City of Albuquerque and Bernalillo County.

> Officer Jason Harvey took his Oath of Office as a Special Deputy on December 11, 2000 under the authority of Sheriff Joe Bowdich. Officer Harvey has retained his arrest authority in Bernalillo County through his continued employment with the Albuquerque Police Department and therefore continues to hold his Commission of Special Deputy through the authority of my office.

Letter at 1. Gonzales attaches to the letter Harvey's Oath of Office noting his appointment as a

"special deputy" in Bernalillo County Sheriff's Department, dated December 11, 2000. Oath of

Office at 1 (dated December 11, 2000), filed June 28, 2018 (Doc. 52-1).

**6.      The Amended Reply.**

Young replies to the United States' Amended Response. See Defendant's Amended

Reply to the Government's Amended Response to Motion to Suppress, filed June 28, 2018

(Doc. 53)("Amended Reply"). The Amended Reply is largely identical to the Reply, but Young

addresses the United States' new assertions regarding Harvey's arrest authority in Bernalillo

County. See Amended Reply at 5. Young argues that the Letter and the Oath of Office is

"certainly interesting," but "bears no mention as to precisely when Officer Harvey received a

Commission as a Special Deputy." Amended Reply at 2. Young contends that the United

States' failure to produce evidence that Gonzales commissioned Harvey and Smith before

Young's arrest indicates that "either there is no such information or that such information, if it

does exist, works to the detriment of the Government." Amended Reply at 2-3.

<u>**LAW REGARDING FOURTH AMENDMENT SEIZURES**</u>

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  <u>See</u> <u>Oliver v. Woods</u>, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  <u>See</u> <u>Oliver v. Woods</u>, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," <u>United States v. Daoust</u>, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  <u>Oliver v. Woods</u>, 209 F.3d at 1186.

1.      <u>**Investigative Detentions and Reasonable Suspicion.**</u>

An encounter that is not consensual may nevertheless be justified as an investigative detention.  <u>See</u> <u>Dorato v. Smith</u>, 108 F. Supp. 3d. 1064, 1118 (D.N.M. 2015)(Browning, J.).  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  <u>Dorato v. Smith</u>, 108 F. Supp. 3d. at 1118.  First, the officer "must have a

particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruled on other grounds as recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

 "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").  A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest, which probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

 An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  "The officer need not be

absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in Terry v. Ohio of an investigative detention -- a "stop" -- and of a protective search -- a "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)). The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment. United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot. See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect],

and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient.  <u>See</u> 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In <u>United States v. Ceballos</u>, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  <u>See</u> 355 F. App'x at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  <u>See</u> 355 F. App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  <u>See</u> 355 F. App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  <u>See</u> 355 F. App'x at 228.  Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  <u>See</u> 355 F. App'x at 227-29.  The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant."  355 F. App'x at 229.  The Tenth Circuit explained, in an opinion that the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, wrote and Judges Briscoe and McWilliams joined:

A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street. Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.

. . . .

We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion. See 355 F. App'x at 229. The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F. App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

(1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417. At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vazquez, United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in "was consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct. 483 F. App'x at 418 (quoting District Court Opinion at 19). The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior." 483 F. App'x at 418. The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque Ord. § 12-2-21(B)). The Tenth Circuit, thus, reversed Judge Vazquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

2.      **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest. An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person

has been placed under arrest.  <u>United States v. Melendez-Garcia</u>, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 499 (1983).  The use of handcuffs, however, does not always elevate a detention into an arrest.  <u>See</u> <u>United States v. Albert</u>, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a <u>Terry</u> stop."); <u>United States v. Reyes-Vencomo</u>, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest."); <u>Pierre-Louis v. Schake</u>, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. Apr. 30, 2014) (Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun).  "Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  <u>United States v. Rodriguez</u>, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).  <u>See</u> <u>Wilson v. Jara</u>, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'"  (quoting <u>Oliver v. Woods</u>, 209 F.3d at 1185)), <u>aff'd</u>, 512 F. App'x 841 (10th Cir. 2013).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  <u>United States v. Valenzuela</u>, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting <u>United States v. Edwards</u>, 242 F.3d 928, 934 (10th Cir. 2001))(citing <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."  <u>United States v. Morris</u>, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme Court has made the

following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard. See Beck v. Ohio, 379 U.S. 89, 96 (1964). "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)). Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

### 3. When a Detention Becomes an Arrest.

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis

of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for

their protection.'"  United States v. Perea, 374 F. Supp. 2d at 974.  See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").  United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a Terry stop must be reasonably related in scope to the circumstances which justified the interference in the first

place and may not go beyond what is necessary for officer safety. The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730 (citations omitted)(internal quotation marks omitted).

### 4. Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d 1472, 1476-77 (10th Cir. 1995). Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, 2011 WL 7444745, at *49 (citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)(en banc)).

The Tenth Circuit confronted the issue when an officer must conduct further investigation before arresting an individual in Romero v. Fay. In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder. See 45 F.3d at 1474. Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder. See 45 F.3d at 1474. After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi. See 45 F.3d at 1474. The plaintiff stated that three individuals would

establish that he was asleep at home when the murder occurred.  <u>See</u> 45 F.3d at 1474.  The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  <u>See</u> 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.  <u>See</u> 45 F.3d at 1474.

The plaintiff brought a § 1983 action for, among other things, violations of his Fourth Amendment rights.  <u>See</u> <u>Romero v. Fay</u>, 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  <u>See</u> 45 F.3d at 1476.  The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, authored, and Judges Tacha and McKay joined.  <u>See</u> 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit determined that,

> [o]nce [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, authored, and Judges Anderson and Logan joined, concluded that qualified immunity did not apply. See 147 F.3d at 1257-59. The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations." 147 F.3d at 1257. The Tenth Circuit added that

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . . Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff]. They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest. Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her. See 478 F.3d at 1113 (internal quotation marks

omitted).  Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend.  See 478 F.3d at 1113.  The Tenth Circuit, in an en banc opinion that Judge Kelly authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].  See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").  Based on the facts above, [the defendant] was arrested without probable cause.

478 F.3d at 1116 (footnotes omitted)(citations omitted).  The Tenth Circuit further held that

> it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d . . . 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation.").  In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.  Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted)(citations omitted).  The Tenth Circuit concluded, therefore, that qualified immunity did not apply.  See 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  See 2011 WL 7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim against the arresting officer and the City of Rio Rancho for, among other things, unlawfully

arresting him in violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The

Court found that the officer had probable cause to arrest the plaintiff based on information

gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother --

Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz.  See 2011

WL 7444745, at *43-46.  Garcia argued that, by failing to re-interview Odom and Katz, and

instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview

readily accessible witnesses."   2011 WL 7444745, at *15.  Garcia contended that, moreover,

Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz'

neighbors before arresting him violated his constitutional rights.  See 2011 WL 7444745, at *15.

Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered

Katz' and Odom's motivations to lie.  See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the

plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits
> for the general proposition that officers must interview witnesses at the scene,
> Garcia points to no case law which would establish that, after the officers at the
> scene have interviewed witnesses, the Constitution requires the investigating
> detective to interview those witnesses again. . . .  Here, the responding police
> officers . . . interviewed every adult alleged to be involved in the incident and
> briefly spoke with K.J. . . .

> Garcia also states that, if Casuas had investigated further, she would have
> known that there was no semen on the bedding, and she would have discovered
> Katz' and Odom's motivation if she spoke to him. . . .  The Tenth Circuit's
> discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion
> that Casuas was required to do more after [K.J.'s interview] solidified the
> existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:

>> Plaintiff contends that regardless of whether the statements by Duran and
>> Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff,
>> under clearly established law a reasonable police officer would have
>> investigated his alibi witnesses before arresting him, and the exculpatory

information possessed by them would have negated the probable cause to arrest. We disagree.

45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest."  147 F.3d at 1257 n. 8.

. . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses.  Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J.  Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom.  Garcia only speculates that Casuas *might* have found something.  An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.  In Romero v. Fay, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him.  When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . .  Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . .  During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives.  The cases that Garcia cites establish only that the police may not ignore available material witnesses.  Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed.  Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . .  Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination,

because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview. Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49.

## LAW REGARDING THE FIFTH AMENDMENT TO
## THE CONSTITUTION OF THE UNITED STATES

The Fifth Amendment's self-incrimination clause states: "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Statements that a defendant makes during a law-enforcement officer's custodial interrogation are generally not admissible as evidence against that defendant if the declarant has not received the warnings that Miranda v. Arizona, 384 U.S. at 436, requires. See Dickerson v. United States, 530 U.S. 428, 444 (2000); United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008). Miranda v. Arizona's requirements, however, are limited. "Police officers need not administer Miranda warnings to everyone they question." United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008). Rather, "Miranda applies only to 'custodial interrogation[s].'" United States v. Jones, 523 F.3d at 1239 (quoting Miranda v. Arizona, 384 U.S. at 444).

In other words, "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Chee, 514 F.3d at 112 (quoting United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)). Any questioning by law-enforcement officers "reasonably likely to elicit an

incriminating response" constitutes an interrogation. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). See United States v. Medrano, 356 F. App'x 102, 107 (10th Cir. 2009)(unpublished); United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993). The "in custody" requirement is satisfied only when a suspect's "freedom of action is curtailed to the degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984)(quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). See United States v. Jones, 523 F.3d at 1239. Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. Rogers, 391 F.3d 1165, 1171 (10th Cir. 2004)(quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). In determining the custodial nature of an interrogation, the Court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'" United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted).

The Tenth Circuit, in recognizing that an examination of the circumstances' totality is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place. See United States v. Jones, 523 F.3d at 1240. Those factors include: (i) whether the suspect is informed that he or she may end the interview at will, or is not required to answer questions; (ii) whether the interview's nature is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect. See United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)). Several factors indicate police domination of the encounter: (i) separating the suspect from others who could lend moral support; (ii) isolating the

suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory. See United States v. Jones, 523 F.3d at 1240. The Tenth Circuit has been deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole rather than exclusively relying on some enumerated factors while ignoring others. See United States v. Jones, 523 F.3d at 1240.

## ANALYSIS

The Court denies the Motion. Harvey lawfully stopped Young, because the circumstances' totality suggests that Young might be involved in a crime. Moreover, the circumstances justify the length and manner of Harvey's detention, because it was reasonable for Harvey to detain Young long enough to determine whether he has outstanding warrants or is a felon. The Court also concludes that it will not suppress Young's post-arrest statements notwithstanding Harvey's failure to Mirandize Young, because Harvey did not interrogate Young. Finally, the Court concludes that Harvey was authorized to operate throughout Bernalillo County, but, even if he was not so authorized, the arrest did not violate Young's Fourth Amendment rights. Accordingly, the Court denies the Motion.

## I.     HARVEY HAD REASONABLE SUSPICION TO STOP YOUNG.

The Court first determines that Harvey had reasonable suspicion that Young may have committed a crime, because Harvey spotted Young carrying what Harvey suspected was a firearm and acting strangely in an area of Bernalillo County known for criminal activity. Second, Harvey detained Young, because a reasonable person in Young's position would not have felt free to leave. Third, it was reasonable for Harvey to detain Young long enough to

determine whether he had a criminal record, because Young's actions suggested to Harvey that Young may be a felon in possession of a firearm.

### A.    HARVEY CONDUCTED AN INVESTIGATIVE STOP ON YOUNG.

Harvey's encounter with Young stopped being a consensual encounter when he took the pocketknife and said to Young:  "Let me just hold onto that for a second while we check everything out.  And just hang out tight right here, okay?"  Harvey Tr. at 2:18 21 (Harvey); Lapel Video 1, at 01:01 01:03 (Harvey).  "Consensual encounters between police and citizens are not considered 'seizures' within the meaning of the Fourth Amendment and consequently do not require any suspicion of criminal wrongdoing."  United States v. Villagrana-Flores, 467 F.3d 1269, 1273 (10th Cir. 2006).  Law enforcement officers who merely approach individuals and pose questions to them do not implicate the Fourth Amendment if the individuals are willing to listen and voluntarily answer.  See United States v. Drayton, 536 U.S. 194, 200 (2002); Florida v. Royer, 460 U.S. 491, 497 (1983)(plurality opinion).  Accordingly, "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized."  United States v. Ojeda–Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. at 201).  See California v. Hodari D., 499 U.S. 621, 627-28 (1991)("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))).

A reasonable person in Young's position would not feel free to terminate the encounter and leave once Harvey took Young's pocketknife and told him to stay put.  Harvey and Smith meet Young in the desert, and tell Young that they are "just going to check this out real quick."  Harvey Tr. at 2:12 14 (Harvey).  See supra FOF ¶ 43, at 9.  Harvey asks whether Young has any

weapons on him that Harvey "should know about."  Harvey Tr. at 2:12 14 (Harvey); FOF ¶ 45, at 9.  Young takes a pocketknife out of his pants pocket and displays it for Harvey.  See Lapel Video 1, at 00:57 01:01 (Harvey, Young); Harvey Tr. at 2:16 17 (Harvey, Young); FOF ¶ 45, at 9.  Harvey considers the pocketknife for a moment and says, "[l]et me just hold onto that for a second while we check everything out.  And just hang out tight right here, okay?"  Harvey Tr. at 2:18 21 (Harvey); Lapel Video 1, at 01:01 01:03; FOF ¶ 46, at 9.  Harvey then walks away, leaving Young with Smith.  See Lapel Video 1, at 01:02-01:25.  At this point, Young has no reason to think he can terminate this encounter and leave.  First, Harvey has his pocketknife.  Young could not have reasonably believed he could have simply asked for it back, because Harvey had commanded that Young give it to him and also indicated that he would not return it until after he had surveyed the scene.  Second, Harvey commanded Young to "hang out tight right there" before leaving Young waiting with Smith.  Harvey Tr. at 2:18 21 (Harvey); Lapel Video 1, at 01:01 01:03; FOF ¶ 46, at 9.  In other words, Harvey expressed concern about weapons, took Young's pocketknife, indicated to Young that he would not return the knife until after he had took a look, and ordered Young to stay next to another police officer.  There is nothing about those facts that could lead Young to believe he could simply bid adieu to Smith, ask for his pocketknife, get in his pickup truck, and drive away.

        In his testimony, Harvey equivocated whether Young was free to leave before his formal. See Tr. at 77:19-78:25 (Knoblauch, Harvey).  When Young cross-examined Harvey, he asked Harvey if he -- Young -- was free to leave after Harvey took his pocketknife, and Harvey answered: "No."  Tr. at 77:19-21 (Knoblauch, Harvey).  Harvey later stated:

> I was trying to run that plate as fast as I could and try to figure out who he was, to see if he was a felon. . . .  At that point, if he would have told me, . . . I don't want to talk to you, and I want to leave, then I probably would have let him go.

Tr. at 77:19-78:25 (Knoblauch, Harvey). The United States echoed this position later in the hearing. See Tr. at 104:10-23 (Spiers)(stating that Harvey "detain[ed] the Defendant so they could investigate," but that, if Young "had resisted and decided he didn't want to have any part of it, was going to leave, they would have probably let him go"). Whether Harvey and Smith would have permitted Young to leave if Young had tried is immaterial to the Court's Fourth Amendment analysis. The question here is whether a reasonable person in Young's position would have felt free to leave and not whether he could have left. See United States v. Ojeda–Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006). A reasonable person would not feel free to leave the encounter with Smith and Harvey once Harvey took his pocketknife and told him to stay.

### B. HARVEY HAD REASONABLE SUSPICION TO STOP YOUNG.

The Fourth Amendment protects individuals from unreasonable searches and seizures, including unreasonable investigatory stops or detentions. See United States v. McHugh, 639 F.3d 1250, 1255 (10th Cir. 2011)(citing United States v. Simpson, 609 F.3d 1140, 1146 (10th Cir.2010)). "A detention is justified at its inception if "the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." United States v. DeJear, 552 F.3d 1196, 1200 (10th Cir. 2009)(citing United States v. Werking, 915 F.2d 1404, 1407 (10th Cir.1990)).

Before analyzing whether Harvey had reasonable suspicion when he first spotted Young, it is worth reviewing how low the reasonable suspicion bar is. See United States v. Simpson, 609 F.3d 1140, 1153 (10th Cir. 2010)("Reasonable suspicion is not, and is not meant to be, an onerous standard."). As a general matter, for reasonable suspicion, a police officer "simply must possess 'some minimal level of objective justification' for making the stop," United States v.

Winder, 557 F.3d at 1134 (quoting United States v. Vercher, 358 F.3d at 1261), even when that information "fall[s] 'considerably short' of a preponderance standard," United States v. Winder, 557 F.3d at 1134.  In other words, there may be reasonable suspicion "even if it is more likely than not that the individual is *not* involved in any illegality." United States v. Johnson, 364 F.3d at 1194 (emphasis in original).

Reasonable suspicion does not require that the police officer suspect an individual of being involved in a particular crime.  See Terry v. Ohio, 392 U.S. at 30 (stating that reasonable suspicion requires the police officer to conclude "that criminal activity may be afoot"); Oliver v. Woods, 209 F.3d at 1186 (stating that, for reasonable suspicion, a police officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity"); United States v. Pack, 612 F.3d 341, 356 (5th Cir. 2010)("Requiring police to have particularized facts that support a finding that 'criminal activity may be afoot' is different from requiring the police to articulate particularized facts that support a finding that a particular specific crime is afoot.").  A police officer can have reasonable suspicion even if the individual's observed actions are legal and might have an innocent explanation.  See United States v. Winder, 557 F.3d at 1134 ("For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'" (quoting United States v. Vercher, 358 F.3d at 1261)).

The Court summarizes the factors and circumstances relevant to its determination whether Harvey had reasonable suspicion upon seeing Young.  Harvey was out on the West Mesa, which, in his experience, is a place known for criminal activity, e.g., as a place where people abandon stolen cars or distribute drugs.  See FOF ¶ 4, at 4.  Harvey is also aware of the West Mesa murders -- he was the detective on the case -- and encountered Young near the West Mesa burial site.  See FOF ¶¶ 14-17, at 6.  Harvey saw, through his binoculars, a red pickup

truck with its driver's side door open, which, to Harvey, was a sign that the pickup truck might have been stolen.  See FOF ¶ 25, at 7.  Harvey then saw Young emerge from an abandoned cattle water tank.  See FOF ¶ 29, at 7.  Young was shirtless.  See FOF ¶ 30, at 7.  It was November and the temperature was in the 60s.  See FOF ¶ 22, at 7.  Harvey saw Young carrying a dark object, which he placed in the bed of the pickup truck.  See FOF ¶ 37, at 8.  Harvey thought that the dark object was a firearm in a holster.  See FOF ¶ 36, at 8.  Young's torso was covered in tattoos, which Harvey thought were "prison tattoos," because they were all blueish monochrome, and, in Harvey's experience, prison tattoos are not colorful.  See FOF ¶ 32, at 8.

These facts and Harvey's inferences establish reasonable suspicion justifying detaining Young.  First, that the encounter happened on the West Mesa weighs towards reasonable suspicion.  The "nature of the area in which a detention takes place is a relevant consideration" in the reasonable suspicion analysis.  United States v. Johnson, 364 F.3d at 1193 (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)).  Thus, in United States v. Johnson, the Tenth Circuit approved of the district court's determination that the police encounter's setting -- a neighborhood in Albuquerque with a reputation for violent crime -- factored into its reasonable suspicion analysis.  See United States v. Johnson, 364 F.3d at 1193.  See also United States v. Aragones, 483 F. App'x at 417 (concluding that a police officer had reasonable suspicion to detain a person in part because of his "presence in a high crime area").  Of course, an area's nature cannot alone justify a stop of anyone who is in it.  See Illinois v. Wardlow, 528 U.S. 119, 124 (2000)("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a

crime." (citing <u>Brown v. Texas</u>, 443 U.S. 47 (1979)).[9] Although people may use the West Mesa

for recreational activities, as Young asserts, <u>see</u> Tr. at 3:4-6 (Knoblauch), there is no doubt that

the West Mesa bears the reputation as a place where a police officer patrolling the area should be

on alert for criminal activity. Harvey's experience with the West Mesa's criminal side is

particularly strong. He was the lead officer on the West Mesa Murders. <u>See</u> FOF 17, at 6.

When Harvey spotted Young, he was within a half mile of the West Mesa Murder burial site.

<u>See</u> Tr. at 22:4-16 (Spiers, Harvey); FOF 21, at 7. Harvey has personally recovered scores of

stolen vehicles left on the West Mesa. <u>See</u> FOF 18, at 6. He also personally discovered a drug

drop site on the West Mesa. <u>See</u> FOF 4, at 4, Tr. at 36:17-37:16 (Harvey). There may be plenty

of innocent uses for the West Mesa, but its criminal reputation is not undeserved. It is thus

reasonable that activity on the West Mesa is more likely to indicate that criminal activity is afoot

than those same actions elsewhere.

The pickup truck with its driver's side door open weighs towards reasonable suspicion.

Harvey stated that, based on his experience recovering stolen vehicles abandoned on the West

Mesa, he looks for vehicles with their doors open, with their hoods up, with their wheels

removed, that are burnt, or that have people standing nearby. <u>See</u> FOF ¶ 19, at 6; Tr. at 26:13-19

(Harvey). Here, he spotted a red pickup truck next to an abandoned water tank with its driver's

side door open; soon after spotting the pickup truck, he saw Young emerge from the water tank

and drop a black object in the truck's bed. <u>See</u> FOF ¶¶ 29, 36-37, at 7-8. To be sure, there is

nothing illegal about parking a pickup truck on a mesa and leaving the driver's side door open.

---

[9]Although the neighborhood cannot be the sole factor establishing reasonable suspicion, it is worth underscoring this factor's practical effect: an individual faces a greater risk of lawful detention merely for being in a certain neighborhood, regardless of that individual's actions.

As the Court notes above, that observed actions are lawful is no bar to a police officer's reasonable suspicion determination, and a police officer need not eliminate an innocent explanation before lawfully detaining someone.  See United States v. Winder, 557 F.3d 1129, 1134.  Had Harvey spotted this empty pickup truck with its door ajar parked in a residential driveway, the situation might not raise any eyebrows; parked out on the West Mesa --- a place known as a stolen vehicle repository -- next to an abandoned water tank, with no obvious purpose for being there, a police officer may reasonably wonder what the story is.

Harvey spotting Young carrying what looked like a firearm weighs towards reasonable suspicion.  The Court cautions that merely possessing a firearm may not, by itself, be enough to support reasonable suspicion.  Courts in the Tenth Circuit have found no reasonable suspicion on several occasions where the individual's only notable behavior was carrying a weapon.  In Stoedter v. Gates, 704 F. App'x 748, 750 (10th Cir. 2017)(Moritz, J.), for instance, police in Utah received a call that man had taken a shotgun from the truck of his car into a house.  See Stoedter v. Gates, 704 F. App'x at 750.  Police officers arrived at the scene and found two men on the house's porch, one of whom -- Robert Stoedter -- matched the caller's description of the man with the shotgun.  See 704 F. App'x at 750.  Although both men looked relaxed, the police officers drew their weapons and detained the men.  See 704 F. App'x at 750.  The Tenth Circuit concluded that -- given that carrying a shotgun is not illegal in Utah and the men were not acting suspiciously -- "no reasonable officer could have believed that 'reasonable and articulable suspicion' existed to support seizing Stoedter."  704 F. App'x at 756 (quoting Vondrak v. City of Las Cruces, 535 F.3d 1198, 1203 (10th Cir. 2008)).

Similarly, in St. John v. McColley, a movie theater manager in Alamogordo, New Mexico, called the police, explaining that his customers were upset that one moviegoer was

wearing a holstered handgun, and asked that the police remove the man.  See St. John v.

McColley, 653 F. Supp. 2d 1155, 1158 (D.N.M. 2009)(Black, J.).  The police officers removed

the man from the theater, restrained and searched him, and finally let him return to the film once

he left the handgun in his truck.  See 653 F. Supp. 2d at 1158.  The Honorable Bruce D. Black,

United States District Judge for the District of New Mexico, concluded that the police officers

did not have reasonable suspicion to detain the man:

> Defendants had no reason for seizing Mr. St. John other than the fact that he was
> lawfully carrying a weapon in a public place.  Because New Mexico law allows
> individuals to openly carry weapons in public -- and Mr. St. John had done
> nothing to arouse suspicion, create tumult or endanger anyone's well-
> being -- there were no articulable facts to indicate either criminal activity or a
> threat to safety.

653 F. Supp. 2d at 1162-63.  Judge Black added that, "[c]andidly, . . . one would expect someone

engaged in shady business to act in a more stealthy fashion than Mr. St. John did here."  653 F.

Supp. 2d at 1161 (citing Duran v. City of Douglas, Arizona, 904 F.2d 1372, 1377 (9th Cir.

1990)).  United States v. White, No. 16-CR-10050-JTM, 2016 WL 6037621, at *3 (D. Kan. Oct.

14, 2016)(Marten, J.)(concluding that a police officer "had no articulable reasonable suspicion

that defendant" -- who, while in a store, had a firearm tucked into his waist band -- "had or was

committing a crime").

By contrast, in United States v. Rodriguez, 739 F.3d 481 (10th Cir. 2013), the Tenth

Circuit affirmed the Court's decision that an APD officer had reasonable suspicion that a

convenience store employee was unlawfully carrying a concealed loaded firearm, because he

saw a firearm tucked into the employee's pants when the employee bent over to stock shelves.

See 739 F.3d at 488, affirming United States v. Rodriguez, 836 F. Supp. 2d 1258, 1285 (D.N.M.

2011)(Browning, J.).  The Tenth Circuit stated that, although the police officer did not know

whether the firearm was loaded, it was reasonable for him to suspect that it was loaded "rather than waiting to find out," because a basic rule of gun safety is to assume every firearm is loaded, and because it is logical that a concealed firearm would be loaded, see United States v. Rodriguez, 739 F.3d at 488. "The principal purpose of carrying a concealed handgun is to assail another or defend oneself. An unloaded firearm serves neither of these purposes well, making the fact that Defendant's handgun was loaded a distinct possibility." United States v. Rodriguez, 739 F.3d at 488. The Tenth Circuit added that, although the officer "could have sought to engage Defendant in a consensual encounter, the law did not require him to do so." 739 F.3d at 488. The Tenth Circuit reasoned that, "[g]iven the confined space in which the parties found themselves at the outset of their encounter," the officer "exercised sound judgment in declining to question Defendant before detaining him." 739 F.3d at 489. The defendant argued that permitting police officers to detain anyone with a concealed firearm is analogous to stopping any motor vehicle to check if the driver has a license and a right to drive the vehicle -- an indiscriminate search that the Supreme Court has determined violates a driver's Fourth Amendment rights. See United States v. Rodriguez, 739 F.3d at 490 (citing Delaware v. Prouse, 440 U.S. 648, 650 (1979)). The Tenth Circuit disagreed with the defendant's argument:

> Driving a car, however, is not like carrying a concealed handgun. Driving a vehicle is an open activity; concealing a handgun is a clandestine act. Because by definition an officer cannot see a properly concealed handgun, he cannot randomly stop those individuals carrying such weapon. Officer Munoz responded to a dispatch reporting two employees of the convenience store were showing each other handguns. Once at the store, he witnessed Defendant carrying the concealed weapon only because Defendant was bending over and his shirt was untucked. Moreover, unlike the random stop of a motorist, we may safely assume the contribution to public safety made by the stop of an individual known to be carrying a concealed handgun will hardly be insignificant since "[c]oncealed weapons create an immediate and severe danger to the public." *Terry*, 392 U.S. at 31 . . . . (Harlan, J., concurring).

United States v. Rodriguez, 739 F.3d at 490.  See United States v. Hartz, No. 17-40067-01-DDC, 2017 WL 6387613, at *3 (D. Kan. Dec. 14, 2017)(Crabtree, J.)(concluding that police officers had reasonable suspicion that criminal activity was afoot justifying the detention of two men, because one man "brandished a weapon, spoke loudly at the officers, and fled the scene," and the other man "appeared to be traveling and communicating with" the man with the firearm).

Although Young did not brandish a firearm or act in a way that suggested he was dangerous, the facts of this case are distinguishable from St. John v. McColley, Stoedter v. Gates, and United States v. White.  In those cases, the men with the firearms did nothing out of the ordinary besides carry a firearm in a way that the law allows.  Here, Young was in a place where criminal activity is known to occur; once he saw the police officers, he dropped the firearm in the pickup truck bed and walked away from it, leading Harvey to wonder whether Young was trying to distance himself from the firearm or anything else in the pickup truck.  See FOF ¶¶ at 36-38, at 8.  Although Young was not carrying a concealed firearm, this case has in common with United States v. Rodriguez a defendant who was carrying a firearm under circumstances that raises a reasonable possibility that his possession of that firearm is not lawful.

The Court recognizes that the reasonable suspicion analysis requires considering the totality of the circumstances and not looking at each factor in isolation.  See United States v. Johnson, 364 F.3d at 1189.  Although no single factor is determinative in this case, looking at the big picture, Harvey had reasonable suspicion that Young might be engaged in criminal activity.  Young was on the West Mesa, an area known for criminal activity.  The pickup truck was parked on the West Mesa in a location with no clear purpose and one door left open, which is consistent with a stolen vehicle.  Young emerged from a hidden location -- an abandoned water tank -- with no clear purpose for being in there.  He was carrying what Harvey thought might be a firearm,

which he dropped in the pickup truck once he saw the police officers and walked away from the truck. Given all these factors, Harvey had reasonable suspicion that Young might be engaged in criminal activity sufficient to justify detaining Young and investigating the scene.[10]

### C. YOUNG'S DETENTION WAS REASONABLY RELATED TO THE CIRCUMSTANCES JUSTIFYING THE STOP.

Having determined that Harvey had reasonable suspicion to detain Young, the Court moves to whether the following detention was reasonable. An investigative detention must be "reasonably related in scope to the circumstances" that justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1229 (10th Cir. 2001)(en banc), overruled on other grounds as recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007). For instance, a detention ceases to be reasonably

---

[10]That Young was shirtless and tattooed does factor slightly into the Court's reasonable suspicion analysis. First, Harvey spotted Young when the temperature was in the sixties. See FOF ¶¶ 22-23, at 7. Walking around shirtless when it is chilly out is not directly associated with any criminal activity, but it is strange enough behavior to raise trained and experienced law enforcement's eyebrows out on the West Mesa. Second, there is some reason that Young's tattoos should create reasonable suspicion that he is a felon. Courts should permit police officers to rely on their experience and training when making reasonable suspicion determinations. See United States v. Johnson 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details."). The United States has provided some cause for the Court to defer to Harvey on this matter. Harvey suspected that Young may have gotten his tattoos in prison, because they appeared homemade and were monochrome blue. See FOF ¶¶ 32-34, at 8. Harvey bases this assessment on his general, anecdotal experience that his colleagues' tattoos tend to feature multiple colors, and his presumption that multiple colored tattoo ink are not plentiful in prison. See FOF ¶ 34, at 8; Tr. at 40:14-19 (Harvey). These generalized explanations say that Young looked like a guy who had served time. For there to be particular and articulable facts to support reasonable suspicion, Harvey does not have to have actual extensive experience with prison tattoo aesthetics or actually recognize a symbol associated with prison life or gang affiliation. Cf. e.g., United States v. Aragones, 483 F. App'x at 416 (factoring into the reasonable suspicion calculation that the police officer noticed the individual had a neck tattoo that was "consistent with gang affiliation").

related to the circumstances once police officers eliminate the suspected criminal activity justifying the stop, such as when police officers continue to detain a driver at a sobriety checkpoint even after determining that he was not intoxicated. See Gross v. Pirtle, 245 F.3d 1151, 1157 (10th Cir. 2001). See also United States v. McSwain, 29 F.3d 558, 561-62 (10th Cir. 1994)(reasoning that officer exceeded the scope of the traffic stop's underlying justification when he questioned defendant about his vehicle and travel itinerary, and requested to see his license and registration after ensuring the validity of the vehicle's temporary registration sticker). A detention is not reasonably related to the circumstances if the individual is detained in a manner whose severity exceeds needs justifying the stop. For instance, handcuffing or drawing weapons on an individual who is detained -- but not yet arrested -- may be unlawful if the circumstances do not warrant concern that the individual may flee or pose danger to the police officer. See United States v. Perdue, 8 F.3d at 1458, 1463–64 (holding that the officers acted reasonably when they executed a Terry stop with their weapons drawn where weapons had been discovered on the property); United States v. Melendez–Garcia, 28 F.3d at 1052-53 (observing that "there was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop").

Here, Harvey and Smith detained Young for "[m]aybe thirty-five [or] forty" minutes. Tr. at 76:19-23 (Spiers, Harvey). During that entire time, Young was standing next to Smith. See FOF ¶¶ 47, 60, at 9, 11. Harvey first inspected the water tank, peeked into the pickup truck bed, spoke a bit with Young, and spent the rest of the time in his squad car making calls checking on Young's criminal history. See FOF ¶¶ 61-68, at 11-12. The detention's circumstances were reasonably related to the justification for the stop. First, neither Harvey nor Smith physically

restrained Young during the detention, nor did they draw their weapons, neither of which would have been appropriate, given that they did not have reason to suspect that Young had a weapon on him, was dangerous, or a flight risk. Second, the detention's length was not excessive given the circumstances. The important question is whether, after Harvey spoke with Young and checked out the water tank, there continued to be reasonable suspicion to justify detaining Young for the thirty or so minutes Harvey needed to go to his squad car and get his questions answered about Young's criminal history.

There is no question that Harvey could maintain the stop long enough to get Young's identity and check for outstanding warrants, because, as a general rule, police officers may check to see whether a detainee is a wanted person, irrespective of circumstances of that detention. See United States v. Burleson, 657 F.3d 1040, 1051 (10th Cir. 2011)(concluding that a police officer "was justified in performing a warrants check even in the absence of objective safety concerns because he was entitled to determine whether any of the detainees were evading justice"); United States v. Villagrana-Flores, 467 F.3d 1269, 1275 (10th Cir. 2006)(holding that a police officer does not violate the Fourth Amendment during a Terry stop by checking a detainee for warrants). A more substantive question is whether Harvey violated Young's Fourth Amendment rights by continuing to detain him long enough to check whether he was a felon. The Court concludes that the circumstances justified Harvey's check into whether Young was a felon.[11] Although firearm

---

[11]At the hearing, Young asked Harvey whether he knew that certain felony convictions will not deprive a person's right to possesses a firearm, and Harvey answered that he was "not real familiar with all those." Tr. at 81:9-13 (Knoblauch, Harvey). To the extent that Young contends that Harvey lacked reasonable suspicion that Young was a felon in possession of a firearm, because certain felony convictions do not implicate a person's right to carry a firearm, the argument is unpersuasive. To be sure, 18 U.S.C. § 922(g)(1) -- which makes it a crime for anyone "who has been convicted . . . of . . . a crime punishable by imprisonment for a term

possession is not necessarily illegal, Young gave Harvey reason to wonder whether Young might be guilty of being a felon in possession of a firearm. To reach this conclusion, the Court is slightly swayed by Harvey's contentions to the Court that he suspected that Young's tattoos had a prison provenance, see FOF ¶ 32, at 8, and by his assertions, captured in the lapel video, that he "guess[es]" that Young is a felon and that "[h]e's covered in tats like he is." Harvey Tr. at 7:1-3 (Sanchez, Harvey). The important factors here are that Harvey saw a tattooed man holding a firearm, and that Harvey saw a man drop a firearm into a cluttered pickup truck bed and walk away from the truck moments after spotting the police officers. See FOF ¶¶ 36-37, at 8. Harvey could reasonably wonder whether Young had a particular reason to want to not be caught by the police with a firearm. Harvey's search into Young's criminal history, therefore, was a reasonable check in light of Young's actions and behavior.

## II. THE COURT WILL NOT SUPPRESS YOUNG'S POST-ARREST STATEMENTS, BECAUSE THEY WERE NEITHER INCRIMINATORY NOR THE RESULT OF INTERROGATION.

Young asks the Court to suppress all statements that he made after his arrest, because neither Harvey nor Smith Mirandized him. See Motion at 12-14. The United States concedes that Harvey did not Mirandize Young before their conversation. See FOF ¶ 80, at 13 (admitting that he did not Mirandize Young). Nonetheless, the United States contends that Harvey's post-arrest statements are admissible, because he did not make his statements "as a result of law enforcement interrogation." Response at 12. According to the United States, Miranda warnings

---

exceeding one year" to possess a firearm excludes certain crimes -- does not apply to people whose felony convictions "pertain[] to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices," 18 U.S.C. § 921(a)(20)(A). The possibility that a someone's felony conviction might one of the few felonies not qualifying for the being a felon in possession of a firearm crime is too insignificant to vitiate a police officer's otherwise valid reasonable suspicion.

are necessary only before an interrogation, and, furthermore, Harvey was not interrogating Young on their walk to the police car.[12] See Response at 12. At the hearing, the United States notes the "conversational nature" of their verbal exchange. Tr. at 110:17-18 (Spiers).

"Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Chee, 514 F.3d at 112 (quoting United States v. Perdue, 8 F.3d at 1463). Any questioning by law-enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation. Rhode Island v. Innis, 446 U.S. at 301. See United States v. Medrano, 356 F. App'x at 107; United States v. Parra, 2 F.3d at 1068.

Young was in custody. Harvey placed Young in handcuffs, told Young that he was under arrest, and was walking Young to a police car. See FOF ¶¶ 74-75, at 12; Tr. at 106:23-107:6 (Court, Spiers)(stating that formal arrest happened when Harvey put Young in handcuffs). The next question is whether Young made any incriminating statements in response to a question reasonably likely to elicit an incriminating response. Casual conversations with a law enforcement officer, however, may not be an interrogation even when the defendant is in the officer's custody. For instance, in United States v. Ochoa-Zaragoza, 2000 WL 192842 (10th Cir. 2000)(table), the Tenth Circuit stated that a United States Deputy Marshal did not conduct an

---

[12]There is some confusion about what Young said. At the hearing, the parties recognized that one of the videos and its corresponding transcript that the United States entered into evidence does not involve Young and is unrelated to this case. See Tr. at 5:20-6:7 (Knoblauch); Tr. at 54:1-19 (Knoblauch, Court, Spiers)(agreeing that the conversation is irrelevant to this case and that the Court should ignore the Harvey Tr. after line 2 on page 20). Consequently, much of the United States' arguments in the Response are irrelevant as well, because the United States bases its arguments on that irrelevant conversation. See Response at 12 (summarizing the irrelevant conversation and arguing that the speaker made his statements voluntarily). The Court therefore considers the only video that captures Young speaking after his arrest, which is Lapel Video 3. See Harvey Tr. at 13:6-20:2.

impermissible interrogation outside the defendant's counsel's presence when he asked the defendant basic facts about his trial -- such as how long the trial would be and whether a jury had been picked -- while transporting him to the courthouse.  See United States v. Ochoa-Zaragoza, 2000 WL 192842 at *4 n.3 (citing United States v. Criswell, 696 F.2d 636, 639 (8th Cir. 1983) (determining that incriminating statements made during a casual conversation with law enforcement officers were not the product of interrogation); United States v. Hackley, 636 F.2d 493, 499-500 (D.C.Cir.1980)(same)).

Thus whether a statement is made in response to a question reasonably likely to elicit an incriminatory response is a fact specific inquiry.  The conversation reads in full:

YOUNG[13]: (Inaudible).

OFFICER HARVEY:  Yeah, we could do that.  It's going to be easier.

YOUNG: This way you got to drive all the way up and all the way back.

OFFICER HARVEY:  Yep.

YOUNG: (Inaudible).

OFFICER HARVEY:  Oh, do you? And you say you just live right down here?

YOUNG:  Yeah, right there on (inaudible).

OFFICER HARVEY: What's that?

YOUNG: I said I got time on (inaudible).

OFFICER HARVEY: So is mine. How did you drive in here?

YOUNG: Huh? Down the --

---

[13]As mentioned surpra, the Harvey Tr. indicates that Harvey had this conversation with Smith, but the Court is confident that Harvey is speaking with Young as he walked Young to a waiting police car.

OFFICER HARVEY:  That road?

YOUNG: -- (inaudible).

OFFICER HARVEY:  Oh, got you.

YOUNG:  It dead ends right there-

OFFICER HARVEY:  Yeah.

YOUNG: (Inaudible).

OFFICER HARVEY:  You know to make it which way?  The same way?  Have you been out here before?

OFFICER SMITH:  Yeah, I come about once a month.

OFFICER HARVEY:  Oh, got you.

YOUNG: (Inaudible).

OFFICER HARVEY: What's that?

YOUNG: (Inaudible) scrap cigarette money, really.

OFFICER HARVEY:  Oh, Yeah.

. . . .

OFFICER HARVEY:  Man, calves are burning. I just hiked I just hiked 14 miles the other day. We just did that South Peak. Yeah, we did search and rescue.

YOUNG: (Inaudible)?

OFFICER HARVEY:  Yep.  So we've been all- the way up to the crest of that two nights ago and then down the backside.

YOUNG: (Inaudible).

OFFICER HARVEY: What's that.

YOUNG: What are the trails that you guys went to?

OFFICER HARVEY: There's no road over there.  There's nothing over there.

YOUNG: (Inaudible).

OFFICER HARVEY:  No, we were looking for a guy-

YOUNG:  Oh no shit?

OFFICER HARVEY: On that trail, Yeah.

YOUNG: (Inaudible).

OFFICER HARVEY: (Inaudible). All right.

YOUNG: (Inaudible) left you behind, I guess, couldn't find him.  They left.

OFFICER HARVEY:  Uh-huh.

YOUNG:  There's two of them.

OFFICER HARVEY:  Oh, he's missing up there?

YOUNG:  Yeah, he didn't come back.

OFFICER HARVEY:  How long ago was that?

YOUNG: About maybe three weeks ago.

OFFICER HARVEY: And they still don't know where he's at, huh?  That's not good.

YOUNG: (Inaudible).

OFFICER HARVEY:  Yep.

YOUNG: (Inaudible) Santa Fe, Vegas.

OFFICER HARVEY: (Inaudible).

YOUNG: (Inaudible).

Harvey Tr. at 6:13-16:2 (Harvey, Young).

Harvey did not interrogate Young during this exchange, because Harvey did not ask

Young any questions reasonably likely to elicit an incriminating response.  The only substantive

question that Harvey poses is whether Young had ever previously been out to the West Mesa

before. <u>See</u> Harvey Tr. at 14:4-5 (Harvey). The Court cannot say whether this question is

reasonably likely to elicit an incriminatory response, because the Court does not see how

Young's previous West Mesa experience might be incriminating. Neither party addressed that

topic's materiality to the case. The Court therefore denies Young's request to suppress all his

post-arrest statements.[14]

## III. HARVEY WAS AUTHORIZED TO ARREST YOUNG, BUT, EVEN IF HE WERE NOT AUTHORIZED TO OPERATE IN BERNALILLO COUNTY, THE ARREST WOULD NOT HAVE VIOLATED YOUNG'S FOURTH AMENDMENT RIGHTS.

Young argues that Harvey did not have authority to arrest Young, because Harvey -- an

APD officer -- arrested Young outside of the City of Albuquerque. <u>See</u> Motion at 4. Young

essentially argues that, although Bowdich commissioned Harvey and Smith in 2000, there is no

evidence that Sheriff Gonzales recommissioned Harvey and Smith before they arrested Young.

Reply at 4. According to Young, because BCSO's Office Rules and Regulations require sworn

personnel to renew their commission when a new Sheriff assumes office, the United States

---

[14]The Court's decision to deny Young's post-arrest statement suppression request is limited to the statements that Young made in the conversation with Harvey excerpted above. Although Young, in his Motion, contends that, during the ride in custody from the West Mesa to the police station, Brown did not Mirandize Young and also "continued to talk to Mr. Young" during which time "potentially inculpatory information was elicited from him." Motion at 5. The Court cannot determine whether those statements should be suppressed for failure to Mirandize, because the Court has no evidence of that exchange. Thus the Court does not know what, if anything, Young told Brown, nor can the Court determine whether Brown interrogated Young. Given that Young bears the burden of proof to show that the Court should suppress the evidence, <u>see</u> <u>United States v. Torres-Castro</u>, 470 F.3d 992, 999 (10th Cir. 2006)("The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment, and a causal nexus between the violation and the evidence sought to be excluded."), the Court will deny the Motion consistent with <u>Brown v. Illinois</u>, 422 U.S. 590 (1975).

would need to show that Gonzales, who succeeded Bowdich, commissioned Harvey and Smith before they arrested Young.  See Reply at 4-5.  Although the United States moved into evidence Harvey's current Special Deputy Commission Card, which Gonzales signed and has an expiration date of December 31, 2018, see Special Deputy Commission Card at 1-2, Young argues that the card proves nothing, because it does not indicate when it was issued, see Tr. at 24:25-25:3 (Knoblauch)(objecting to the Special Deputy Commission Card's entry into evidence because it does not indicate when it was issued).

The Court concludes that Harvey was commissioned to make arrests in Bernalillo County when he arrested Young.  First, Harvey testified that the BSCO issued his current Special Deputy Commission card "shortly" after Gonzales came into office.  Tr. at 24:18-21 (Spiers, Harvey). Gonzales was elected Sheriff in November, 2014, see FOF ¶ 13, at 14, and Harvey arrested Young in November, 2016, see FOF ¶¶ 20, 74, at 13.  Second, Sheriff Gonzales himself, in his Letter, indicates that, although Commissioned police officers get new Special Deputy Commission Cards each time there is a new Sheriff, those Special Deputy Commissions "have been perpetual and reoccurring."  Letter at 1.  Gonzales also states that Harvey took his "Oath of Office as a Special Deputy on December 11, 2000" and "has retained his arrest authority in Bernalillo County through his continued employment with the Albuquerque Police Department." Letter at 1.  Gonzales' Letter indicates that Harvey's arrest authority in Bernalillo County never lapsed since it began in 2000 and that the Special Deputy Commission Card's status is not the determinative factor.  Thus, even if the evidence showed that Harvey did not get his new Special Deputy Commission Card with Gonzales' signature on it until after he arrested Young, he still had authority to operate in Bernalillo County.  The Bernalillo County Sheriff's Department Rules and Regulations do not indicate otherwise: it states that "[s]worn personnel will renew

their identification/commission cards" in certain situations, such as when there has been "an official change of administration." BCSO's Rules and Regulations § 206-5(B)(1), at 1. That language suggests merely that Commissioned officers must get new cards; it does not suggest that a change of administration renders all previous Commissions null, or that Commissioned officers must re-take their Oath of Office.[15]

Even if Harvey was not authorized to operate on the West Mesa, detaining and arresting Young would not violate his Fourth Amendment rights. To be sure, the Tenth Circuit has determined that a police officer arresting someone outside his or her jurisdiction can violate the Fourth Amendment. In Ross v. Neff, a Sheriff Deputy in Oklahoma arrested a Cherokee man in an area "subject to exclusive federal or tribal criminal jurisdiction." Ross v. Neff, 905 F.2d 1349, 1352 (10th Cir. 1990)("Ross"). The Tenth Circuit concluded that the arresting Deputy violated the man's Fourth Amendment rights, explaining:

> We have implied that an arrest made outside of the arresting officer's jurisdiction violates the Fourth Amendment to the Constitution and is therefore actionable pursuant to 42 U.S.C. § 1983 under the appropriate circumstances. *Smith v. City of Oklahoma City,* 696 F.2d 784 (10th Cir.1983). We now so hold expressly. A warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause.

Ross, 905 F.2d at 1353-54 (footnote omitted). In the years since the Tenth Circuit decided Ross, the Tenth Circuit has reined in that broad declaration, concluding on several occasions that out-of-jurisdiction searches or arrests are not Fourth Amendment violations. See, e.g., United States v. Jones, 701 F.3d 1300, 1312 (10th Cir. 2012); Swanson v. Town of Mountain View, 577 F.3d

---

[15]Section 206-5 also states that sworn personal "will renew their identification/commission cards . . . [w]hen lost, stolen, unserviceable, or when a change of name occurs." BCSO's Rules and Regulations § 206-5(B)(3), at 1. The Court does not think a Commissioned Officer's authority lapses if his or her Special Deputy Commission Card is misplaced.

1196, 1201–03 (10th Cir. 2009)("Swanson"); United States v. Gonzales, 535 F.3d 1174, 1182

(10th Cir. 2008)("Gonzales"); United States v. Sawyer, 441 F.3d 890, 895 (10th Cir. 2006)

("Sawyer"); United States v. Mikulski, 317 F.3d 1228, 1232 (10th Cir.2003)("Mikulski").  The

Tenth Circuit explained:

> In *Mikulski,* "we held a Utah detective did not violate the Fourth
> Amendment when making a warrantless arrest outside his home jurisdiction, but
> within another political subdivision of the state."  *Swanson,* 577 F.3d at 1202.  "In
> reaching this conclusion, we emphasized that state law allowed peace officers
> (with authorization) to act within neighboring political subdivisions, whereas in
> *Ross,* under no circumstances would the officer have had authority to act on tribal
> lands."  *Id.* . . . .

> Furthermore, in *Gonzales,* "we held that an extra-jurisdictional traffic stop
> [by officers in another municipality of the same state] based on an observed traffic
> violation does not constitute a Fourth Amendment violation, despite the fact that
> the stop violated state law."  *Swanson,* 577 F.3d at 1202. Among other things, we
> reasoned that "the arrest in *Ross* took place on federal tribal land, and not within a
> political subdivision, i.e., a municipality, of the same state."  *Id.* at 1203 (internal
> quotation marks omitted).

> Finally, we have indicated that even when the police officers' extra-
> jurisdictional conduct occurs in *another state* (as opposed to another political
> subdivision of the same state), at least in certain contexts, the officers lack of
> authority will be of no or little import in the Fourth Amendment analysis.  *See
> Sawyer,* 441 F.3d at 895–98.  Specifically, in *Sawyer,* we assessed and ultimately
> upheld the Fourth Amendment validity of a consent to search that Kansas officers
> obtained while conducting an investigation in Oklahoma.  *See id.* at 895.  We
> stated that "[t]he federal test for determining the validity of consent to search does
> not require a district court to consider whether a law enforcement officer has
> authority under state law to request consent."  *Id.*  More specifically, we observed
> that "[t]he federal totality of circumstances test does not require an analysis of the
> legal parameters of the Kansas Officers' jurisdictional authority under state law."
> *Id.*  Like Mr. Jones, the defendant in *Sawyer* relied on *Ross.* In distinguishing *Ross,*
> we concluded:  "Although we agree that Oklahoma's interest in monitoring law
> enforcement personnel within its boundaries is strong, that interest is not sufficient
> to elevate this state law violation to a federal constitutional violation."  *Id.* at 898.
> At the end, "we decline[d] to extend *Ross* to the facts of th[at] case." *Id.*

United States v. Jones, 701 F.3d at 1311 (alterations in original).  The Tenth Circuit clarified that

Ross remains good law, but that "post-*Ross* decisions strongly suggest that *Ross* travels no

further than the unique factual circumstances that spawned it: that is, a warrantless arrest by state police on federal tribal land." United States v. Jones, 701 F.3d at 1312. This case does not involve a warrantless arrest by state police on federal tribal land. Therefore, even if Harvey was not authorized to operate in Bernalillo County, his arrest of Young would not violate Young's Fourth Amendment rights.

Young argues that Harvey's arrest implicates the Fourth Amendment because the APD receives federal grants. See Motion at 6. According to Young, this federal ingredient distinguishes this case from Mikulski, because, in Young's view, the APD bore an "indicia" of federal authority, "leading to the conclusion that it is not merely a question of state statutes." Motion at 6. Young does not provide authority for the proposition that a law enforcement agency's partial federal funding changes the Fourth Amendment calculus under these circumstances, and the Court cannot find any. Nor does the Court think that the presence of federal funding should change the constitutional analysis. In Mikulski, the Tenth Circuit "emphasized that state law allowed peace officers (with authorization) to act within neighboring political subdivisions, whereas in Ross, under no circumstances would the officer have had authority to act on tribal lands." Swanson, 577 F.3d at 1202 (citing Mikulski, 317 F.3d at 1232; Ross, 905 F.2d at 1353-54. In this case, the Court sees no reason why receiving federal grants should vitiate an APD officer's legal authority to be cross-commissioned as a Special Deputy in Bernalillo County. See N.M. Stat. Ann. § 4-41-10 ("Any sheriff is hereby authorized at any time to appoint respectable and orderly persons as special deputies"); N.M. Stat. Ann. § 29-1-9 (stating that, to "assume or exercise the functions, powers, duties and privileges incident and belonging to the office of special deputy sheriff," a person must first "receive[] an appointment in writing from a person authorized by law to appoint special deputy sheriffs"). Moreover, even

if Harvey was not cross-commissioned -- a factual assertion that the Court declines to find -- the Court does not think that such a mistake is of constitutional dimension; a city official on county land is of no import to the Constitution, even if it violates state law. Cf. United States v. Mikulski, 317 F.3d 1228, 1232 (10th Cir. 2003)("The officers' violation of state law is not, without more, necessarily a federal constitutional violation." (citing United States v. Baker, 16 F.3d 854, 856 n. 1 (8th Cir. 1994))

**IT IS ORDERED** that the requests in the Defendant's Motion to Suppress the Fruits of Illegal Arrest and Supporting Brief, filed May 10, 2018 (Doc. 43), are denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

John C. Anderson
  United States Attorney
Paul H. Spiers
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiffs*

Charles E. Knoblauch
Charles E. Knoblauch Attorney at Law
Albuquerque, New Mexico

      *Attorney for the Defendant*