# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                  No. CR 17-0694 JB

APACHE YOUNG,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Amended Motion in Limine on Informing the Jury, filed November 26, 2018 (Doc. 138)("Motion"). The Court held a hearing on November 28, 2018. The primary issue is whether the Court should enter an order permitting Defendant Apache Young to inform the jury about a guilty verdict's consequences. The Court will deny the Motion. The Supreme Court of the United States' recent decisions about the Sixth Amendment to the Constitution of the United States of America's right to a jury trial suggest that some Justices on the Supreme Court may be willing to reconsider precedent by addressing whether a practice is necessary to the jury trial right as it existed at the time that the States ratified the Sixth Amendment. Historical sources and precedent show that the common-law jury at the Founders' time knew the ramifications of a guilty verdict and used that knowledge in reaching a verdict, frequently choosing a verdict because it would mitigate a defendant's punishment. Moreover, although courts at the Founders' time instructed the jury that the court's role is to provide the jury the law and that the jury's role is to apply that law to the facts as the jury finds them, the courts also instructed the jury that its role included ultimately deciding both the facts and the law. Courts at the Founders' time allowed lawyers to argue openly to the jury that it should exercise its ability

to decide the law in the case and nullify the law that the court gives.  Accordingly, the common-law jury in the Framers' era knew about and exercised its power to acquit even when the government proved beyond a reasonable doubt that the defendant was guilty, or exercised its power to mitigate the defendant's sentence even when application of the law given by the court to the facts which the jury found provided otherwise.  The Court concludes that Supreme Court and United States Court of Appeals for the Tenth Circuit precedent allowing the jury to know about sentencing ramifications only if its participation in sentencing is required, and preventing the jury from learning about its nullification right, are inconsistent with trial practices at the Founders' time, and that these practices have eroded the Sixth Amendment jury trial right as the Framers understood that right.  Nevertheless, because, as a district court, the Court must faithfully apply controlling Supreme Court and Tenth Circuit precedent, the Court will deny Young's Motion, and prohibit Young from instructing, arguing, or introducing evidence related to the jury's power to nullify or related to potential penalties resulting from a guilty verdict.

## FACTUAL BACKGROUND

On March 14, 2017, a federal grand jury returned an indictment[1] charging Young with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  See Indictment at

---

[1]The Indictment states, in relevant part, that,

[o]n or about November 13, 2016, in Bernalillo County, in the District of New Mexico, the defendant, **APACHE YOUNG,** having been convicted of at least one of the following felony crimes punishable by imprisonment for a term exceeding one year: (1) receiving and transferring a stolen motor vehicle, (2) attempt to commit a felony, to wit robbery, (3) aggravated battery, knowingly possessed, in and affecting commerce, a firearm.  In violation of 18 U.S.C. §§ [sic] 922(g)(l).

Indictment at 1, filed March 14, 2017 (Doc. 2) (emphasis in Indictment).

1, filed March 14, 2017 (Doc. 2). If convicted, Young faces a fifteen-year minimum sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e). See Motion at 1.

## PROCEDURAL BACKGROUND

In the Motion, Young begins by asserting his expectation that the United States will rely on United States v. Parrish, 925 F.2d 1293 (10th Cir. 1991), and United States v. Greer, 620 F.2d 1383 (10th Cir. 1980), "for the proposition that a jury can only be informed of the possible penalties if a statute requires their participation in sentencing." Motion at 1. Young contends that the Supreme Court "implicitly overturned" United States v. Parrish and United States v. Greer in United States v. Booker, 543 U.S. 220 (2005)("Booker"); Blakely v. Washington, 542 U.S. 296 (2004); and Jones v. United States, 526 U.S. 227 (1999)("Jones"), which, according to Young, "command[] the courts to protect the right to a jury trial as it was at the time of the Founders and as it was understood by the Framers." Motion at 2. The Framers, Young argues, openly acknowledged and praised jury nullification, and courts therefore should permit modern juries to know a guilty verdict's consequences, which is the only way to preserve the Sixth Amendment's "sacred role within our criminal justice system." Motion at 2.

Young avers that, although courts in the twentieth century denigrated the jury's centuries-old common-law right to nullify the law's unjust application, the Supreme Court, beginning in Sullivan v. Louisiana, 508 U.S. 275 (1993), has since directed district courts to examine the common law to deduce the jury-trial right's parameters. See Response at 2-3 (citing Sullivan v. Louisiana, 508 U.S. at 278). The Framers did not incidentally include the jury trial right in the Constitution, Young argues, but rather "'knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority.'" Motion at 4 (quoting Duncan v. Louisiana, 391 U.S.

145, 155 (1968)). According to Young, the Supreme Court has equated the people's right to control the judiciary through the jury trial with the people's right to control the legislative and executive branches through suffrage. See Motion at 4 (citing Duncan v. Louisiana, 391 U.S. at 155). Young adds that the current practice evidences the United States' delineating the jury's role in contradiction to the Supreme Court's guidance in Blakely v. Washington. See Motion at 4 (citing Blakely v. Washington, 542 U.S. at 306 ("The very reason the Framers put a jury-trial guarantee in the Constitution is that they were unwilling to trust government to mark out the role of the jury.")). Young maintains that the Framers "would abhor attempts to limit" the jury's role in determining the law, because the Framers "saw the jury as a community body 'to guard against a spirit of oppression and tyranny on the part of rules' and to act 'as the great bulwark of our civil and political liberties.'" Motion at 4 (quoting Booker, 543 U.S. at 239). Young adds that the Supreme Court in Jones emphasizes that the Framers strove to protect liberty "'*from all secret machinations, which may sap and undermine it*,'" which, according to Young, is precisely what results when courts keep from the jury information regarding sentencing ramifications. Motion at 5 (emphasis in Motion)(quoting Jones, 526 U.S. at 246). Hence, Young insists that the Framers would agree with him that this practice is "an affront to liberty." Motion at 5.

The jury historically has exercised its role as "the conscience of the community," Young continues, by exercising its nullification power when facing "severe sentencing laws." Motion at 5 (citing Jones, 526 U.S. at 245 ("The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances . . . endowed a criminal conviction with particularity sanguinary consequences.")). Courts must facilitate the modern jury's ability to exercise this vital role, Young argues, given "sentencing schemes['] . . . ever-increasing harshness" and the Supreme Court's mandate to consider the jury's historical role in

our society.  Motion at 5-6.  Young then quotes extensively from the dissenting opinion in <u>Sparf v. United States</u>, 156 U.S. 51 (1895), wherein the Honorable Horace Gray, then-Associate Justice of the Supreme Court of the United States, in turn quotes extensively from Alexander Hamilton and John Adams for the proposition that the Framers entrusted the historical jury with the power to decide both the law and the facts in all criminal cases.  <u>See</u> Motion at 6 (quoting <u>Sparf v. United States</u>, 156 U.S. at 143, 147)(Gray, J., dissenting)).  Avoiding candor with the jury for no reason other than to prevent the jury from understanding the "true essence of the case before them" disregards the Framer's intent for the Sixth Amendment, Young insists, and is therefore unconstitutional.  Motion at 6.  Young adds that such disregard for the Framer's intent for the Sixth Amendment is "a dangerous step towards tyranny."  Motion at 7 (citing <u>United States v. Datcher</u>, 830 F. Supp. 411, 413 (M.D. Tenn. 1993)(Wiseman, J.)("The Founding Fathers knew that, absent jury nullification, judicial tyranny not only was a possibility, but was a reality in the colonial experience.  Although we may view ourselves as living in more civilized times, there is obviously no reason to believe the need for this protection has been eliminated.").

Without knowing a given sentence's harshness, Young asserts, the jury cannot perform its constitutional function.  <u>See</u> Motion at 8.  Although the function, according to Young, historically did not involve expressly informing the jury of its verdict's consequences, because harsh mandatory sentences were commonly known, for example, that convicted felons would receive the death penalty, the modern criminal justice system's complexity requires courts to permit juries to receive information regarding a guilty verdict's consequences.  <u>See</u> Motion at 8 (citing <u>Sparf v. United States</u>, 156 U.S. at 110-83 (Gray, J., dissenting); <u>United States v. Dougherty</u>, 473 F.2d 1113, 1138, 1144 (Bazelon, J., concurring in part and dissenting in part); <u>United States v. Polouizzi</u>, 549 F. Supp. 2d 308, 402-50 (E.D.N.Y. 2008)(Weinstein, S.J.)).  Keeping such

information from jurors, according to Young, "so denigrates their role that they become 'no more than menial factfinders rather than spokespersons for the community.'"  Motion at 8 (quoting United States v. Polouizzi, 549 F. Supp. 2d at 440).

Young argues that withholding sentencing information from juries evidences that courts do not trust juries with information that might lead to nullification, that is, that courts "'fear that the community might in fact think a law unjust.'"  Motion at 9 (quoting United States v. Datcher, 830 F. Supp. at 415).  Young insists that such misplaced fear "has no role in criminal proceedings" because the United States has a duty "'to seek justice and not merely conviction,'" and, therefore, "'should not shy away from having a jury know the full facts and law of a case.'"  Motion at 9 (quoting United States v. Datcher, 830 F. Supp. at 415).  According to Young, keeping sentencing consequences from the jury diminishes the jury's role and is thus the dangerous step towards tyranny that the Supreme Court cautions against in Duncan v. Louisiana when it states: "'The first object of any tyrant in [Washington] would be to make [Congress] utterly subservient to his will; and the next to overthrow or diminish trial by jury, for no tyrant could afford to leave a subject's freedom in the hands of twelve of his countrymen.'"  Motion at 10 (brackets in Motion)(quoting Duncan v. Louisiana, 391 U.S. at 156 n.23).

Young directs the Court to The King v. Penn and Mead, 6 How. 951 (1670), a seventeenth-century English case wherein the jury determined that the charges against William Penn[2] were unjust despite the prosecution having proved all the necessary elements.  See Motion at 10 (citing The King v. Penn and Mead, 6 How. at 951-58).  Young insists that the Framers' had Penn in mind

_____

[2]William Penn was an early Quaker and founder of the Province of Pennsylvania, which, after the American Revolution, would become the Commonwealth of Pennsylvania, one of the original thirteen states.  See William Penn, Wikipedia, https://en.wikipedia.org/wiki/William_Penn (last visited April 8, 2019).

when they drafted the Constitution.  See Motion at 10.  Young concludes by quoting extensively

from Lysander Spooner's 1852 Essay on the Trial by Jury for the proposition that, when courts

hold jurors "ignorant of the consequences of their decision," they deprive jurors of their primary

duty -- "'*to judge the justice of the law*'" --  and thereby turn them into "*mere tools . . . for carrying*

*into execution any injustice and oppression* [the government] *may desire to have executed*," which

disregards the Framers' efforts to draft a constitution with the power to protect the people from

tyranny.  Motion at 10-11 (emphasis in Motion)(quoting Lysander Spooner Essay on the Trial by

Jury 5 (John P. Jewett ed., 1852)).

The United States did not file a written response to the Motion.  At the November 28, 2018,

hearing, the Court asked Young's counsel whether he had read the Court's opinions on jury

nullification, to which Young's counsel replied that he had read them and finds them "wonderful."

Transcript of Hearing at 7:18-22 (taken November 28, 2018)("Tr.")(Court, Knoblauch).[3]  The

Court replied in gest that Young's counsel could have flattered the Court by citing the Court's

opinions in the Motion, see Tr. at 7:23-24 (Court), and stated that, although the Court is "quite

sympathetic" to arguments that favor informing jurors of their nullification right, Tenth Circuit

caselaw concludes that the Supreme Court has foreclosed such arguments; "so I think we'll just

have to preserve your position."  Tr. at 7:24-8:4 (Court).  The Court added that, although Young

can assert his arguments on appeal, in one of the Court's recent cases the Tenth Circuit indicated

that it "wasn't terribly interested in the issue."  Tr. at 8:4-8 (Court).  Young replied that the Tenth

Circuit is like a jury in the sense that one "never know[s] what they're going to do."  Tr. at 8:9-11

(Knoblauch).

---

[3]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

In response to the United States' concerns over Young informing the jury about his charge's "potential penalties," Tr. at 8:24-9:3 (Schied), the Court again expressed that, although it is sympathetic to Young's position that "the jury should know sentencing parameters," "that's just not the law," and the Court therefore cannot allow such representations, Tr. at 9:4-11 (Court). The Court thereafter denied the Motion. See Tr. at 37:7 (Court).

## LAW REGARDING JURY NULLIFICATION

Although the United States is often described generally and somewhat loosely as a democracy, and certainly enjoys democratic features, the focus is often on, at the federal government level, the elected branches -- the President and the Congress. Yet, when one stares at the mosaic that makes up the United States' constitutional system, there is, in fact, nothing more truly democratic than what takes place, day after day, in federal courts across the nation, when the citizens are summoned to the courthouse to apply the law that Congress has passed and the President has signed to the specific facts of a particular case and of an individual defendant. The citizens of this country valued this democratic mechanism well before the Constitution and the Bill of Rights were drafted, and the passage of time has only ingrained further the importance of jury trials into the fabric of the nation's view of what constitutes justice.

One now cannot seriously dispute, as the nation enters its third century, that one of the most precious and treasured rights that United States citizens and residents have is the Sixth Amendment right to "an impartial jury." U.S. Const. amend. VI. This fundamental right is a cornerstone of the American criminal justice system, and the Sixth Amendment has long embodied and protected this means of resolving criminal charges that the government brings. "That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive

branches, jury trial is meant to ensure their control in the judiciary." Blakely v. Washington, 542 U.S. at 305-06. The jury trial right as preserved in the Bill of Rights was passed down from the right that the Magna Carta enshrines. See Booker, 543 U.S. at 239 ("The Founders presumably carried this concern from England, in which the right to a jury trial had been enshrined since the Magna Carta.").

### 1. The Jury's Role at the Founders' Time.

"The colonial jury played a vital and celebrated role in American resistance to British tyranny leading up to the revolution. American counsel regularly argued the validity of laws directly to juries, which often refused to enforce British laws they felt were unjust." Andrew J. Parmeter, Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification, 46 Washburn L.J. 379, 382-83 (2007)(footnotes omitted). The Honorable Jack Weinstein, United States District Judge for the Eastern District of New York, has noted that, in 1791, at the time of the Sixth Amendment's ratification, "[i]t was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt. In later years this fundamental power of the jury -- and the right of the accused -- has been termed the power to nullify." United States v. Polizzi, 549 F. Supp. 2d 308, 405 (E.D.N.Y. 2008)(Weinstein, J.)(internal quotations omitted).

The Supreme Court has recognized that the jury trial right that the Sixth Amendment affords to defendants was understood at the Founders' time to provide essential protections against government tyranny and to safeguard liberty:

> [T]he historical foundation for our recognition of these principles extends down centuries into the common law. "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . ." 4 [Sir William Blackstone,

Commentaries on the Laws of England: In Four Books 343 (William D. Lewis ed., 2007)](1769).

Apprendi v. New Jersey, 530 U.S. 466, 477 (2000). As Mr. Hamilton first noted, this belief in the jury trial right as a safeguard to liberty was widely shared during the constitution-framing era:

> The friends and adversaries of the plan of the Convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury. Or if there is any difference between them, it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government.

The Federalist No. 83, at 456 (Scott ed. 1894)(Hamilton). The jury trial right was part and parcel of the Framers' belief that the common person should participate in government, and essential to this participation was ensuring that the judiciary was justly and correctly effectuating the laws, whether the laws were written or natural laws. See Clay S. Conrad, Jury Nullification 45 (1998)(citing Note, The Changing Role of the Jury in the Nineteenth Century, 74 Yale L. J. 170, 172 (1964)); Diary of John Adams, Feb. 12, 1771, in 2 The Works of John Adams 253 (1850)(quoted in Blakely v. Washington, 542 U.S. at 306 ("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature [as in the legislature.]")); Letter from Jefferson to L'Abbe Arnold, July 19, 1789, in 3 Works of Thomas Jefferson, 81, 82 (1854)(quoted in Mark D. Howe, Juries as Judges of Criminal Law, 52 Harv. L. Rev. 582, 582 (1939)("Were I called upon to decide, whether the people had best be omitted in the legislative or judiciary department, I would say it is better to leave them out of the legislative. The execution of laws is more important than the making of them.")).

The criminal jury's role at the Founders' time was primarily that of a factfinder, but also included as a secondary role acting as the community's conscience to determine whether the law, or the application of law to the facts, was conscionable. See United States v. Courtney, 960 F. Supp. 2d at 1164. Professor Irwin A. Horowitz, Emeritus Professor of Psychology at Oregon State

University, notes: "While the fact-finder role of the jury is the judicially preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is just and what is not." Irwin A. Horowitz, Jury Nullification: An Empirical Perspective, 28 N. Ill. U. L. Rev. 425, 427 (2007-2008)(quoting Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 110 (1998)). Similarly, Clay S. Conrad, a trial lawyer in Houston, Texas with the law firm of Looney & Conrad, P.C., asserts that the Sixth Amendment jury trial right implicitly recognizes criminal juries' right to determine the law -- and thus jury nullification if they believe the law wrong -- because, at the Framers' time, the concept of a jury included the idea that the jury not only decided the facts of a case, but also the law:

> The Sixth Amendment itself implicitly recognizes the right of criminal trial jurors to judge the law. Although it does not mention that power explicitly, it can logically be assumed that the definition of a jury used in that document would be consonant with the prevailing definition in the legal dictionaries of the period. The most common legal dictionary in Colonial Virginia was the British Jacob's Law Dictionary [(1782)]; and within the encyclopedic definition given in Jacob's, the word 'jury' is defined as:
>
> > Jury . . . [s]ignifies a certain number of men sworn to inquire and try the matter of fact, and declare the truth upon such evidence as shall be delivered them in a cause: and they are sworn judges upon evidence in matter of fact . . . . Juries are . . . not finable for giving their verdict contrary to the evidence, or against the direction of the court; for the law supposes the jury may have some other evidence than what is given in court, and they may not only find things of their own knowledge, but they go according to their consciences.
>
> The right of jurors to judge "according to conscience," then, was implicit within the word "jury" as the drafters of the Bill of Rights understood it. This was the trial by jury the founders knew, and this was the trial by jury they intended to pass on to their progeny.

C. Conrad, supra, at 46-47 (footnotes omitted). The assertion that criminal juries embraced decisions of law as well as fact finds support in precedent caselaw from the Founders' era.

In <u>Georgia v. Brailsford</u>, 3 U.S. (3 Dall.) 1 (1794),[4] a civil case, the Supreme Court noted that the role of the jury is to be the ultimate finder both of the facts and of the law.  <u>See</u> 3 U.S. at 4.  A jury decided the case even though the Supreme Court had original jurisdiction, because the State of Georgia was a party to the case.  The Honorable John Day, then-Chief Justice of the Supreme Court of the United States, charged the jury:

> It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide.  But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy.  On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law.  But still both objects are lawfully, within your power of decision.

3 U.S. at 4.  In <u>People v. Croswell</u>, 3 Johns. Cas. 337 (N.Y. Sup. Ct. 1804), Mr. Hamilton was counsel for the defendant, who was indicted for libel against then-President Thomas Jefferson.  The trial court in the case instructed the jury that they were to enter a special, as opposed to general, verdict limited to finding only two issues: (i) whether the article was published; and (ii) whether the article's innuendos were true or false.  <u>See</u> 3 Johns. Cas. at 342.  The jury was instructed that the defendant's intent -- the element requiring that the defendant intended the statements to be

---

[4]<u>Georgia v. Brailsford</u> is the only published case in which the Supreme Court has presided over a jury trial.  The Seventh Amendment to the Constitution of the United States of America preserves the use of a jury in federal common law suits that would have used a jury when the Seventh Amendment was adopted.  Although it would seem remarkable for the Supreme Court to preside over a jury trial today, the Supreme Court historically impaneled juries at the beginning of every term.  The Supreme Court even heard at least three cases with juries in the 1790's.  <u>Georgia v. Brailsford</u> is, however, the only case that was reported.  The Supreme Court has shifted its practice in modern times by delegating any fact finding to a special master.  The Supreme Court, moreover, when exercising its original jurisdiction hears mostly equitable cases, which do not require a jury.  <u>See</u> Lochlan F. Shelfer, <u>Special Juries in the Supreme Court</u>, 123 Yale L.J. 208, 210-11 (2013).

libelous -- was a matter of law exclusively for the court.  See 3 Johns. Cas. at 341-42.  Mr. Hamilton

argued:

> The Chief Justice misdirected the jury, in saying they had no right to judge of the intent and of the law.  In criminal cases, the defendant does not spread upon the record the merits of the defence, but consolidates the whole in the plea of not guilty.  This plea embraces the whole matter of law and fact involved in the charge, and the jury have an undoubted right to give a general verdict, which decides both the law and the fact. . . .  All the cases agree that the jury have the power to decide the law as well as the fact; and if the law gives them the power, it gives them the right also.  Power and right are convertible terms, when the law authorizes the doing of an act which shall be final, and for the doing of which the agent is not responsible.
>
> The intent constitutes crime.  To deny, then, to the jury the right to judge of the intent, and yet to require them to find a general verdict of guilty, is requiring them to commit perjury.  The particular intent constitutes the crime, in cases of libel, beca[us]e the act is not, of itself, unlawful; and where the particular intent alone constitutes the guilt, the court cannot judge of that intent, and the jury must find it. . . .
>
> It is admitted to be the duty of the court to direct the jury as to the law, and it is advisable for the jury in most cases, to receive the law from the court; and in all cases, they ought to pay respectful attention to the opinion of the court.  But, it is also their duty to exercise their judgments upon the law, as well as the fact; and if they have a clear conviction that the law is different from what it is stated to be by the court, the jury are bound, in such cases, by the superior obligations of conscience, to follow their own convictions.  It is essential to the security of personal rights and public liberty, that the jury should have and exercise the power to judge both of the law and of the criminal intent.

2 Johns. Cas. at 345-46 (emphasis omitted).  The prosecution countered that the sound

administration of court business requires that juries be permitted to determine the facts only:

> The jury have, undoubtedly, the power, in criminal cases, to decide the law as well as the fact, if they will take upon themselves the exercise of it; but we must distinguish, in this case, between power and right.  It is the right of the jury to decide the fact, and only the fact; and it is the exclusive province of the court to decide the law in all cases, criminal as well as civil.  A jury is wholly incompetent, and necessarily must be, from the nature of their institution, to decide questions of law; and if they were invested with this right, it would be attended with mischievous and fatal effects.  The law, instead of being a fixed rule, would become uncertain and capricious, and there would not remain any stability or uniformity of decision, or certainty of principle, in the administration of justice. . . .

If the jury were to judge of the law in the case of libels, why not of the effect of writings in civil cases, and of the law in all cases where the plea is the general issue? Surely the counsel on the other side are not prepared to carry their doctrine to this extent.

3 Johns. Cas. 350-51.  Mr. Hamilton replied:

But it is not only the province of the jury, in all criminal cases, to judge of the intent with which the act was done, as being parcel of the fact; they are also authorized to judge of the law as connected with the fact.  In civil cases, the court are the exclusive judges of the law, and this arose from the nature of pleadings in civil suits; for, anciently, matters of law arising in the defence, were required to be spread upon the record, by a special plea, and the jury were liable to an attaint for finding a verdict contrary to law.  But in criminal cases, the law and fact are necessarily blended by the general issue, and a general verdict was always final and conclusive, both upon the law and the fact.  Nor were the jury ever exposed to an attaint for a verdict in a criminal case; and this is decisive to prove that they had a concurrent jurisdiction with the court on questions of law; for where the law allows an act to be valid and definitive, it presupposes a legal and rightful authority to do it.  This is a sure and infallible test of a legal power.

In England, trial by jury has always been cherished, as the great security of the subject against the oppression of government; but it never could have been a solid refuge and security, unless the jury had the right to judge of the intent and the law.

The jury ought, undoubtedly, to pay every respectful regard to the opinion of the court; but suppose a trial in a capital case, and the jury are satisfied from the arguments of counsel, the law authorities that are read, and their own judgment, upon the application of the law to the facts, (for the criminal law consists in general of plain principles,) that the law arising in the case is different from that which the court advances, are they not bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions?  To oblige them, in such a case, to follow implicitly the direction of the court, is to make them commit perjury, and homicide, under the forms of law.  Their error is fatal and cannot be corrected.  The victim is sacrificed; he is executed; he perishes without redress. Was he a juror, in such a case, he would endure the rack rather than surrender his own convictions on the altar of power, rather than obey the judicial mandate.

People v. Croswell, 3 Johns. Cas. at 355-56 (citations omitted).

The Supreme Court of New York was equally split, with two justices agreeing with Mr.

Hamilton and two justices siding with the prosecution.  The Honorable James Kent, then-Associate

Justice of the Supreme Court of New York, wrote in agreement with Mr. Hamilton that "[t]here is

nothing peculiar in the law of libels, to withdraw it from the jurisdiction of the jury" by requiring a special verdict. 3 Johns. Cas. at 365-66. Justice Kent reasoned that, in all other areas of criminal law, the jury is charged with finding intent:

> The jury are called to try, in the case of a traitor, not only whether he committed the act charged, but whether he did it traitorously; and in the case of a felon, not only whether he killed such a one, or took such a person's property, but whether he killed with malice prepense, or took the property feloniously. So in the case of a public libeller, the jury are to try, not only whether he published such a writing, but whether he published it seditiously. In all these cases, from the nature of the issue, the jury are to try not only the fact, but the crime, and in doing so, they must judge of the intent, in order to determine whether the charge be true, as set forth in the indictment. The law and fact are so involved, that the jury are under an indispensable necessity to decide both, unless they separate them by a special verdict.

3 Johns. Cas. at 366-67 (emphasis omitted). He thus concluded:

> [U]pon every indictment or information for a libel, where the defendant puts himself upon the country, by a plea of not guilty, the jury have a right to judge, not only of the fact of the publication, and the truth of the innuendoes, but of the intent and tendency of the paper, and whether it be a libel or not; and, in short, of "the whole matter put in issue upon such indictment or information." That in this, as in other criminal cases, it is the duty of the court, "according to their discretion, to give their opinion and direction to the jury on the matter in issue;" and it is the duty of the jury to receive the same with respectful deference and attention, and, unless they choose to find a special verdict, they are then to exercise their own judgments on the matter in issue, with discretion and integrity.

3 Johns. Cas. at 376-77 (internal citation omitted).

The Honorable Morgan Lewis, then-Chief Justice of the Supreme Court of New York, disagreed with Mr. Hamilton and Justice Kent, and concluded that the policies behind not constricting a jury to deciding matters of law are not present in the United States as they were in England:

> It has been urged, that to deny a jury the right of deciding on the law and the fact, in all cases of criminal prosecution, is contrary to the spirit and genius of our government. But how, has not been attempted to be shown. In England, where the judges are appointed by the crown, and juries form a substantial barrier between the prerogatives of that crown and the liberties of the people, the reasons for

extending the powers of the latter are certainly much stronger than with us, where the judges are, in effect, appointed by the people themselves, and amenable to them for any misconduct.

People v. Croswell, 3 Johns. Cas. at 409.

### 2.    Sparf v. United States.

In the nineteenth century, the Honorable Joseph Story, then-Associate Justice of the Supreme Court of the United States, riding circuit in Massachusetts, is credited with issuing the first American opinion explicitly limiting the role of jurors in United States v. Battiste, 24 F. Cas. 1042 (C.C.D. Mass. 1835).  See United States v. Polouizzi, 687 F. Supp. 2d at 190 (noting that the first of "[t]wo major Supreme Court Justices' opinions in the nineteenth century . . . restricting the Sixth Amendment's jury" right to decide the law is "Justice Story's in . . . United States v. Battiste . . ."), vacated, 393 F. App'x 784 (2d Cir. 2010)(Miner, J., joined by Leval and Wesley, JJ.)(unpublished); C. Conrad, supra, at 65 (noting that 160 years had passed since the introduction of jury nullification, or jurors as deciders of the law, "before Supreme Court Justice Joseph Story, riding circuit in Massachusetts, rendered the first major American court opinion limiting the role of juries . . .").  In United States v. Battiste, the defendant was on trial for violation of a newly enacted law punishing human trafficking in slaves, and Justice Story was concerned that, because Massachusetts was the first state to abolish slavery and was home to much of the abolitionist movement, the jury would convict him based on their beliefs about slavery rather than on the facts. See United States v. Polouizzi, 687 F. Supp. 2d at 190-91 ("Justice Story's statement was made in the context of *preventing a conviction unfounded under the statute as he construed it, not to prevent the jury from refusing to convict a person technically guilty*." (emphasis in original))); C. Conrad, supra, at 66.  Justice Story instructed the jury as to his opinion that the jury determining

guilt based on the jurors' own beliefs, rather than on the law as the court told them -- jury nullification -- is inconsistent with the notion of a fair trial:

> Before I proceed to the merits of this case, I wish to say a few words upon a point, suggested by the argument of the learned counsel for the prisoner upon which I have had a decided opinion during my whole professional life. It is, that in criminal cases, and especially in capital cases, the jury are the judges of the law, as well as of the fact. My opinion is, that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case, tried upon the general issue. In each of these cases, their verdict, when general, is necessarily compounded of law and of fact; and includes both. In each they must necessarily determine the law, as well as the fact. In each, they have the physical power to disregard the law, as laid down to them by the court. But I deny, that, in any case, civil or criminal, they have the moral right to decide the law according to their own notions, or pleasure. On the contrary, I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court. This is the right of every citizen; and it is his only protection. If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views, which different juries might take of it; but in case of error, there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury. Indeed, it would be almost impracticable to ascertain, what the law, as settled by the jury, actually was. On the contrary, if the court should err, in laying down the law to the jury, there is an adequate remedy for the injured party, by a motion for a new trial, or a writ of error, as the nature of the jurisdiction of the particular court may require. Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness, or ignorance, or accidental mistake, to interpret it. If I thought, that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial. But believing, as I do, that every citizen has a right to be tried by the law, and according to the law; that it is his privilege and truest shield against oppression and wrong; I feel it my duty to state my views fully and openly on the present occasion. It is not, indeed, an occasion, on which there is any reason to doubt, that an intelligent jury can understand the principles of law applicable to the subject, as well as the court; for they are the principles of common sense. And as little reason is there, in my view, to suppose, that they can operate injuriously to the real merits of the case of the prisoner.

24 F. Cas. at 1043.

In Pierce v. State, 13 N.H. 536 (1843), the Supreme Court of New Hampshire cited to

United States v. Battiste in holding that the right to return a verdict based on a finding that the law

is otherwise than the court gives it to the jury is inconsistent with the proposition that the

Constitution is the supreme law of the land:

> [T]he result at which we have arrived is that the juries have not the right to decide
> the law in any case; that this accords with the best authorities in the common law,
> and with other legal rights which must be surrendered if they may decide the law;
> and that they are bound by the law, as laid down to them by the court. . . .
>
> The constitution of the United States, and the acts of Congress made in pursuance
> thereof, are the supreme law of the land, and the judges in every state are bound
> thereby.  If juries are not bound also, the question can never be settled whether a
> law be in pursuance of the constitution, and the courts must suspend their judgments
> until a sufficient number of verdicts has been returned, one way or the other, to
> render it probable that juries generally in future will return their verdicts the same
> way, -- for no nearer approach to certainty could be made.
>
> We cannot believe that impartial and reflecting men, of whatever profession they
> may be, can advocate doctrines which may lead to such results as the right of the
> jury to decide the law may end in.  We cannot think that the people or their
> representatives would be content with an exposition of the constitution which
> would cause the constitutionality of the license law to remain an open question,
> until it could be settled by the verdict of a jury; of a body admirably adapted to the
> decision of questions of fact, but irresponsible, giving no reasons for their decisions,
> not subject to impeachment or attaint, without access to the sources of the law, and
> therefore unfitted for the investigation of legal rights.  No reflecting man in the jury
> box would be willing to take upon himself this responsibility.  He would feel that
> the question could not be examined with the deliberation it required; that the law
> could not be expounded with quite so much facility as it could be made, -- and that
> there was no such inspiration in the jury box as would enable twelve men to
> determine, per saltum, grave questions which, elsewhere, require care, and thought,
> and patient study, and time for undisturbed reflection.  And it is the opinion of the
> court, that it is inconsistent with the spirit of the constitution that questions of law,
> and still less, questions of constitutional law, should be decided by the verdict of
> the jury, contrary to the instructions of the court.

Pierce v. State, 13 N.H. at 551-54 (internal citations omitted).  Courts around the country began to

follow suit and adhere to the proposition that allowing juries to decide the law in a case, and to

decide against the law as the court gave it to them, is inconsistent with the constitutional right for

a fair trial. See, e.g., Commonwealth v. Porter, 51 Mass. 263, 263, 10 Metcalf 263, 263 (1845)("[I]t is the duty of the court to give instructions to the jury on all questions of law which arise in a cause tried by them; and it is the duty of the jury to receive the law from the court, and to conform their . . . decision to such instructions . . . ."); State v. Burpee, 65 Vt. 1, 25 A. 964, 973 (1892)("The doctrine that jurors are judges of the law in criminal cases is repugnant to . . . the constitution of Vermont, which guaranty to every person within this state 'a certain remedy' for all wrongs, conformably to the laws . . . .")(quoting Vt. Const. art. 4, 10).

Sixty years after United States v. Battiste, the Honorable Justice John Marshall Harlan, then-Associate Justice of the Supreme Court of the United States, writing for the majority in Sparf v. United States, was tasked with deciding whether the district court could find that manslaughter did not apply as a matter of law and the jury had to follow that instruction, or whether it was wholly the jury's determination. See United States v. Courtney, 960 F. Supp. 2d at 1170. The defendants in Sparf v. United States, tried jointly for murder, asserted on appeal that the court invaded the jury's province to determine the law and the facts in criminal cases, where the judge instructed the jury on manslaughter and murder, but also instructed the jury:

> I do not consider it necessary, gentlemen, to explain [manslaughter] further, for if a felonious homicide has been committed, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder. In other words, it may be in the power of the jury, under the indictment by which these defendants are accused and tried, of finding them guilty of a less crime than murder, to wit, manslaughter, or an attempt to commit murder; yet, as I have said in this case, if a felonious homicide has been committed at all, of which I repeat you are the judges, there is nothing to reduce it below the grade of murder.

156 U.S. at 60. The judge additionally instructed the jury: "[A]s one of the tribunals of the country, a jury is expected to be governed by law, and the law it should receive from the court." 156 U.S. at 63. The Supreme Court held that the district court did not err in giving these instructions:

> We are of opinion that the court below did not err in saying to the jury that they

could not, consistently with the law arising from the evidence, find the defendants guilty of manslaughter, or of any offense less than the one charged; that if the defendants were not guilty of the offense charged, the duty of the jury was to return a verdict of not guilty. No instruction was given that questioned the right of the jury to determine whether the witnesses were to be believed or not, nor whether the defendant was guilty or not guilty of the offense charged. On the contrary, the court was careful to say that the jury were the exclusive judges of the facts, and that they were to determine -- applying to the facts the principles of law announced by the court -- whether the evidence established the guilt or innocence of the defendants of the charge set out in the indictment.

The trial was thus conducted upon the theory that it was the duty of the court to expound the law, and that of the jury to apply the law as thus declared to the facts as ascertained by them. In this separation of the functions of court and jury is found the chief value, as well as safety, of the jury system. Those functions cannot be confounded or disregarded without endangering the stability of public justice, as well as the security of private and personal rights.

156 U.S. at 106.

Justice Harlan notes the varied opinions of jurists and court decisions dating back to Georgia v. Brailsford, which had recognized that juries necessarily have the right to determine matters of law in addition to fact, but concludes: "We are of the opinion that the law in England at the date of our separation from that country . . . falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court." Sparf v. United States, 156 U.S. at 90. Justice Harlan reasoned that the incorrect belief about the jury's ability to depart from the law which the court gives to it arises from the jury's ultimate ability to decide guilt or innocence in rendering a general verdict: "The contrary view rests, as we think, in large part, upon expressions of certain judges and writers, enforcing the principle that when the question is compounded of law and fact a general verdict, ex necessitate, disposes of the case in hand, both as to law and fact." 156 U.S. at 90. He determined, therefore, that "the general common-law rule in criminal cases" at the time of the Sixth Amendment's ratification was

the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury, by a general verdict, of necessity determined in the particular case both law and fact, as compounded in the issue submitted to them.

156 U.S. at 98. Justice Harlan thus rejected the defendants' contention that the district court judge's instructing the jury that it was to follow the law that he gave to them was improper, reasoning:

We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence. Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be.

156 U.S. at 102. Justice Harlan, articulating the policy behind the Supreme Court's holding, noted that requiring juries to adhere to courts' instructions ensures that laws, even if they may be unpopular, are enforced:

"As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to purposes of injustice. But, on the other hand, I do consider that this power and corresponding duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen. The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men. To enforce popular laws is easy. But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, -- there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne."

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 1 Curt. 62, 63 (C.C.D. Mass. 1851)).

States quickly followed on the heels of the Supreme Court's decision in Sparf v. United States to restrict the role of juries. Pennsylvania, for instance, clarified its opposition to jury nullification in the case of Commonwealth v. Bryson, 120 A. 552 (1923), where the defendant

challenged the district court's instruction, which provided: "[I]n this sort of case you are the judges of the law and the facts, the law as well as the facts, but you are to take the law from the court as the proper source of information."  120 A. at 554.  The Supreme Court of Pennsylvania noted that correctness of the instruction "is now settled in Pennsylvania," holding: "There is nothing in the instructions of which defendant can justly complain.  It is the duty of the jury to take the law from the court, to the same extent in a criminal case as in any other, and a trial judge can properly so instruct."  120 A. at 554.  Further, the Supreme Court of Illinois in 1931 held unconstitutional a statute which provided that juries in criminal cases are the judges of both fact and law, reasoning that the statute "abrogates an essential attribute of the trial of a criminal case by a jury as known to the common law, and results in the deprivation of a right which has been uniformly guaranteed by our successive Constitutions."  People v. Bruner, 175 N.E. 400, 404 (1931).  The Supreme Court of Illinois cites to Sparf v. United States as authority for the proposition that, at common law, it is a jury's duty to take and apply the law as the judge gives it to the jury.  See People v. Bruner, 175 N.E. at 403 (noting that the Supreme Court in Sparf v. United States, "following the rule and practice at common law, [held that] it was the duty of the jury in every criminal case . . . to take the law from the court and to apply the law so received to the facts as they found them from the evidence").

  **3.**  **The Jury's Current Role.**

  "It is well-established that the court instructs the jury as to the rules of law and that the jury applies the facts as they find them to those rules."  United States v. Grismore, 546 F.2d 844, 849 (10th Cir. 1976)(citing Sparf v. United States, 156 U.S. at 51).  "One touchstone of a fair trial is an impartial trier of fact -- 'a jury capable and willing to decide the case solely on the evidence before it.'"  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)(quoting

Smith v. Phillips, 455 U.S. 209, 217 (1982)).  A juror meets the constitutional standard for impartiality where the juror "can lay aside his opinion and render a verdict based on the evidence presented in court."  Patton v. Young, 467 U.S. 1025, 1037 n.12 (1984).  As the Tenth Circuit has explained, a "defendant's right to an impartial jury does not include a right to a jury composed of persons who will disregard the district court's instructions."  United States v. James, No. 98-1479, 2000 WL 136816, at *3 (10th Cir. 2017).[5]  Cf. United States v. Fredette, 315 F.3d 1235, 1240-41 (10th Cir. 2003)("The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.")(internal quotation marks omitted)(quoting Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999)).

The Tenth Circuit has held that "there is no right to jury nullification."  Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999).  Jury nullification is defined as a

> jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.

Jury Nullification, Black's Law Dictionary at 936 (9th ed. 2009).  "While we recognize that a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath."  United States v. Gonzalez, 596 F.3d 1228, 1237 (10th Cir.

---

[5]United States v. James is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. James and United States v. Gehringer, 385 F. App'x 830, 834 (10th Cir. 2010), have persuasive value on a material issue and will assist the court in its disposition of this Memorandum Opinion and Order.

2010)(internal quotation marks omitted)(quoting United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983)). "[W]e disapprove of the encouragement of jury nullification." United States v. Gonzalez, 596 F.3d at 1237. The Tenth Circuit in Crease v. McKune cited with approval the United States Court of Appeals for the Second Circuit's holding in United States v. Thomas, 116 F.3d 606 (2d Cir. 1997), in which the Second Circuit stated that "the powers of juries to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent." 116 F.3d at 615. Moreover, the Tenth Circuit has held that "the law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law." United States v. Rith, 164 F.3d at 1337. See United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992)(holding that criminal defendants are "not entitled to jury nullification instructions").

In United States v. James, the Tenth Circuit upheld a district court judge's sua sponte dismissal of a potential juror who stated his belief that the juror had the power to disregard the judge's admonition on the law and acquit if the juror felt it just to do so. See 2000 WL 136816, at *4. The district court judge asked the juror, an emeritus professor of law at the University of Denver, whether he was "willing to accept the law from me as I give it in the instructions," to which the juror responded that his "inclination is to follow the judge's instructions." 2000 WL 136816, at *2. The juror noted, however, that he had one "qualm" and that was the view that "a jury always has the power to acquit . . . . [n]ot withstanding the evidence." 2000 WL 138816, at *2. The judge then, immediately, sua sponte dismissed the juror and provided the following explanation to the venire:

> Now, we were on the subject of experience with the law. I just excused the professor because he expressed a view that the jury can disregard the law. I'm

surprised to hear that's being taught, if it is being taught. But at any rate, that's not the law. As I have explained patiently and carefully, the jury has to accept the law as it is, and it's up to the jury to decide on the evidence, you know, whether the evidence meets this high standard of proof, and can certainly decide on an acquittal, as he said, if the evidence doesn't persuade or convince you beyond a reasonable doubt. But the jury can't make up the law, and that's the little exchange that we had there, and I'm sure you followed along with that, but I wanted to make it plain why it was that I excused this teacher.

2000 WL 138816, at *2. When the defendant appealed, asserting that the judge's sua sponte dismissal of the juror and instruction to the venire violated his Sixth Amendment jury trial rights, the Tenth Circuit affirmed, holding:

In light of his responses to questions during voir dire, the district court did not abuse its discretion or commit plain error in sua sponte dismissing [the] prospective juror . . . . A person who is either unwilling or unable to follow the court's instructions is not qualified to be a juror. Nor did the district court commit any error when it informed the jurors that it is their obligation to follow the law as it instructs. In short, the defendant was not deprived of his right to a fair trial.

2000 WL 138816, at *4.

The Tenth Circuit and the Supreme Court bind the Court, and the Court may not provide the jury with an instruction inviting nullification. See United States v. Courtney, 960 F. Supp. 2d at 1189. While in United States v. Courtney, the Court stated that the defendant

perhaps should be afforded the opportunity to have the Court instruct the jury, or his counsel be allowed to tell the jury, that, if it finds "the law arising in the case is different from that which the court advances," the jurors are "bound by their oaths, by their duty to their creators and themselves, to pronounce according to their own convictions," rather than according to the dictates of the law,

960 F. Supp. 2d at 1196, the Court ultimately held that current Supreme Court and Tenth Circuit controlling law required denial of the requested instruction. See United States v. Courtney, 960 F. Supp. 2d at 1196-97. The defendant appealed the denial of the instruction, and the Tenth Circuit responded:

In a lengthy exposition, the district court correctly noted that the role of the Sixth Amendment, like many other portions of our Constitution, has changed over time.

However, rather than embarking on a winding and uncertain[6] journey into the minds of the framers, we must follow Supreme Court and Tenth Circuit precedent. Therefore, we state once again that "a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law."

United States v. Courtney, 816 F.3d 681, 681(10th Cir. 2016)(quoting United States v. Rith, 164 F.3d at 1338). See United States v. Warwick, 16-CR-4572 MCA, 2017 WL 5027295 (D.N.M. Oct. 30, 2017)(Armijo, C.J.)(concluding that the court's role to instruct the jury on the law and the duty of the jury to obey the instructions have been clearly defined since 1895). See also United States v. Jensen, No. 17-CR-2566 WJ, 2018 WL 878963 (D.N.M. Feb. 13, 2018)(Johnson, J.)(stating that the Tenth Circuit has repeatedly affirmed that a defendant is not entitled to an instruction advising or encouraging the jury to exercise the power of nullification); United States v. Edwards, 266 F. Supp. 2d 1290, 1322 (D.N.M. Aug. 22, 2017)(Browning, J.)(concluding the same); United States v. Folse, No. CR 15-2485 JB, 2015 WL 10383584 (D.N.M. Nov. 9, 2015)(Browning, J.)(concluding that the Sixth Amendment jury trial right, as the Supreme Court and Tenth Circuit currently construe it, does not permit the Court to allow the jury to hear discussion related to sentencing, nullification, or the United States Sentencing Guidelines).

## LAW REGARDING JURY KNOWLEDGE OF SENTENCING RAMIFICATIONS

In criminal cases, the United States and the defendant often work together to keep the jury ignorant of the ramifications of its determination of guilt. The Supreme Court has consistently directed that, "when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" Shannon v. United States, 512 U.S. 573, 579 (1994)(footnote omitted)(quoting Rogers v. United States, 422 U.S. 35, 40 (1975)). It is not clear that this ignorance was present at the time of the Sixth Amendment's ratification.

---

[6]With all due respect to the Tenth Circuit, the Court does not think it is "uncertain" what was in the Framers' minds regarding jury nullification.

1.      **Jury Knowledge of Sentencing Ramifications at the Founders' Time**.

Colonial and British jurors at the Founders' time came to the courts from the same vicinity as the defendant, "were well-informed and self-confident property owners, and knew the essentials of the local criminal law and its punishments."  United States v. Polizzi, 549 F. Supp. 2d at 406 (internal citations omitted).  Professor Jeffrey B. Abramson, Professor of Law and Government at the University of Texas Law School, has noted that jurors at the Founders' time did not "come to the jury with minute skill in the laws," but rather the local knowledge jurors would have possessed included knowledge of the laws.  Jeffrey B. Abramson, We, The Jury: The Jury System and the Ideal of Democracy 32 (1994).  Professor Abramson explains:

> Not only was formal legal training unnecessary, but jurors did not even need to rely on a judge's instructions to know the common law of the land, rooted as it was in fundamental principles of natural justice. . . .  Thus, members of a Massachusetts grand jury in 1759 were told that they "need no Explanation" as to most legal matters because "your Good Sence & understanding will Direct ye as to them."

Abramson, supra, at 32.  John Adams similarly noted that "in many cases judges gave the jury no instructions on the law."  1 The Legal Papers of John Adams 230 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965).

Jurors' knowledge of the law can be seen in a case that the late Professor Julius Goebel, Jr., George Welwood Murray Professor of Legal History at Columbia University School of Law and Director at the Foundation for Research in Legal History, chronicled, where he notes that, in 1702, a jury verdict was overturned based on the jurors' lack of knowledge about the laws under which the defendant was convicted:

> After being tried in a well-publicized trial and found guilty of treason in 1702, Nicholas Bayard, a former commanding officer of the New York militia and mayor of New York under British rule, appealed to the British Crown based on irregularities in the jury composition -- i.e., the jurors' ignorance of the law:

> In his petition and "appeal" to Queen Anne, Nicholas Bayard stated among other things that he had been "convicted by an illegal petty jury of Aliens and Dutch unduely returned and very ignorant of the English Laws and Language". . . . Among the affidavits taken by John Bridges and Samson Shelton Broughton, under the Queen's order of reference for the collection of evidence in connection with the Bayard appeal, are statements of some of the petit jurors who had joined in the verdict declaring Bayard guilty of high treason. Thomas Sanders and Isaac Stoutenbergh, two of the trial jurors, made oral statements as follows, confirming the allegations made by Bayard in his petition: ". . . these [depend on] their great Ignorance of the Laws of England at that time not knowing what was High Treason . . . the Foreman . . . Did assert it was High Treason . . . to disturb the peace good and quiet of this Government and that Colonell Bayard had disturbed the peace by the addresses and eight or nine jurors were for clearing . . . Bayard but were perswaded by the foreman."

Julius Goebel, Jr. & T. Raymond Naughton, <u>Law Enforcement in Colonial New York</u> 604 n.7 (1944). Professor Goebel notes that New York jurors in revolutionary times often mitigated crimes based on their knowledge of the potential sentences that the defendants faced if the jurors found them guilty of the greater crime:

> We have spoken of the grooves in which <u>the jury might exercise its charity</u>: the verdict in thefts for amounts under the 12d. boundary between grand and petit larceny, and the privilege of finding manslaughter, self-defense or accident upon indictments for murder. These prerogatives the juries in New York did not hesitate to assert, and to these old and established powers of mitigation may be added, perhaps, the avoidance in New York of the incidents of felony judgment by the persistent finding of no goods or tenements. Of considerably greater significance than these possible interferences of the jury, but connected therewith in the case of verdicts for crimes of a less degree when murder, burglary, arson, highway robbery and certain others were charged, is the mitigation obtained by benefit of clergy.

Goebel & Naughton, <u>supra</u>, at 751 (emphasis added)(footnote omitted). "[T]he benefit of the clergy" was a system of mitigation in which a first-time offender convicted of a lesser crime would be branded on the thumb rather than sentenced to death. <u>United States v. Polizzi</u>, 549 F. Supp. 2d at 411 (quoting John H. Langbein, <u>The Origins of the Adversary Criminal Trial</u> 193 (2003)). <u>See</u> 1 Sir William Blackstone, <u>Commentaries on the Laws of England: In Four Books</u> 1753 (William

D. Lewis ed., 2007)(noting that "the benefit of the clergy at present stand[s] . . . considerably different from its original institution . . . [,] what was at first an unreasonable exemption of particular popish ecclesiastics into a merciful mitigation of the general law with respect to capital punishment").

Sir Dudley Ryder, who served as a trial judge for the trial judiciary of the Old Bailey[7] from 1754 to 1756, at least in one case, instructed the jury on the possible ramifications of a guilty verdict at trial and documented his belief that the jury determined the verdict based on availability of the benefit of the clergy:

> Ryder sometimes found time to jot down a little of what he was telling the jury. John Taplin was tried before Ryder in October 1754 on an indictment charging theft from a dwelling house of a watch, valued at forty shillings, and of more than twenty guineas in money. The [Old Bailey] report of the outcome is as curt as possible, "Guilty 39s.," meaning that the jury convicted him but determined the combined value of what was stolen to be thirty-nine shillings (less than two guineas, hence well below the value charged in the indictment). Ryder's notes explain why. "The jury found him guilty to the value of 39s., which they did after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy. It is by Act of 12 Ann." Ryder thus records his own role in guiding the jury's prerogative of 'valuing' the loot. Because the statute of 1713 to which Ryder refers withdrew so-called benefit of clergy from thefts of forty shillings' value or more when committed in a dwelling house, it foreclosed the primary ground upon which a convict could escape the death penalty for such an offense. The convention of the day, immortalized in Blackstone's phrase as the jury's "pious perjury," was that the jury could "downvalue" the goods, in this instance to thirty-nine shillings, in order to consign the convict to the lesser sanction of transportation for seven years.

John H. Langbein, Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources, 50 U. Chi. L. Rev. 1, 22 (1983)(footnotes omitted)("Ryder Sources"). Professor John H. Langbein, Sterling Professor of Law and Legal History at Yale Law School, concludes from

---

[7] Old Bailey was London, England's central criminal court from 1674 to 1913. See The Proceedings of the Old Bailey, https://www.oldbaileyonline.org// (last visited Oct. 9, 2018).

Ryder's notebook chronicling many of his trials during his tenure on the Old Bailey bench that the paramount, if not only, purpose of the jury was to determine the sentence:

> Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In most cases the accused had been caught in the act or otherwise possessed no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings. The main object of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction from death to transportation, or to lower the offense from grand to petty larceny, which ordinarily reduced the sanction from transportation to whipping. . . .

> The jury not only decided guilt, but it chose the sanction through its manipulation of the partial verdict. Since guilt was typically although not inevitably a forgone conclusion in many (perhaps most) cases, sentence is what was at stake when these cases were "contested."

Ryder Sources, supra, at 41, 55 (footnotes omitted). Professor Langbein notes that, in Ryder's two years on the bench at Old Bailey, although he tried over one-hundred and seventy-one cases, there were only sixteen different crimes with which the defendants were charged. See Langbein, supra, at 42. Professor Langbein, in addition to reviewing Ryder's notebook, also reviewed a group of reports called the Old Bailey Session Papers ("OBSP") from the 1670s to the 1730s, concluding:

> [T]he jury of that time had a large role in what we think of as sentencing, that is, in determining the sanction. In a significant fraction of the cases that went to trial, the real issue was whether the jury would choose to exercise its power to "value" stolen goods in ways that would affect the applicable sanction. It was understood that the value that the jury assigned was fictional, and that the jury was in truth deciding whether to rescue the culprit from the ordinary sanctions of transportation and death by so characterizing the crime that only a lesser sanction could be invoked. If the goods were valued below 12 pence (in practice the Old Bailey juries used the figure of 10 pence), the crime became petty larceny, hence a misdemeanor, and the convict escaped with a whipping or a short jail term. Under certain circumstances the jury could, by valuing goods below other monetary ceilings, bring the culprit under the rubric of benefit-of-clergy, for which the sanction was branding in the thumb. The decision between finding an accused guilty of murder or manslaughter, which also belonged to the jury, can be seen as the choice between capital punishment and branding. It could be argued that in all these situations the jury was in reality discharging a sentencing function, and even today we expect sentencing officers to

consult past conviction evidence. But we have seen that the OBSP show that the juries were using past conviction evidence to determine guilt, and with no constraint from the bench.

John H. Langbein, The Criminal Trial Before the Lawyers, 45 U. Chi. L. Rev. 263, 303-04 (1978)(footnotes omitted).

In United States v. Battiste, the case in which Justice Story first intimated that it was the jury's duty pursuant to the Sixth Amendment to follow the law as the judge provides it to the jury, the judge read to the jury the indictment, which included the mandatory sentence for conviction. See 24 F. Cas. at 1044. The indictment included the statutory language for the law under which the defendant was convicted, providing in relevant part: "[I]f any citizen . . . shall land . . . on any foreign shore, [and] seize any negro or mulatto . . . with intent to make such negro or mulatto a slave . . . such citizen or person shall be adjudged a pirate, and on conviction thereof . . . shall suffer death." 24 F. Cas. at 1044.

### 2. Jury Knowledge of Sentencing Ramifications in Modern Times.

"It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" Shannon v. United States, 512 U.S. at 579 (quoting Rogers v. United States, 422 U.S. at 40). The Supreme Court explains that its reasoning is to avoid confusion and keep separate the jury's factfinding role from the judge's role in determining the sentence the law requires:

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

<u>Shannon v. United States</u>, 512 U.S. at 579.  In support of this proposition, the Supreme Court cites to <u>Rogers v. United States</u>, in which the Supreme Court held that the district court erred when, without notice to the defendant and out of the defendant's presence, it answered in the affirmative a communication which the jurors sent during their deliberations inquiring whether the court would accept a verdict of guilty as charged "with extreme mercy of the Court."  422 U.S. at 37, 40.  The Supreme Court concluded that the district court's statements to the jurors irreparably prejudiced the defendant, reasoning that the court's statements might have induced a verdict that the jury would not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of "guilty with extreme mercy" within five minutes "after being told unconditionally and unequivocally that it could recommend leniency," strongly suggests that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise.

<u>Rogers v. United States</u>, 422 U.S. at 40 (internal citations omitted)(quoting <u>United States v. Glick</u>, 463 F.2d 491, 495 (2d Cir. 1972)).

The Tenth Circuit has stated: "The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial.  Breach of this standard has often been grounds for reversal."  <u>United States v. Greer</u>, 620 F.2d 1383, 1384 (10th Cir. 1980).  The Tenth Circuit has held specifically that an instruction on possible minimum sentences is not required absent a jury's required participation in sentencing and that a district court has no discretion to instruct the jury on sentencing ramifications.  <u>See</u> <u>United States v. Parrish</u>, 925 F.2d 1293, 1299 (10th Cir. 1991)("We hold a jury instruction about mandatory minimum sentences was properly omitted because the offenses do not specifically require jury participation in sentencing.");  <u>United States v. Gehringer</u>, 385 F. App'x 830, 834 (10th Cir. 2010)(unpublished)("In light of established Tenth Circuit and Supreme Court authorities, the

district court had no discretion to instruct the jury on the sentencing penalties, and therefore did

not abuse its discretion in denying the defendant's request.").

The Court decided this issue in United States v. Courtney, 960 F. Supp. 2d at 1200. The

Court recognized that the Supreme Court and the Tenth Circuit precedent pre-determined the issue,

yet the Court provided discussion regarding its conclusion that the precedent has eroded the Sixth

Amendment right to a jury trial.

> The Court concludes that, Supreme Court and especially Tenth Circuit precedent
> allowing the jury to know about sentencing ramifications only if its participation
> in sentencing is required, and precedent preventing the jury from learning about its
> nullification right, are inconsistent with trial practices at the Founders' time, and
> that these practices have eroded the Sixth Amendment jury trial right as the Framers
> understood that right. Nevertheless, because, as a district court, the Court must
> faithfully apply controlling Supreme Court and Tenth Circuit precedent, the Court
> will deny Courtney's motion to instruct the jury with information implying that it
> has the ability to depart from its duty to follow the Court's instructions on the law.

960 F. Supp. 2d at 1154. The Court in that case concluded that: (i) "Although the Common-Law

Jury was Informed About Sentencing Ramifications, Under Controlling Precedent, the Court Can

Inform the Jury of the Possible Penalties Only If a Statute Requires the Jury's Participation In

Sentencing"; (ii) "The Sixth Amendment Jury Trial Right, as the Supreme Court and Tenth Circuit

Currently Construe It, Does Not Include the Jury's Right to be Informed of Its Right to Jury

Nullification"; and (iii)

> Because the Supreme Court's and Tenth Circuit's Interpretations of the Sixth
> Amendment Jury Trial Right Do Not Allow for the Court to Provide the Jurors
> Instructions About Sentencing Ramifications or Jury Nullification, the Court Will
> Follow Tenth Circuit Precedent and Will Deny [Defendant's] Request to Instruct
> the Jury About the Sentencing Guidelines Advisory Sentencing Provisions and
> About the Jury's Nullification Power.

960 F. Supp. 2d. at 1179-98.[8]  The Tenth Circuit upheld the decision to not instruct the jury regarding its power to nullify, but it reversed on other grounds.

> On appeal, Courtney argues that (1) the forfeiture order must be reduced by the amount the lenders received from the properties through mortgage payments and the sale of the properties, and (2) he should have been allowed to inform the jury of the possible sentence and its power to acquit him if they believed the conviction would be unjust.  Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we reverse on the first argument and affirm on the second.

United States v. Courtney, 816 F.3d at 682.  Since United States v. Courtney, the Court has issued opinions conforming with United States v. Courtney's holding that controlling Supreme Court and Tenth Circuit precedent do not permit the Court to allow a jury to hear information regarding sentencing ramifications.  See, e.g., United States v. Edwards, 266 F. Supp. 3d at 1292 (concluding that Supreme Court and Tenth Circuit precedent allow the jury to know about sentencing ramifications only if its participation in sentencing is required).

## ANALYSIS

The Court concludes that the common-law jury knew about the sentencing ramifications and used that knowledge in reaching the verdict.  The courts' practice today is inconsistent with the jury trial right as the Framers understood that right, because withholding knowledge about the sentencing ramifications of a jury verdict from contemporary juries leaves jurors without knowledge that, at the Framers' time, would have been important in reaching the verdict.  The Court concludes that courts at the Founders' time instructed the jury about its nullification power, because courts instructed the jury that its role included ultimately determining both the fact and the law.  Additionally, defense counsel at the Founders' time were permitted to argue openly to the jury that it should exercise its nullification power.  The Court therefore concludes that the

---

[8]The capitalization is because these were the Court's headings for these three sections.

Supreme Court's and Tenth Circuit's requirements to keep out any mention of the jury's ability to nullify and to prevent any lawyer from mentioning to the jury that it can mitigate or nullify its verdict, is inconsistent with the Framers' intent in preserving the jury trial right in the Sixth Amendment. Nevertheless, because, as a district court, the Court must faithfully apply controlling Supreme Court and Tenth Circuit precedent, the Court will deny the Motion.

## I. THE SIXTH AMENDMENT JURY TRIAL RIGHT, AS THE SUPREME COURT AND TENTH CIRCUIT CONSTRUE IT, DOES NOT INCLUDE THE JURY'S RIGHT TO BE INFORMED OF ITS RIGHT TO JURY NULLIFICATION.

Young asserts that Sixth Amendment jurisprudence requires a return to the historical jury, and that the Framers intended to secure in the Sixth Amendment the right to a jury that had the knowledge and ability to practice nullification. See Motion at 2. The Court concludes that the Sixth Amendment jury trial right, as the Supreme Court and Tenth Circuit currently construe it, does not permit the Court to allow the jury to hear any discussion related to sentencing, nullification, or to the United States Sentencing Guidelines. Accordingly, the Court will deny the Motion and prohibit Young from instructing, arguing, or introducing evidence related to nullification.

## A. AT THE FOUNDERS' TIME, THE COMMON-LAW JURY'S ABILITY TO FIND THE LAW AS WELL AS THE FACTS INCLUDED THE RIGHT TO JURY NULLIFICATION.

As Judge Weinstein notes in United States v. Polizzi: "It was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt. In later years this fundamental power of the jury -- and the right of the accused -- has been termed the power to nullify." 549 F. Supp. 2d at 405 (internal quotation marks omitted). Judge Weinstein concludes that "[t]he negative connotations of this characterization of the jury's power and responsibility ignore history and the meaning of the Sixth Amendment." 549 F. Supp. 2d at 405. The history to

which Judge Weinstein refers is the dual roles that the common-law jury played at the Founders' time: its primary role was as factfinder, but its secondary role was to also find the law, often by acquitting if the jury found the law unjust. See I. Horowitz, supra, at 427 ("While the fact-finder role of the jury is the judicially preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is just and what is not.").

The jury's nullification power was well-known and used during the Founders' time, as common-law juries during the seventeenth and eighteenth century saw the development of the jury's power to acquit against the facts, or, as it was referenced in the time, to find the law in addition to the facts. See United States v. Courtney, 960 F. Supp. 2d at 1189-90. In the late-seventeenth century, Edward Bushell, who had been imprisoned for his role in acquitting -- against the court's direction to convict -- two Quakers of the offenses of unlawful assembly and breaching the peace resulting from their preaching, petitioned for a writ of habeas corpus. See United States v. Polizzi, 549 U.S. at 405; C. Conrad, supra, at 24. When the judge instructed the jury about the facts which the prosecution needed to prove to convict, the judge instructed the jury that the prosecution had proved those facts and instructed the jury it was their job to find as fact that the defendants had committed the crimes. See C. Conrad, supra, at 26 (quoting The Tryal of Wm. Penn and Wm. Mead for Causing a Tumult . . . , How. St. Tr. at 6:951 (1670)). When the jury refused to convict, and Bushell was imprisoned for his failure thereafter to pay a fine, the Honorable John Vaughn, then-Chief Justice of the Court of Common Pleas, held that to require a jury to find guilt because the court believed that all elements of the law were proven is to make the use of a jury useless. See C. Conrad, supra, at 27. As one scholar notes, Chief Justice Vaughn's decision "ushered in . . . 'the heroic age of the English jury,' during which 'trial by jury emerged

as the principle defense of English liberties,'" C. Conrad, <u>supra</u>, at 28 (quoting J. M. Beattie, <u>London Juries in the 1690's</u> 214, <u>in</u> J. S. Cockburn & Thomas A. Green, eds., <u>Twelve Good Men and True</u> (1988)), and which influenced the common-law jury to the point that, at the Founders' time, "jury [nullification] [w]as an accepted part of the American law for the next several generations," C. Conrad, <u>supra</u>, at 32.

Jury nullification as part of the Framers' conception of the common-law jury can be seen from Chief Justice John Day's instruction to the jury in the 1794 Supreme Court case, <u>Georgia v. Brailsford</u>, in which he charged the jury about its dual role as both finder of fact and law, stating that the jury had "a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy." 3 U.S. at 4. Moreover, an example of the jury's secondary role as finder of the law is played out in the case of <u>People v. Croswell</u>, wherein Mr. Hamilton was the defense attorney arguing for the increased jury role as finder of the law. <u>See United States v. Courtney</u>, 960 F. Supp. 2d at 1190. Although the case was tried in a state court, the majority opinion was joined by a future Associate Justice of the Supreme Court, the Honorable Smith Thompson, and noted that "[t]he law and fact are so involved, that the jury are under an indispensable necessity to decide both . . . ." <u>People v. Croswell</u>, 3 Johns. Cas. at 367.

The Supreme Court in its recent sentencing opinions has not only discussed that the Sixth Amendment jury trial right guarantees the "historical foundation" of the jury as "guard[ing] against a spirit of oppression and tyranny on the part of rulers, and as the great bulwark of our civil and political liberties," <u>Booker</u>, 543 U.S. at 239 (internal quotations and alterations omitted)(quoting <u>Apprendi v. New Jersey</u>, 530 U.S. at 477), but has specifically pointed out the jury's nullification power at common law. The Supreme Court referenced the jury's power to find against the facts that the evidence establishes in both <u>Apprendi v. New Jersey</u> and <u>Jones v. United States</u>, noting

that "juries devised extralegal ways of avoiding jury verdicts . . . ."  Apprendi v. New Jersey, 530

U.S. at 479 n.5.  In Jones v. United States, the Supreme Court similarly noted that "[t]his power to

thwart Parliament and Crown took the form . . . of flat-out acquittals in the face of guilt . . . ."  526

U.S. at 245 (quoting 4 W. Blackstone, supra, at 238-39).  The authorities suggest that the common-

law jury at the Founders' time had the ability to nullify by acquitting the defendant against the

facts that the evidence establishes at trial, or -- as it was referred to at the time -- to determine the

law.

 The Court concludes that there is, therefore, a tension between the historical authority about

the common-law jury's role and the Supreme Court's finding in Sparf v. United States "that the

law in England at the date of our separation from that country . . . falls far short of the contention

that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of

law announced by the court."  156 U.S. at 90.  Justice Harlan's inclusion of the word "rightfully"

before "refuse" leaves this statement open to interpretation that, although the nullification power

was part of the common-law jury's role, it was nevertheless wrongful to exercise it.  Such an

argument is, however, irreconcilable with the recent Supreme Court decisions' recognition of the

crucial importance of the common-law jury's mitigation power to the Sixth Amendment's

preservation of the jury trial right.

 **B. THE COMMON-LAW JURY'S NULLIFICATION ROLE INCLUDES THE RIGHT TO BE INSTRUCTED ABOUT ITS NULLIFICATION RIGHT.**

 The Court agrees with Young that the common-law jury exercised its role as "the

conscience of the community" by nullifying "severe sentencing laws," Motion at 5, because the

historical record suggests that the common-law jury not only used its nullification power, but also

that jury nullification was a well-known, common jury power to guard against what it saw as unjust

laws, see United States v. Courtney, 960 F. Supp. 2d at 1191.  The historical background also

suggests that juries at the Framers' time did not have to be provided instruction about their ability to nullify. See United States v. Courtney, 960 F. Supp. 2d at 1191. The frequency with which juries mitigated the verdict or acquitted a guilty defendant, because they saw the law as unjust, suggests that jurors knew about their ability to nullify without any information from the courts about that ability and that this nullification power was essential "to ensure their control in the judiciary." Blakely v. Washington, 542 U.S. at 305. Nevertheless, courts at the Founders' time, including the Supreme Court in 1794, instructed juries that it was their right to be the ultimate judge of both the facts and the law. See United States v. Courtney, 960 F. Supp. 2d at 1191.

The caselaw from the Framers' era discussing whether courts should instruct juries about their ability to determine the law in libel cases, on the one hand, does not necessarily lend support to the position that courts should inform juries about the ability to nullify the verdict, because, given the special verdict form provided to juries at this time, libel cases may be seen as unique. See United States v. Courtney, 960 F. Supp. 2d at 1191. Although Mr. Hamilton in People v. Croswell used broad and sweeping language to advocate for the jury's role to decide the law in addition to the facts -- and thus to allow them to nullify if they believed the defendant had factually committed the crime -- Mr. Hamilton was arguing that it was unconstitutional to take away the jury's power to find that the defendant had the required intent for libel. See United States v. Courtney, 960 F. Supp. 2d at 1191. In essence, he was arguing for the jury's power to reach a verdict, because all that the district court allowed the jury to return in People v. Croswell was a special verdict, limited only to finding whether there was publication and whether the statement's inference was true. See 3 Johns. Cas. at 342. Even though Justice Kent's language in People v. Croswell is, therefore, subject to, and often cited for, a reading that it embraces the jury's role as being able to disregard the law given to them by the court as "the jury are under an indispensible

necessity to decide both [the law and the fact]," 3 Johns. Cas. at 366, the court's otherwise unsurprising conclusion is that, in a libel case, "the jury have a right to judge . . . whether it be a libel or not . . . in short, . . . 'the whole matter put in issue . . . .'" 3 Johns. Cas. at 376-77.

The Founders nevertheless believed it proper for the court to instruct the jury on the law. In People v. Croswell, while Justice Kent writes that the jury should decide the whole of the matter, he still notes that it is the court's duty to instruct the jury about the law: "[A]s in other criminal cases, it is the duty of the court, 'according to their discretion, to give their opinion and direction to the jury on the matter in issue,' and it is the duty of the jury to receive the same with respectful deference and attention . . . ." 3 Johns. Cas. at 377. Justice Kent did not hold that the court had the affirmative obligation to instruct the jury that it was to find the facts as well as the law but held merely that it was error to deny the jury the ability to exercise its power to, at that time, do both in reaching the ultimate conclusion of guilt or innocence. People v. Croswell appears, therefore, to go only as far as to recognize the longstanding proposition that the jury has the power to nullify, or to decide the ultimate issue of guilt, regardless whether the evidence establishes guilt, but does not stand for the proposition that the defendant has the right to demand instruction from the court about the jury's ability to exercise its nullification power. Rather, it falls in line with Justice Harlan's conclusion about the common-law jury's role that he articulated in Sparf v. United States:

> [T]he general common-law rule in criminal cases . . . [is that it is] the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury, by a general verdict, of necessity determined in the particular case both law and fact, as compounded in the issue submitted to them.

156 U.S. at 98.

Regardless whether libel cases are viewed as unique, however, the historical authority shows that the Founders viewed the jury's role to return a verdict based on its conscience,

notwithstanding the court's instructions about the law.  See United States v. Courtney, 960 F. Supp. 2d at 1192.  To say that libel cases are unique cannot account for Chief Justice Day's charge to the jury in Georgia v. Brailsford -- not a libel case -- "that by the same law, which recognizes th[e] reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy."  3 U.S. at 4.  Rather, dictionaries at the Founders' time included in the definition of jury: "Juries are . . . not finable for giving their verdict contrary to the evidence, or against the direction of the court . . . and they may not only find things of their own knowledge, but they go according to their conscience."  Jacob's Law Dictionary (1782)(quoted in C. Conrad, supra, at 46-47).  The historical sources show, therefore, that not only did the definition of "jury" as written in the Constitution at the Founders' time include the nullification power, but the authority also shows that the Supreme Court was candid with the jury about its "right to take upon yourselves to judge . . . both . . . the law as well as the fact in controversy."  Georgia v. Brailsford, 3 U.S. at 4 (emphasis added).  Contra Crease v. McKune, 189 F.3d at 1194 ("[T]he power of juries to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within authority to prevent." (internal quotation marks omitted)(quoting United States v. Thomas, 116 F.3d at 615)).

C.  **CONTEMPORARY COURTS' WITHHOLDING FROM THE JURY INFORMATION ABOUT ITS MITIGATION OR NULLIFICATION RIGHT HAS LESSENED THE JURY'S CONTROL IN JUDICIAL PROCEEDINGS AND ERODED THE COMMON-LAW JURY'S ROLE.**

The Supreme Court has stated that not all changes to the jury's role implicate the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost not only by gross denial, but by erosion.'"  Apprendi v. New Jersey, 530 U.S. at 483 (quoting

Jones v. United States, 526 U.S. at 247-48).  The question for the Court to decide is whether the judicial exertion of power has changed trial practices to the point where the jury trial right has been unconstitutionally eroded or denied.  Requiring courts to keep information about the mitigation or nullification power from the jury has not wholly taken away a defendant's jury trial right.  Given that: (i) the Founders contemplated the jury's role to include its right to be the ultimate decider of the law; and (ii) the mitigation power played such a large role in the common-law jury's resolution of a case, however, the contemporary judicially created requirement to keep all information from the jury about its "power" to nullify is inconsistent with the Sixth Amendment jury trial right at the Founders' time.

The Supreme Court has noted that "the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power.  It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury."  Blakely v. Washington, 542 U.S. at 308.  Even though an organic change leading to the courts' omissions of any information about the jury's nullification would perhaps not be sufficient to find a judicial exertion of power, such a small evolution is not what occurred.  Sparf v. United States and its progeny effectively took away, by the exertion of judicial power, any possibility that the jury might be informed about its role including its nullification or mitigation power.  The Supreme Court's decision in Sparf v. United States, which established that it is correct for courts to instruct the jury that the law is the court's determination to make and solely in its province, and that it is the jury's duty to apply the law as given, is inconsistent with the practices of the Supreme Court in Georgia v. Brailsford and of the New York Supreme Court in People v. Croswell.  To stake out the position that the law is solely the court's province and that it is the jury's duty to apply the law as the Court gives it to the jury is at tension with the Supreme Court's direction that it is the jurors' "right to take upon

yourselves to judge . . . both . . . the law as well as the fact in controversy," <u>Georgia v. Brailsford</u>, 3 U.S. at 4 (emphasis added), and that, when, in the jurors' eyes, "the law arising in the case is different from that which the court advances," the jurors are "bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions," rather than according to the dictates of the law, <u>People v. Croswell</u>, 3 Johns. Cas. at 355-56. The question thus becomes whether this judicial power infringes on the jury's province.

Like the modern-day jury's lack of knowledge about sentencing information, it may be that any lack of the jury's knowledge about its nullification power does not implicate the Sixth Amendment's jury trial right, because even if the jurors' knowledge about nullification has receded, the jury's power to nullify still exists to the same extent that it did in the Founders' time. <u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1193-94. As the Honorable Judge Learned Hand, United States Circuit Judge for the Second Circuit, observed in <u>Steckler v. United States</u>, 7 F.2d 59 (2d Cir. 1925), however inconsistent jury nullification may be with the jury's role as factfinder and duty to apply the law as given to its findings of fact, the jury retains this nullification power and exercises this power when the jury sees fit to do so regardless whether the court informs the jury about the power:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

7 F.2d at 60.

The Supreme Court and especially the Tenth Circuit have also concluded that this change in practice -- affirmatively to instruct the jury to follow the law which the district court gives to it -- has not unconstitutionally eroded the jury's role from the Founders' conception of that role.

This conclusion finds support in the policy considerations which Justice Harlan noted in <u>Sparf v. United States</u>. Justice Harlan noted that many of the concerns present in England and the colonies in the Framers' era about the injustice that stems from judges as arms of the oppressive state dissipated with the requirements in the United States that judges give their opinions publicly, explain the reasoning behind their opinions, and the repercussion of impeachment guaranteed in the United States Constitution:

> As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to the purposes of injustice.

156 U.S. at 107 (quoting <u>United States v. Morris</u>, 1 Curt. at 63). He reasoned, rather, that placing the duty to expound the law in the courts and requiring the citizens to follow them furthers the interests of justice by helping to ensure that laws which the democratic government enacts are enforced regardless of their popularity:

> I do consider that this power and corresponding duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen. The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men. To enforce popular laws is easy. But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, -- there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne.

<u>Sparf v. United States</u>, 156 U.S. at 107 (quoting <u>United States v. Morris</u>, 1 Curt. at 63). As Justice Weinstein notes, <u>Sparf v. United States</u> produces a court system that can efficiently deal with the realities of the organic evolution of the American legal system and the jury pool:

> Justice Harlan's majority opinion was well designed to produce a more efficient court system calculated to deal with the growing complexity of the law; the much improved training and professionalism of bench and bar; a lay public increasingly out-of-touch with the law's details; and a desire to provide predictable rules protecting our growing national industry and commerce.

United States v. Polizzi, 549 F. Supp. 2d at 421. These courts have, therefore, been very clear about what a trial court should do when asked to inform the jury about its nullification power or to allow the lawyers to do so: "[N]either the court nor counsel should encourage jurors to violate their oath." United States v. Gonzalez, 596 F.3d at 1237 (internal quotation marks omitted)(quoting United States v. Trujillo, 714 F.2d at 106). See United States v. Gonzalez, 596 F.3d at 1237 ("[W]e disapprove of the encouragement of jury nullification.").

The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism. See United States v. Courtney, 960 F. Supp. 2d at 1195. That the jurors' lack of knowledge stems at least in part from the judicial exertion of power, and that the jury's nullification power played an important role in criminal jury trials at the Founders' time, counsels in favor of finding this evolution unconstitutional. In Blakely v. Washington, the State of Washington asserted that, although the jury did not find the aggravating fact supporting the enhancement that the sentencing judge applied, and the sentencing range based on the facts submitted to the jury corresponded with a 49 to 53-month range, the 90-month sentence imposed was nevertheless constitutional, because the statutory maximum for the crime was ten years, and the sentence imposed was under that statutory maximum. See 542 U.S. at 303. Justice Scalia, then-Associate Justice of the Supreme Court, noted, however, that "[o]ur precedents make clear that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict," 542 U.S. at 303 (emphasis omitted), noting that, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority," 542 U.S. at 304 (citations omitted). Justice Scalia explained that Apprendi v. New Jersey and its progeny are based on the commitment to the

Framers' intention in providing the Sixth Amendment jury trial right: the people's ultimate control of the judiciary.

> Our commitment to <u>Apprendi</u> in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. <u>See</u> Letter XV by the Federal Farmer (Jan. 18, 1788), <u>reprinted in</u> 2 <u>The Complete Anti–Federalist</u> 315, 320 (H. Storing ed. 1981)(describing the jury as "secur[ing] to the people at large, their just and rightful control in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), <u>reprinted in</u> 2 <u>Works of John Adams</u> 252, 253 (C. Adams ed. 1850)("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), <u>reprinted in</u> 15 <u>Papers of Thomas Jefferson</u> 282, 283 (J. Boyd ed. 1958)("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"); <u>Jones v. United States</u>, 526 U.S. 227, 244-48 . . . (1999). <u>Apprendi</u> carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.

<u>Blakely v. Washington</u>, 542 U.S. at 305-06. To take away the defendant's ability to inform the contemporary jury about its nullification power, which was central to the common-law jury's role in ensuring that the people kept "ultimate control . . . in the judiciary," 542 U.S. at 306, effectively takes away the modern jury's ability to withhold a guilty verdict where it believes to do so is just. This situation is particularly the case when a court instructs the jury that it must follow the court's instructions on the law and set aside any beliefs it may have about what the law should be. In such a case, because the jury did "not exercise the control that the Framers intended," the sentence that the court subsequently imposes on the defendant does not "derive[] wholly from the jury's verdict," as the Framers contemplated "jury," and therefore violates the Framers' intent in preserving the jury trial right in the Sixth Amendment. <u>Blakely v. Washington</u>, 542 U.S. at 305-06.

Because the common-law jury at the Founders' time was in control of the judiciary by virtue of rendering the ultimate decision in its verdict, and because the courts at the time of the Founders told the jury that the jury was the master of the law and of the facts, the Supreme Court's and the Tenth Circuit's precedent that the trial court should not instruct the jury about nullification is inconsistent with the Framers' intention in adopting the Sixth Amendment jury trial right. Moreover, the requirement that the court not allow the lawyers to encourage nullification is inconsistent with the practice at the time of the Framers, as Mr. Hamilton's conduct in People v. Croswell exhibits. Even though it is messy to talk openly to the jury about jury nullification in the modern American judicial system, the Constitution is not about efficiently convicting defendants. The Court has made clear its belief that the jury has the power to put off the law as the Court gives it and to convict according to the jury's conscience.[9] This power has been a long-standing bulwark against the threat of judicial despotism and congressional tyranny, yet the Court is left no choice but to deny the Motion. Despite the Supreme Court's possible receptiveness to reconsider the issue of jury nullification and the courts' role in educating the jury of its power, the Supreme Court

---

[9] The Court thinks that the most potent criticism of the Court's position is that jury nullification might be misused for racial reasons. For example, the fear may be that a white jury might engage in jury nullification when there is a white defendant officer accused of killing an African-American civilian. The Court would not take away jury nullification in these circumstances, because a prosecutor might be under political pressure to bring a case, and more importantly, because the jury more often has an African-American defendant on trial, and the jury might want to take race into consideration in these circumstances. See Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 Yale L.J. 677, 715-18 (1995)(arguing that African-American jurors should sometimes vote to acquit in criminal cases where African-American defendants are factually guilty, because the benefits of returning the defendant to the community may outweigh the harms caused by incarceration). This country has fought a civil war and engaged in a long struggle to attempt to rid itself of racial divide. The Court could also live with the proposition that the court tell the jury that it cannot base jury nullification on race. The jury could be told that race is an illegitimate factor. One might say that an instruction might not be effective, but a court can never rule out all jury misconduct, and the Court's experience is that American juries work hard to follow the Court's instructions.

has not directly ruled on the issue. The Court must defer, therefore, to the Supreme Court's guidance to district courts that, where a recent decision casts doubt about Supreme Court caselaw's precedential value, district courts must adhere to the established precedent until the Supreme Court explicitly reconsiders it. See Hohn v. United States, 524 U.S 236, 252-53 (1998)("[O]ur decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued validity."). See also United States v. Courtney, 960 F. Supp. 2d at 1199 ("Thus, although the recent Supreme Court case law discussing the Sixth Amendment jury trial right calls into question the language in this instruction, the Court cannot say that the Supreme Court has effectively ruled this instruction unconstitutional.").

## II. THE COURT CONCLUDES THAT, ALTHOUGH THE COMMON-LAW JURY WAS INFORMED ABOUT SENTENCING RAMIFICATIONS, UNDER CONTROLLING PRECEDENT, THE COURT CAN INFORM THE JURY OF THE POSSIBLE PENALTIES ONLY IF A STATUTE REQUIRES THE JURY'S PARTICIPATION IN SENTENCING.

Young asserts that the Framers believed the jury needed to have sentencing information to perform its proper function, and notes that, historically, common law juries had sentencing information that modern juries do not. See Motion at 8 (citing Sparf v. United States, 156 U.S. at 110-83; United States v. Dougherty, 473 F.2d at 1144; United States v. Polouizzi, 549 F. Supp. 2d at 402-50). Although the United States did not respond to the Motion, in United States v. Baker, 342 F. Supp. 3d 1189 (D.N.M. 2018)(Browning, J.), the United States directed the Court to Chapman v. United States, 443 F.2d at 920, for the proposition that a jury shall not be informed of possible penalties unless a statute specifically requires its participation in determining punishment. See United States v. Baker, 342 F. Supp. 3d at 1222. The Supreme Court has not expressly decided whether this determination is unconstitutional, because it is inconsistent with the Framers' intent in adopting the Sixth Amendment, but Young argues that the Supreme Court has possibly

implicitly rejected the proposition. See Motion at 2 (citing Booker, 543 U.S. at 404; Blakely v. Washington, 542 U.S. at 296; Jones v. United States, 526 U.S. at 227). Regardless how the Court interprets history, however, the Court, as a district court, is not free to say that Supreme Court decisions have implicitly overruled Tenth Circuit opinions; that task is one for the Supreme Court and the Tenth Circuit. The Court will deny the Motion's request to permit Young to inform the jury of its guilty verdict's consequences. See Motion at 11.

### A.   HISTORICALLY AND AT THE FOUNDERS' TIME, THE COMMON-LAW JURY KNEW THE RAMIFICATIONS OF ITS VERDICT.

Changes in juror qualifications have resulted in a situation in which, at the time that the Founders ratified the Sixth Amendment, the common-law juries were vastly different from our contemporary juries. See United States v. Courtney, 960 F. Supp. 2d at 1180. Whereas Professor Goebel notes that New York juries had a "high property qualification . . . , which rested upon the presumed higher responsibility and intelligence of propertied persons," courts today do not require property ownership, let alone a high property value qualification, as a prerequisite for juror qualification. New Mexico state courts do not get their jury pool from property ownership records, but rather from the Department of Motor Vehicles, or, in the United States District Court for the District of New Mexico, from the state of New Mexico's voter registration list. See Misc. No. 08-00004-40, Order Adopting Modified Jury Plan ¶ 4, at 2, filed December 2, 2008. Similarly, whereas Judge Weinstein notes that colonial and British jurors at the Founders' time "were from the vicinage, were well-informed and self-confident property owners, and knew the essentials of the local criminal law and its punishments," United States v. Polizzi, 549 F. Supp. 2d at 406 (citations omitted), the jurors today do not have those same requirements and do not often have those same qualities, see J. Goebel & T. Naughton, supra, at 603 (noting that "[t]he [New York] Judicature Act of 1691 and 1692 also contained provisions that no man's rights or property should

be determined . . . unless the facts be found by verdict of twelve men of the neighborhood."(emphasis added)).  Although the jury pools contain only persons who are registered to vote in a certain New Mexico county, or licensed to drive in the state, especially in a large state like New Mexico with a smaller population density, jurors may not hail from within what in the eighteenth century would have been considered the defendant's vicinity.

The twenty-first century American jury pool has less knowledge about the law than the common-law jury pool of the Founders' time.  See United States v. Courtney, 960 F. Supp. 2d at 1180.  As Professor Langbein notes in looking at Ryder's personal notebook from 1754 to 1756, in two years on the bench at the central criminal court in London, trying over 170 cases, there were only sixteen laws with which a mid-eighteenth-century Londoner may have been charged, and with which the freeholder jury pool would thus likely have been familiar.  See Ryder Sources, supra, at 42.  In modern times, however, "[f]or decades, the task of counting the total number of federal criminal laws" has been attempted by "lawyers, academics and government officials," largely without success: a 1982 United States Department of Justice study attempting to count the number of federal criminal laws as part of an effort to persuade Congress to revise it, "produced only an educated estimate: about 3,000 criminal offenses."  Gary Fields & John R. Emshwiller, Many Failed Efforts to Count Nation's Federal Laws, Wall St. J., July 23, 2011.  Thus, while Professor Abramson notes that jurors in the late-eighteenth century American colonies did not "come to the jury with minute skill in the laws," the local knowledge jurors would have possessed included knowledge of the laws.  Abramson, supra at 32.  The same cannot be said for contemporary juries in federal courts.  The extent of colonial juries' knowledge of the law is exemplified by the 1702 trial of Nicholas Bayard, a New York mayor while under British rule, who appealed his conviction on grounds that the trial was improper, because two of the jurors did

not have their own independent knowledge of treason's elements, "but were perswaded [sic] by the foreman." Goebel & Naughton, supra, at 603.

At the time of the Sixth Amendment's ratification, juries knew what the ramifications of a guilty verdict would be, because of the limited sentences available. Importantly, of the sixteen offenses at issue in the Old Bailey trials, only two of those sixteen laws were misdemeanors, while the rest were felonies. Ryder Sources, supra, at 42. At that time, juries knew well the repercussions of a guilty verdict for the fifteen felonies. See United States v. Courtney, 960 F. Supp. 2d at 1181. Punishment for the first offense was the "benefit of the clergy," which meant the judge would choose between seven years' banishment or immediate release with a branding on the thumb. See United States v. Courtney, 960 F. Supp. 2d at 1181. Punishment for the second offense was death. See Ryder Sources, supra, at 39. For misdemeanors, although the judge had more discretion, it was almost invariably lashings. See Ryder Sources, supra, at 53. Juries at the Founders' time likely knew a substantial amount more about the law with which the defendant was charged and almost certainly knew the repercussions of a guilty verdict.

The Supreme Court, in its recent sentencing decisions discussing the Sixth Amendment jury trial right as it existed at the Founders' time, has similarly noted both the vicinity tenet and that offenses were sanction-specific when the Sixth Amendment was ratified in 1791. See United States v. Courtney, 960 F. Supp. 2d at 1181. In Blakely v. Washington, the Supreme Court noted that a tenet of the Sixth Amendment jury trial right at the Founders' time was "that the 'truth of every accusation' against a defendant should afterwards be confirmed by unanimous suffrage of twelve of his equals and neighbours . . . ." 542 U.S. at 301 (quoting 4 W. Blackstone, supra, at 343). The Supreme Court in Apprendi v. New Jersey recognized that, at least with respect to felonious conduct, "the English trial judge of the later eighteenth century had very little explicit

discretion in sentencing. The substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense." 530 U.S. at 479. Cf. 530 U.S. at 481 (noting that there was a "19th-century shift in this country from statutes providing fixed-term sentences to those providing judges discretion within a permissible range"). The Supreme Court has noted the very limited sentences available to American judges at the Founders' time and the nature of mandatory sentencing in contrast to its recent sentencing opinions: "In the early days of the Republic, when imprisonment had only recently emerged as an alternative to the death penalty, confinement in public stocks, or whipping in the town square, the period of incarceration was generally prescribed with specificity by the legislature. Each crime had its defined punishment." United States v. Grayson, 438 U.S. 41, 45 (1978).

Even if the Court instructed modern-day juries that the crime with which the defendant in the case is charged is a felony or a misdemeanor, given the multiple crimes with specific statutory minimum and maximum sentences, those juries likely would not know the possible sentences the defendants face if found guilty. Whereas the Supreme Court noted in Apprendi v. New Jersey that the nineteenth century saw a shift from mandatory, definite sentences to a system in which the court could impose a sentence at the court's discretion, because courts today are not permitted to inform the modern-day jury about the possible sentencing range flowing from the defendants' guilty verdicts, and given the complexity of the United States Sentencing Guidelines, the modern-day jury is likely without knowledge of the possible sentencing ramifications of their guilty verdict. The Court, in its experience on the bench, has found that present-day jurors, beyond lacking knowledge about sentencing ramifications for felonies or misdemeanors, often do not recognize the difference between criminal and civil jury trials. Numerous times conducting voir dire, when the Court inquired about a potential juror's past experience on a civil or criminal jury trial, the

juror's answers show that what the juror believes was a criminal trial was actually civil and vice versa. Judge Weinstein has similarly noted that the vast difference between late-eighteenth century juries' knowledge about criminal law and sentencing ramifications of guilty verdicts, and contemporary juries' knowledge, is not surprising given the vast difference in criminal law as it then existed compared with the law today: "Criminal law then was much simpler than today, now requiring tomes of highly abstruse, convoluted definitions and extraordinary combinations of statutory prison maximums and minimums, fines, restitutions, forfeitures, probationary terms, treatment for mental health and other problems in and out of prison, sentencing guidelines, case law and local practice." United States v. Polizzi, 549 F. Supp. 2d at 407. Considering the small number of offenses in the late-seventeenth century and eighteenth century, and that there were only two sanctions available for a felony conviction, support for withholding sentencing information from the jury and the jury's resulting lack of knowledge cannot be found in the historical reality of the common-law jury known to the Founders at the time of the Sixth Amendment's ratification.

### B. JURORS ON COMMON-LAW JURIES USED THEIR KNOWLEDGE OF THEIR VERDICT'S SENTENCING RAMIFICATIONS IN REACHING THEIR VERDICT.

Juries at the Founders' time not only knew about the sentencing ramifications of their verdicts, but historical evidence shows that juries weighed heavily the defendant's sentence in reaching their verdicts. In looking at jury verdicts throughout the eighteenth century in colonial New York, Professor Goebel concludes:

> The verdicts . . . are illustrative of one of the most important aspects of the jury's prerogative -- the power to effect a mitigation in the severity of the law by verdicts which would let off an obvious offender with penalties less than the worst of the charges against him would make inevitable. This power was not confined to the selection of a relatively innocuous count on which to return a conviction, but extended, as indicated above, to a finding of an offense less in degree than that

> charged in the indictment. The importance of this rule in the case of felonies was obvious, since it was possible thus for the defendant to pray clergy and escape the rigor of the otherwise inevitable judgment of life and limb.

J. Goebel & T. Naughton, supra, at 673 (footnotes omitted). The eighteenth-century jury in England also consistently exercised its power to effect a mitigation of the defendant's sentence. Professor Langbein notes that "only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence . . . . To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings." Ryder Sources, supra, at 41. Professor Langbein provides the common example in which a jury found that the value of stolen goods was thirty-nine shillings, because at a value of forty shillings, the defendant lost ability for application of the benefit of the clergy and, thus, was necessarily sentenced to death. See Ryder Sources, supra, at 22 ("Ryder's notes explain . . . 'The jury found him guilty to value of 39s., which they did after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy . . . in order to consign the convict to a lesser sanction of transportation for seven years.'" (quoting Ryder Notebook at 11)).[10]

---

[10]Professor Langbein explains:

> The judges of the three royal central courts served as trial judges at the Old Bailey in a rotation; two or three of them joined the Recorder of London, the permanent judge of the Old Bailey, for each sessions. In the 1750s the Chief Justice of King's Bench took his turns in April and October. Ryder sat at four sessions, October of 1754, April and October of 1755, and April/May of 1756 (he died later that May). At these four sessions the Old Bailey conducted 171 felony trials. Ryder presided at about a quarter of them, forty-four trials, and his judge's notes survive for all forty-four. The original notes are contained in a single notebook, the property of the Earls of Harrowby (the peerage that, with some difficulty, was founded on Ryder's career). The notebook, together with other volumes of notes that Ryder made while conducting civil (nisi prius) cases, is now on deposit at Lincoln's Inn. Fortunately, all these shorthand judge's notes were transcribed in the 1970s and the

The Supreme Court has twice noted the common-law jury's mitigation power stemming from their knowledge of the repercussion of guilty verdicts. In <u>Jones v. United States</u>, the Supreme Court noted that "competition developed between judge and jury," and provided the jury's mitigation power as an example: "The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences." <u>Jones v. United States</u>, 526 U.S. at 245. In <u>Apprendi v. New Jersey</u>, the Supreme Court again referenced this mitigation power, noting that, at the Founders' time:

> [J]uries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant. [<u>Jones v. United States</u>, 526 U.S.] at 245 . . . ("This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses, manifestations of what Blackstone described as 'pious perjury' on the jurors' part. 4 Blackstone 238-239").

<u>Apprendi v. New Jersey</u>, 530 U.S. at 480 n.5. It is thus clear that the Supreme Court's conception

---

typescript placed on deposit at Lincoln's Inn (and subsequently at the University of Chicago Law Library). The transcription is the work of K. L. Perrin, who rendered many other Ryder shorthand documents into typescript for the Harrowby muniments over a period of three decades until his death in 1981. The researcher who is prepared (as I have been) to rely upon the Perrin transcription does not need to master the shorthand.

. . . .

The transcriber renders the shorthand documents as 'Law notes of Sir Dudley Ryder,' and he numbers them Documents 12-17. The volume I am using, the Old Bailey notes, is Document 14, which he transcribes in 62 pages of single-spaced typescript. I cite this typescript hereafter as Ryder Notebook.

<u>Ryder Sources</u>, at 8-9 & n.19.

of the common-law jury which the Sixth Amendment protects includes a jury with knowledge of the sentences a guilty defendant faces and a jury that uses this knowledge to reach its verdict.

It may be suggested that this recognition that there was knowledge germane to common-law jurors, without more, does not clearly suggest that withholding knowledge about sentencing ramifications is inconsistent with the Sixth Amendment's jury trial right.  If, for instance, a juror at the Founders' time knew the sentence that a guilty defendant faced only because there existed a very limited number of laws and a much more limited class of potential sentences, the courts' refusal today to institute a change to affirmatively provide to the jury this information does not clearly violate the defendant's Sixth Amendment right.  It seems tenuous to argue that knowledge lost because the jury pool has enlarged since the Sixth Amendment's ratification or that knowledge lost because the jurors in the jury pool are less educated about the criminal law, without any affirmative conduct on the courts' behalf -- and without more -- implicates the Sixth Amendment. The Supreme Court has recognized that the Sixth Amendment "limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury," Blakely v. Washington, 542 U.S. at 308; a change resulting from the inclusion of a broader base of citizens in the jury pool, or from an evolution of the jurors in the jury pool, without courts' affirmative exertion of power, may not implicate the Sixth Amendment jury trial right.  On the other hand, however, even if the jury's lack of knowledge about the sentence that the defendant faces is diminished, because the modern-day jury is left without information that appears to have been important to the common-law jury's verdict and its power to mitigate the defendant's sentence, the substance of the defendant's Sixth Amendment jury trial right appears to have deteriorated substantially.  See Booker, 543 U.S. at 237 (stating that the Supreme Court's holding that the Sentencing Guidelines are unconstitutional if mandatory "is an answer not motivated by Sixth

Amendment formalism, but by the need to preserve Sixth Amendment substance"). To be consistent with what the Framers thought a jury was at the time of the Bill of Rights' adoption, it may no longer be defensible to keep the jury so ignorant of the verdict's sentencing ramifications.

### C. WITHHOLDING KNOWLEDGE ABOUT SENTENCING FROM THE MODERN-DAY JURY LEAVES THE JURY WITHOUT KNOWLEDGE THAT IT WOULD HAVE HAD AT THE FRAMERS' TIME.

Judicial power as it relates to sentencing in the modern criminal court system appears to infringe on the Sixth Amendment's reservation of jury power in two interrelated areas. The first is that the Sentencing Guidelines have caused, at least in part, the modern-day jury's ignorance of the ramifications of a guilty verdict. Although, at the Framers' time, judges had discretion regarding sentences for misdemeanors -- largely between corporal punishment and banishment -- for felonies, judges until the nineteenth century had no discretion in relation to sentencing. See Apprendi v. New Jersey, 530 U.S. at 481 (noting "the 19th-century shift in this country from statutes providing fixed-term sentences to those providing judges with discretion within a permissible range"); 530 U.S. at 482 (noting "[t]he historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties . . . ."); Ryder Sources, supra, at 41 (noting the mandatory sentences for felonies were either transportation/banishment if the benefit of the clergy was available, or death if not, and, for misdemeanors, was transportation or whipping). While Congress' power to make law includes "the power to fix the sentence for a federal crime," Mistretta v. United States, 488 U.S. 361, 364 (1989), Congress' creation of over 3,000 federal laws presents significant problems for jurors who may wish to educate themselves about sentencing repercussions for certain criminal offenses, and the federal Sentencing Guidelines have made self-education of potential sentences virtually impossible. Although a juror may be educated about statutory minimums and maximums, a juror

likely cannot educate him or herself about a defendant's potential sentence, as the Guidelines take into account the defendant's circumstances, and the circumstances surrounding the crime, and, after Booker, allow a judge to depart from a Guidelines sentence. The Sentencing Guidelines, enacted pursuant to Congress' power to make laws and to delegate that power, see Mistretta v. United States, 488 U.S. at 361, therefore have necessarily eroded the jury's ability to take into consideration the potential sentence that the defendant faces and eroded its ability to use its mitigation power, see Apprendi v. New Jersey, 530 U.S. at 483 (noting "the Framers' fears 'that the jury right could be lost not only by gross denial, but by erosion'"(quoting Jones v. United States, 526 U.S. at 247-48)).

Second, even though the Sentencing Guidelines find some support in the judges' discretion at the Framers' time to sentence within a prescribed range -- even if it applied only in the limited situations of misdemeanors -- the prohibition on any mention to the jury of a guilty verdict's sentencing implications does not find the same support. Ryder, while on the bench at Old Bailey, noted one particular situation in which the jury returned a guilty verdict finding that the defendant stole goods worth thirty-nine shillings and credits the jury's finding to the fact that the jurors found that amount "after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy." Ryder Sources, supra, at 22 (internal footnote omitted). Ryder in the 1750s therefore, at least, was not required to keep information about the jury's verdict's sentencing implications from the jury. Similarly, in United States v. Battiste, Justice Story in 1835 read to the jury the statute pursuant to which the defendant was charged, which included the sentencing ramification: "Death." 24 F. Cas. at 1044. Judges therefore were not precluded from informing juries about the verdict's sentencing implications.

**D. WHERE THE VERDICT DOES NOT ALTER THE MINIMUM AND/OR MAXIMUM SENTENCE IMPOSED ON THE DEFENDANT, THE COURT IS NOT FREE TO GIVE THE JURY SENTENCING INFORMATION.**

Neither Supreme Court nor Tenth Circuit precedent prohibit, wholesale, any mention of possible sentences. See United States v. Courtney, 960 F. Supp. 2d at 1185. Rather, the modern-day principle is limited to those situations in which "a jury has no sentencing function." Shannon v. United States, 512 U.S. at 579. The Supreme Court in Apprendi v. New Jersey held that "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. at 490, and the jury is therefore required to participate in finding a fact that, by changing the mandatory maximum, changes substantially the nature of the sentence. Similarly, in Jones v. United States, the Supreme Court construed 18 U.S.C. § 2119 to constitute three separate offenses, rather than one sentence with three factual considerations for sentencing, because it reasoned that, to leave to a judge factual findings which would mean the difference between a sentence of up to fifteen years, up to twenty-five years, or up to life, implicates the defendant's Sixth Amendment jury trial right. See United States v. Courtney, 960 F. Supp. 2d at 1185. On the one hand, the Supreme Court's constitutional requirement that a jury participate in factfinding where the fact is necessary to a sentence with a substantially different punishment is analogous to the factual finding required in the case which Ryder notes, where the jury was to determine whether the total value of stolen goods was forty shillings or more, as a finding of forty shillings makes mandatory a death sentence and precludes the possibility of the benefit of the clergy. See United States v. Courtney, 960 F. Supp. 2d at 1185. Similarly, whereas Justice Story in United States v. Battiste instructed the jury by reading them the statute which included the punishment -- death, see United States v. Courtney, 960 F. Supp. 2d at 1185 -- courts instruct contemporary juries if the death sentence is a

possible punishment for their potential jury's return of a guilty verdict, <u>see</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1185.  Moreover, it is possible that modern-day juries know whether the return of a guilty verdict in a capital case -- such as first-degree murder -- in their jurisdiction puts at issue a possible death sentence.  On the other hand, in Ryder's example, he appears not only to have required the jury to find a fact upon which an enhanced sentence depends, but to have gone further and instructed the jury specifically about the implications of finding the particular fact.  Ryder notes that "I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy," <u>Ryder Sources</u>, <u>supra</u>, at 22; by telling the jury that fact, he instructed it specifically that the implications of the factual finding meant an increased maximum sentence, or, rather, the preclusion of anything except for the maximum sentence, <u>see</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1186.  Even when a juror's participation is required to enhance a mandatory minimum sentence, modern-day courts do not instruct the jury on the sentencing implications of the factual findings that they make.  <u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1186.  In the case of drug-trafficking, for example, where the amount of the drugs in which the defendant traffics determines the statutory maximum and minimum, the jury is not told, as Ryder told the jury in another context, the line at which the possible relief from the death sentence becomes impossible or that there is a line at which the statutory maximum and minimum sentence changes.  <u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1186.  Requiring courts to withhold from jury instructions a guilty verdict's ramifications therefore violates the defendant's Sixth Amendment jury trial right as the Founders thought of that right.

Current Supreme Court and Tenth Circuit law makes clear, however, that withholding sentencing information from juries not directly participating in sentencing does not unconstitutionally invade the province of the jury.  <u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d

at 1186. The Supreme Court, in the majority opinion that the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court of the United States, authored in Apprendi v. New Jersey, recognizes that there are organic changes which take place in trial practices without violating the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost only by gross denial, but by erosion.'" 530 U.S. at 483 (quoting Jones v. United States, 526 U.S. at 247-48). The Supreme Court has thought that the evolution of courts' practice to prohibit instructions about sentencing ramifications where the jury's factfinding does not fundamentally affect the defendant's sentencing ramifications to avoid "distract[ing] them from their factfinding responsibilities, and creat[ing] a strong possibility of confusion," Shannon v. United States, 512 U.S. at 579, is such a constitutional change in trial practice. The Supreme Court's recent sentencing opinions, moreover, are susceptible to a narrow construction of the Sixth Amendment's jury trial right. The Supreme Court in Booker held that the Sentencing Guidelines' mandatory nature is unconstitutional, because the Guidelines, in taking into consideration the defendant's relevant conduct, often produced a sentencing range higher than the mandatory maximum allowed based on facts which the jury found. See United States v. Courtney, 960 F. Supp. 2d at 1186. The Supreme Court construed the Sentencing Guidelines as advisory rather than mandatory, because requiring a sentence imposed beyond the maximum sentence that the jury's verdict allowed violated the defendant's Sixth Amendment jury trial right to "in a meaningful way guarantee[] that the jury would still stand between the individual and the power of the government under the new sentencing regime." Booker, 543 U.S. at 237. The Supreme Court noted that this construction "is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance." 543 U.S. at 237. In Apprendi v. New Jersey, the Supreme

Court quoted its recognition in <u>Jones v. United States</u> that the Sixth Amendment's substance, as the Founders saw it, is its protection against substituting new methods of trial in place of the jury trial:

> As we stated in <u>Jones</u>: "One contributor to the ratification debates, for example, commenting on the jury trial guarantee in Art. III, § 2, echoed Blackstone in warning of the need '<u>to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial</u>, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY.' A [New Hampshire] Farmer, No. 3, June 6, 1788, quoted in The Complete Bill of Rights 477 (N. Cogan ed. 1997)."

<u>Apprendi v. New Jersey</u>, 530 U.S. at 484 n.11 (emphasis added)(quoting <u>Jones v. United States</u>, 526 U.S. at 248). See <u>Booker</u>, 543 U.S. at 238-39 ("The Framers of the Constitution understood the threat of 'judicial despotism' that could arise from 'arbitrary punishments upon arbitrary convictions' without the benefit of a jury in criminal cases." (quoting <u>The Federalist No. 83</u> at 499 (C. Rossiter ed. 1961))). Whereas the Supreme Court has held that certain facts necessary to imposing a greater mandatory maximum statutory sentence require jury participation in finding those facts, substituting a court's finding of those facts, especially where the standard of proof is a preponderance of the evidence rather than beyond a reasonable doubt, would effectively introduce a new method of trial. The Supreme Court's recent sentencing decisions requiring jury participation in this factfinding and precluding a court's substitution of facts for the jury's, therefore, preserves the jury's factfinding role as it existed at the Founders' times. Presumably the Supreme Court justifies the contemporary practice to withhold sentencing ramifications from the jury at trial where its factfinding does not substantially affect the sentence imposed -- <u>i.e.</u>, does not affect the range in which the judge can exercise discretion -- does not effectively introduce a new arbitrary method of trial as a substitute for a jury trial, but rather continues the practice of allowing the judge to exercise discretion in sentencing. See <u>Apprendi v. New Jersey</u>, 530 U.S. at 482 n.9

(noting that, "[u]nder the common-law procedure, the court determines in each case what <u>within the limits of the law</u> shall be the punishment -- the question being one of discretion" (emphasis in original)(quoting 1 J. Bishop, <u>Criminal Law</u> §§ 933-34(1) (9th ed. 1923))).  The Supreme Court in <u>Booker</u> noted that, as Mr. Hamilton wrote in <u>The Federalist No. 83</u>, the Framers' intent in ratifying the Sixth Amendment was to protect from judicial despotism by mandating a jury trial in criminal cases; the Supreme Court has apparently concluded that to withhold instruction about sentencing ramifications from a jury whose facts do not affect the defendant's possible mandatory maximum sentence does not change that the criminal jury trial right is exercised, and fully protected and satisfied, when the jury finds as fact whether the defendant committed the crime.  Moreover, the Supreme Court has apparently decided that, in a contemporary society in which Congress has enacted over three thousand federal criminal laws and substituted mandatory criminal sentences for the Sentencing Guidelines, the requirement to withhold jury instruction about possible sentences stems from the concern that their knowledge of sentencing ramifications "distracts them from their factfinding responsibilities, and creates a strong possibility of confusion," <u>Shannon v. United States</u>, 512 U.S. at 579, and that keeping the jurors ignorant preserves the defendant's criminal jury trial right.

The Supreme Court's conclusion that withholding sentencing information may help protect the defendant's Sixth Amendment jury trial right finds support in the Supreme Court's decision in <u>Rogers v. United States</u>, in which the Supreme Court held that the district court erred when it told the jury that it would accept a guilty verdict "with extreme mercy of the Court."  422 U.S. at 40. The Supreme Court reasoned that the district court's statements to the jurors irremediably prejudiced the defendant, reasoning that the court's statements might have induced a verdict that the jury would not otherwise have reached:

The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of "guilty with extreme mercy" within five minutes "after being told unconditionally and unequivocally that it could recommend leniency," strongly suggests that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise.

Rogers v. United States, 422 U.S. at 40 (internal citations omitted)(quoting United States v. Glick, 463 F.2d at 495). Were district courts to instruct the jury about the defendant's possible sentence, there is then the issue of what the Court would say. The Court could likely give only statutory minimum and maximum or instruct the jury about the Sentencing Guidelines and their advisory nature. The Sentencing Guidelines are often difficult for those with legal training to understand, and the Supreme Court's concern for instructions about sentencing possibilities leading to jury confusion could come to fruition rather quickly.[11] Moreover, defendants may find that, as the jury in Rogers v. United States quickly decided to convict after they learned that the court may be lenient toward the defendant, knowledge about the Sentencing Guidelines range the defendant faces, and the possibility that a court may vary downward from the guidelines sentence, may result

_____

[11]There are not as many federal criminal trials as there used to be. See [The Honorable] Robert J. Conrad Jr., [United States District Judge for the Western District of North Carolina; Member of the Executive Committee of the U.S. Judicial Conference], and Katy L. Clements, The Vanishing Criminal Jury Trial: From Trial Judges to Sentencing Judges, 86 Geo. Wash. L. Rev. 99, 99 (2018)(stating that "Federal criminal jury trials are dying. Surely, but not slowly. Within the ten-year span from 2006 to 2016, the absolute number of cases disposed of by jury trial declined by forty-seven percent."). The United States Probation Office ("USPO") could generate a Form 13 for the relatively few defendants that go to trial. A Form 13 is a pre-plea Presentence Investigation Report, see United States v. Vasquez, No. CR 09-3613 JB, 2011 WL 5238817, at *2 (D.N.M. Oct. 24, 2011)(Browning, J.), that the USPO prepares for many defendants who need to know what the guideline range will be if they plea or go to trial. If there are no objections to the Form 13, the parties could tell the jury that the guidelines calculation will be the one the judge will likely use. If there is an objection, the Court can deal with it pre-trial or, if that is not possible, tell the jury that there is an objection to an enhancement and what impact that objection may have on the sentencing guidelines range.

in a guilty verdict where a jury might not otherwise reach one. Even though the discretion to inform the jury about possible sentences would likely be left to the defendant's wishes whether to so instruct the jury, the defendant may learn to be careful about what he or she wishes.

The Court does not minimize, therefore, the difficulties that fully informing juries about the sentencing ramifications that its verdicts would present.[12] There are good prudential reasons why the modern American court system has decided to tell the jury not to think about sentencing. See United States v. Courtney, 960 F. Supp. 2d at 1188. The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism. See United States v. Courtney, 960 F. Supp. 2d at 1188. To keep the jury ignorant of sentencing ramifications is not consistent with the concept of a jury trial at the Founders' time. See United States v. Courtney, 960 F. Supp. 2d at 1188. To fully protect the defendant's right to a jury trial, it appears necessary to allow him or her to advise the jury about the sentencing ramifications of its verdict.

Nevertheless, the Court is obligated to follow controlling Supreme Court and Tenth Circuit precedent. See, e.g., Zamora v. Wells Fargo Home Mortg., 831 F. Supp. 2d 1284, 1305 (D.N.M. 2011)(Browning, J.)("While the Court realizes that its decision . . . may in some ways be unfair and unduly harsh . . . , the Court is bound to follow binding precedent from the Tenth Circuit."). These courts have been very clear about what a trial court should do: the trial court is not to present any information about possible sentencing unless the jury's participation in sentencing is required.

---

[12]The fear of juries often comes from appellate courts that do not deal with juries often, if ever, in their careers. Juries are, however, quite capable. After Blakely v. Washington and before Booker, the Court and the Honorable Bruce D. Black, then-United States District Judge for the District of New Mexico, submitted guidelines enhancements to the jury, out of concern that an enhancement without the jury finding the underlying conduct as fact, would render the Court's enhancement unconstitutional. More jury inclusion can, therefore, be done.

See Shannon v. United States, 512 U.S. at 579 ("It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"(quoting Rogers v. United States, 422 U.S. at 40)); United States v. Parrish, 925 F.2d at 1299 ("We hold a jury instruction about mandatory minimum sentences was properly omitted because the offenses do not specifically require jury participation."); United States v. Greer, 620 F.2d at 1384 ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial. Breach of this standard has often been grounds for reversal."). Accordingly, the Court will deny the Motion.

III. **THE COURT WILL DENY THE MOTION AND WILL PREVENT YOUNG FROM DISCUSSING SENTENCING-RELATED ISSUES IN THE JURY'S PRESENCE, BECAUSE THE SUPREME COURT'S AND THE TENTH CIRCUIT'S SIXTH AMENDMENT INTERPRETATIONS DO NOT PERMIT THE COURT TO ALLOW JURORS TO RECEIVE INFORMATION ABOUT SENTENCING RAMIFICATIONS OR NULLIFICATION.**

Young asks the Court to permit him to inform the jury of a guilty verdict's possible sentencing ramifications in this case. See Motion at 1. Although the Court agrees that Young indeed has the right to so inform the jury, Supreme Court and Tenth Circuit precedent controls, and the Court must deny the Motion. Accordingly, the Court will prohibit Young from discussing punishment and nullification in the jury's presence.

The common-law jury at the Framers' time knew about its ability to nullify -- knew that it had the ability to acquit the defendant or mitigate the verdict regardless whether the evidence proved beyond a reasonable doubt the fact that the defendant was guilty -- and the court informed the jury that its role included acting as the final arbiter of law. See United States v. Courtney, 960 F. Supp. 2d at 1198. At the Framers' time, a jury's exercise of its nullification power would have been considered a proper exercise of its duty. See United States v. Courtney, 960 F. Supp. 2d at 1198. The Supreme Court in Sparf v. United States appears to have considered whether such a

position was efficient and announced that "[the jury cannot] rightfully refuse to act upon the principles of law announced by the court." 156 U.S. at 90. The Court concludes that, even though a defendant's Sixth Amendment jury trial right includes both the right to instruct the jury about the nullification power, and to allow his or her counsel to argue for nullification, it must follow the Tenth Circuit's directions not to instruct the jury about this power. See United States v. Rith, 164 F.3d at 1337 ("[T]he law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law."); United States v. Thomas, 116 F.3d at 615 ("[T]he powers of the jury to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."). At a minimum, it appears that the Court should not be lying to or misleading the jury -- telling the jurors that they do not have the power to nullify or mitigate -- when in fact the jury has that power. Nevertheless, because of controlling precedent, the Court will deny Young's Motion and will prevent Young from discussing sentencing and its ramifications in front of the jury.

**IT IS ORDERED** that the Defendant's Amended Motion in Limine on Informing the Jury, filed November 26, 2018 (Doc. 138), is denied.

UNITED STATES DISTRICT JUDGE

\

*Counsel:*

John C. Anderson
  United States Attorney
Paul H. Spiers
Kristopher N. Houghton
Paul Edward Schied
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Jennifer J. Wernersbach
Law Offices of Jennifer J. Wernersbach, P.C.
Albuquerque, New Mexico

--and--

Charles E. Knoblauch
Charles E. Knoblauch Attorney at Law
Albuquerque, New Mexico

       *Attorneys for the Defendant*