# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                              No.  CR 17-0694 JB

APACHE YOUNG,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States Sentencing Memorandum, filed March 15, 2019 (Doc.  190)("U.S. Sentencing Memo"); and (ii) Young's Sentencing Memorandum, filed June 10, 2019 (Doc.  203)("Young's Sentencing Memo").  The Court held a sentencing hearing on February 12, 2021.  See Clerk's Minutes at 1, filed February 11, 2021 (Doc.  268).  The issues are whether the Court should sentence Defendant Apache Young to: (i) the mandatory minimum sentence of fifteen years of incarceration, as Young requests; (ii) the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") sentencing recommendation -- 235 to 293 months; or (iii) 293 months, the high end of the Guideline range, as Plaintiff United States of America requests.  Having weighed carefully the factors in 18 U.S.C. § 3553(a), the Court determines that a 235-month sentence is appropriate, because any lesser sentence would not be sufficient to reflect the factors in 18 U.S.C. § 3553(a) and to comply with the purposes of 18 U.S.C. § 3553(a)(2).

## FACTUAL BACKGROUND

The Court takes its facts from the Third Presentence Investigation Report, filed December 10, 2020 (Doc.  258)("PSR"), the U.S. Sentencing Memo, and Young's Sentencing Memo.  Young was born in Silver City, New Mexico in 1981.  See PSR ¶ 55, at 19.  His father was William

Young, who passed away in 2015 from dementia, and his mother is Annie Baca.  See PSR ¶ 53, at

18.  Young was not close with his late father, last speaking to him in 2005, but he is very close

with his mother.  See PSR ¶ 53, at 18.  Young is one of nine children.  See PSR ¶¶ 53-54, at 18.

Young had a "good" childhood, and "denied all forms of abuse and stated his necessities were

always met."  PSR ¶ 56, at 19.  Young's parents divorced when he was a young child, but they

remained civil towards each other.  See PSR ¶ 56, at 19.  Young's mother continues to be very

supportive of him and, although Young did not meet his father until Young turned seven, Young

"has no hard feelings towards him," and still loved him.  PSR ¶ 56, at 19.  Young was also very

close to his grandfather, who passed away when Young was twelve years old.  See PSR ¶ 56, at

19.  Young's grandfather showed Young how to hunt and was a father figure to him.  See PSR

¶ 56, at 19.  The passing of his grandfather was very difficult for Young.  See PSR ¶56, at 19.

Young spent his childhood in Silver City.  See PSR ¶ 55, at 19.  Young described Silver

City as a small community where everyone knows each other, and a place where "firearms were

always normal, always around, and necessary for hunting."  PSR ¶ 56, at 19.  While growing up

in Silver City, Young enjoyed spending time outdoors and fishing.  See PSR ¶ 56, at 19.

Additionally, Young was a member of the Brown Pride gang as a youth in Silver City, but he

stopped affiliating with the gang when he went to prison in 2002.  See PSR ¶ 57, at 19.  Young

resided in Silver City until the age of twelve, when, after "getting into trouble," he moved to

Phoenix, Arizona, to reside with his sister.  PSR ¶ 55, at 19.  Young resided in Phoenix for about

five months before he moved back to Silver City, because he was not listening to his sister.  See

PSR ¶ 55, at 19.  At the age of seventeen, Young moved to Las Vegas, Nevada, to "get away from

local trouble."  PSR ¶ 55, at 19.  Young then "got in trouble in Las Vegas" and had to move back

to Silver City after eighteen months.  PSR ¶ 55, at 19.  A few months later, Young moved to El

Paso, Texas, where he resided for about eighteen months.  See PSR ¶ 55, at 19.

Young earned a general equivalency diploma ("G.E.D.") in 1997 while attending the New Mexico Boys School in Springer, New Mexico.  See PSR ¶ 67, at 20.  When asked about his goals for the future, Young stated that "he would like to obtain an HVAC[1] certificate, attend higher education, potentially work in construction, and work as a tattoo artist."  PSR ¶ 58, at 19.

Young has one child, Timothy, who is twenty years old.  See PSR ¶ 62, at 20.  Timothy lives with his mother, Monica Coyazo, in Albuquerque.  See PSR ¶ 62, at 20.  Young is close with his son.  See PSR ¶ 62, at 20.  Young was previously married in 2008, but divorced in 2015.  See PSR ¶ 60, at 19.

Young has had two significant periods of employment.  See PSR ¶ 68-71, at 21.  First, he worked as a plumber for A Tech Plumbing in Albuquerque from August, 2015, through November, 2016.  See PSR ¶ 69, at 21.  Subsequently, Young worked as a general landscaper for one month in 2015 for Cardoni's Tree Service in Albuquerque.  See PSR ¶ 70, at 21.  Young also worked odd jobs, including laying asphalt, from 2009 through 2015 when he was not in custody.  See PSR ¶ 71, at 21.

When Young was nineteen years old, he moved to Albuquerque, New Mexico, where he lived for five months.  See PSR ¶55, at 19.  Young sentenced to four years imprisonment, see PSR ¶ 55, at 19, following his conviction for the following offenses: (i)  Possession of a Stolen Motor Vehicle; (ii) Shoplifting; (iii) Reckless Driving; (iv) Resisting, Evading, or Obstructing an Officer; (v) Driving while Under the Influence of Intoxicating Liquor; (vi) Concealing Identity; (vii)

---

[1]A heating, ventilation, and air conditioning (HVAC) certificate is acquired after passing a specialized exam and shows that a technician has all the required skills and knowledge to perform a job properly.

Encouraging Violation of Probation; and (viii) No Driver's License.  See PSR ¶ 29, at 10-11. Young was released from custody in 2005, and he returned to live in Silver City.  See PSR ¶ 55, at 19.  After a few months, Young violated his probation and was therefore incarcerated for three years.  See PSR ¶ 55, at 19.  Following his release in 2008, Young lived in Albuquerque, New Mexico, for six months.  See PSR ¶ 55, at 19.  Young then moved to Tulsa, Oklahoma, and, shortly thereafter, on April 18, 2009, Young was arrested and charged for the following offenses: (i) Attempted Robbery with a Weapon; (ii) two counts of Assault and Battery with a Deadly Weapon; (iii) two counts of Robbery with a Weapon; (iv) Obstructing an Officer; and (v) Attempted Robbery with a Firearm, see PSR ¶ 34 at 13.  Young received a five-year prison sentence.  See PSR ¶ 55, at 19.  Young was released in 2014, and lived in Albuquerque with his mother and grandmother until his arrest on November 13, 2016.  See PSR ¶ 55, at 19.

On November 13, 2016, Albuquerque Police Department ("APD") Officers patrolling the West Mesa approached Young's vehicle, which was parked by a water tank.  See Albuquerque Police Department Footage of Officer Jason Harvey at 7:38 ("APD Footage").  As the officers approached Young, they observed that Young "popped his head up" and "placed something in the bed of his truck" that "looked like a holster."  APD Footage at 7:42.    The officers approached Young and Officer Jason Harvey asked Young if there were "any guns or weapons we need to know about?"  APD Footage at 0:55.  Young replied; "No, sir."  APD Footage at 0:57.  Officer Harvey then asked: "Do you have any weapons on you?"  APD Footage at 0:58.  Young replied: "Just a little pocket knife."  APD Footage at 1:00.  Officers then approached the vehicle and observed a pistol in the vehicle.  See PSR ¶ 7, at 7.  The officers ran a record check on Young, revealing that he was a convicted felon.  See PSR ¶ 8, at 7.  The officers arrested and collected the pistol, which was determined to be stolen.  See PSR ¶ 8, at 7.  On November 15, 2016, a search

warrant was executed on Young's vehicle, and located a shotgun and a rifle belonging to Young's cousin. See PSR ¶ 8, at 7. A ski mask, shovel, and several pairs of women's underwear were also located in the vehicle. See PSR ¶ 8, at 7.

**PROCEDURAL BACKGROUND**

On March 14, 2017, the United States filed an Indictment charging Young with the following offense: Count 1 Felon in Possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). See PSR ¶¶ 1-3 at 7; Indictment as to Apache Young, filed March 14, 2017 (Doc. 2). The Indictment alleges that the offense occurred on November 13, 2019, in Bernalillo County, New Mexico. See PSR ¶ 1 at 7. On December 10, 2018, a jury convicted Young of the one count. See Verdict at 1, filed December 10, 2018 (Doc. 175).

**1.     The United States' Sentencing Memo.**

In its Sentencing Memorandum, the United States recommends that the Court accept the findings and calculations in the PSR, and sentence Young at the high end of the Guidelines' recommended range. See U.S. Sentencing Memo at 1. The United States contends that aggravating factors, including Young's criminal history and his promises to pose a future danger to specific individuals and the public, warrant a high-end sentence. See U.S. Sentencing Memo at 1. The United States notes that Young "has made apparent his lack of respect for the law through his repeated conduct and statements," and that "a high-end sentence would promote deterrence and respect for the law." U.S. Sentencing Memo at 1.

The United States then addresses factual disputes which Young asserts in his Objections[2].

---

[2]The Court addressed Young's objections to the PSR in its Memorandum Opinion and Order, filed February 11, 2021 (Doc. 272). The Court, therefore, does not address Young's objections in the analysis here.

<u>See</u> U.S. Sentencing Memo at 2.  The United States asserts that Young omits relevant parts of the transcript of the encounter between Young and Harvey, when Young argues that the PSR ¶ 6, at 4, is incorrect.  <u>See</u> U.S. Sentencing Memo at 2 (citing Objections I ¶ 2, at 1).  Instead, the United States maintains that the PSR indicates correctly that Young lied about the presence of firearms.  <u>See</u> U.S. Sentencing Memo at 2-3.  The United States then agrees with Young's assertion that the PSR ¶ 3, at 4, misidentifies whether it was the rifle or the shotgun, which was stolen, but contends that "the salience of the difference is unclear."  U.S. Sentencing Memo at 3 (citing Objections I ¶ 3, at 1-2).

Next, the United States contends that the Court should consider Young's statements made in an interview with homicide detectives in light of the 18 U.S.C. § 3553(a) factors.  <u>See</u> U.S. Sentencing Memo at 3.  The United States argues that Young's statements regarding his 2005 conviction for three counts of aggravated battery demonstrate the importance of imposing a sentence that will protect the public from the defendant's further crimes.  <u>See</u> U.S. Sentencing Memo at 4 (citing 18 U.S.C. § 3553(a)(2)(c)).  The United States maintains that the PSR indicates that Young has committed violent crimes in the past, and that Young's statement to the homicide detective that he was "playing for blood"[3] when he committed aggravated battery on July 25, 2005, shows that at least one of Young's past crimes was an instance of retaliation for a wrong.  U.S. Sentencing Memo at 4.  The United States alleges that "Young's description of the retaliatory shooting that led to his 2005 conviction for aggravated battery raises serious concerns in light of other statements Young made on recorded jail calls."  U.S. Sentencing Memo at 5.

Next, the United States discusses Young's recorded jail calls.  <u>See</u> U.S. Sentencing Memo

---

[3]"Play for blood" is a phrase made popular by the American Western film, Tombstone (Hollywood Pictures 1993), meaning to play a deadly game.

at 5.  The United States asserts that Young made threats and other troubling comments because Young perceived that he had been treated unfairly.  See U.S. Sentencing Memo at 5 (citing Apache Young Interview Segments (no date), filed March 15, 2019 (Doc. 190-3)).  The United States argues that Young suggested that citizens should shoot and kill police officers in a September 6, 2018, call with his mother, where Young stated that "'smoking more of their asses is what needs to go down'" when discussing recent police shootings.  U.S. Sentencing Memo at 6.  The United States then addresses a telephone call from September 27, 2018, where "Young references his own violent history and notes how his current experiences are leading him to consider a return to his old ways, with members of the criminal justice system as the implied targets of wrath."  U.S. Sentencing Memo at 6.

The United States contends that threatening statements are a "common refrain" during Young's jail calls.  United States' Sentencing Memo at 6.  For example, the United States describes a September 27, 2018, telephone call where Young issues a threat directed apparently at the Court or United States counsel, and an October 16, 2018, telephone call where Young states: "I'll make 'em suffer," and "I'm gonna traumatize these people."  U.S. Sentencing Memo at 7.  The United States then emphasizes that, even after receiving a specific warning that the United States planned to use his jail calls at trial, Young continued to make additional threatening statements.  See U.S. Sentencing Memo at 7-8.  The United State contends that Young does not allege any misconduct by the Court or by the United States on the jail calls, and that Young's feeling of being wronged is a result of his own misunderstanding of and lack of respect for the law.  See U.S. Sentencing Memo at 8.

Next, the United States explains that, even though Young has previously acknowledged his guilt, he mentions in multiple telephone calls that he faces a stiff penalty even though he "did

nothing wrong." U.S. Sentencing Memo at 8. The United States argues that, given Young's acknowledgement of guilt, these comments show "that Young views possessing a firearm as a felon as 'nothing,' because it does not involve the type of serious violence he has committed in the past." U.S. Sentencing Memo at 8. The United States emphasizes Young's habitual violations of 18 U.S.C. § 922(g)(1), including that: (i) Young discussed casually going on a hunting trip during his interview with the homicide detective; (ii) trial testimony establishing a customized shotgun sling embroidered with the name APACHE belonged to Young; and (iii) an APD officer observing Young holding a shotgun in August, 2016. See U.S. Sentencing Memo at 9. The United States concludes that Young "clearly demonstrates, by his repeated flaunting of the law, his own words, and by the outrage he feels for being convicted and sentenced according to the law, that he has no respect for the law." U.S. Sentencing Memo at 9.

Finally, the United States admits that it is possible to interpret Young's jail calls in a benign way, acknowledging that Young could have been "blustering, because he was upset, and the statements made are empty threats to express his frustration." U.S. Sentencing Memo at 10. The United States maintains, however, that Young receives a warning at the beginning of each call informing him that his statements are being recorded and, therefore, Young was on notice that the United States is listening to the calls, yet Young made continuously threatening statements. See U.S. Sentencing Memo at 10. The United States argues that, because of the comments' ongoing nature, "the Court would be wholly justified in interpreting [Young's] statements as legitimate threats, either that Young intends to harm the public generally or Government and Court personnel specifically if given the opportunity." U.S. Sentencing Memo at 10.

Next, the United States addresses Young's objections to PSR ¶ 19, at 6, and PSR ¶ 24-25, at 6, regarding his offense level under the Guidelines. See U.S. Sentencing Memo at 10. First,

Young objects to the PSR's statement that two of the three firearms that Young possessed are stolen. See U.S. Sentencing Memo at 11. The United States counters that nothing in the Guidelines suggests that Young must have knowledge of the guns' stolen status for the enhancement to apply. See U.S. Sentencing Memo at 11. Additionally, the United States notes that Young cites to United States v. Jordan, 740 F. Supp. 2d 1013 (E.D. Wis. 2010)(Adelman, J.), in his Objection, a case that notes specifically that "the Commission dispensed with a mens rea requirement for this enhancement." 740 F. Supp 2d at 1016. See U.S. Sentencing Memo at 11. The United States insists that United States v. Jordan relies on U.S.S.G. § 2K2.1 n.8, which states: "Subsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen or had an altered or obliterated serial number." U.S.S.G. § 2K2.1 n.8. See U.S. Sentencing Memo at 11. The United States addresses Young's reference to the Court's opinion in United States v. Ulibarri, 115 F. Supp. 1308 (D.N.M. 2015)(Browning, J.). See United States' Sentencing Memo at 11. The United States presumes that Young references the case because he believes it holds that an enhancement under § 2J1.2(b)(1)(B)[4] did not apply because of a lack of evidence of mens rea. See U.S. Sentencing Memo at 11. The United States argues that U.S.S.G. § 2J1.2(b)(1)(B), unlike § 2K2.1(b)(4), requires a specific mens rea; thus, the United States insists that United States v. Ulibarri does not prevent the Court from applying the § 2K2.1(b)(4) stolen firearms enhancement to Young. See U.S. Sentencing Memo at 12.

Next, the United States responds to Young's argument that he should be awarded credit for accepting responsibility, because he did not deny that he was in possession of the firearms when

_____

[4]"If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels." U.S.S.G § 2J1.2(b)(1)(B).

addressing the Court.  See U.S. Sentencing Memo at 13 (citing Objections I ¶ 6, at 2).   The United States explains that Young avers that he did not contest his factual culpability, and he "cites to United States v.  McKittrick, 142 F.3d 1170 (9th Cir. 1998), in an attempt to escape responsibility for his failure to accept responsibility."  U.S. Sentencing Memo at 13 (citing Objections I ¶ 6, at 2).  The United States counters that, by contesting intent, Young contested an element of the crime and, additionally, United States v.  McKittrick, 142 F.3d 1170 (9th Cir.  1998), is out of the Tenth Circuit and, therefore, is inapplicable to Young's case.  See U.S. Sentencing Memo at 14. Furthermore, the United States asserts that Young's jail calls demonstrate that Young has not accepted responsibility.  See U.S. Sentencing Memo at 14.  The United States concludes that the United States Probation Office ("USPO") correctly calculates Young's offense level in the PSR. See U.S. Sentencing Memo at 14.  The United States argues that, because of Young's status as an Armed Career Criminal , Young's final offense level is 33.  See U.S. Sentencing Memo at 14. Additionally, the United States asserts that, because of Young's criminal history category of VI, the resulting Guidelines range is 235 to 293 months.  See U.S. Sentencing Memo at 14.

The United States argues that a sentence at the high end of the Guidelines range of 235 to 293 months would "adequately account for Young's history and characteristics, the need to afford deterrence and promote respect for the law, and the need to protect the public from future crimes of the defendant."  U.S. Sentencing Memo at 16.  The United States concludes that "Young can identify no viable basis for a departure from the Guidelines nor grounds for a variance under the factors listed in 18 U.S.C. § 3553(a)," and that "the 18 U.S.C § 3553(a) factors place upward pressure on the sentence, and could justify an upward variance"; thus, the United Sates recommends that the Court "sentence Young to a term of imprisonment at the high end of the Guidelines range."  U.S. Sentencing Memo at 17.

2.      **Young's Sentencing Memo.**

In his Sentencing Memorandum, Young contends that the Court should impose a sentence of less than fifteen years. See Young's Sentencing Memo at 10. First, Young argues that a sentence of more than fifteen years would be illegal. See Young's Sentencing Memo at 3. Young states that a sentence of more than fifteen years would violate the provisions of the Armed Career Criminal Act ("ACCA") and violate "the concept of separation of powers." Young's Sentencing Memo at 2. Young states that the ACCA mandates imprisonment for not less than fifteen years for a felon in possession of a firearm with three or more prior convictions for violent felonies or serious drug offenses.[5] See Young's Sentencing Memo at 3. Young notes that the ACCA is silent as to a maximum sentence, but acknowledges that the Tenth Circuit has concluded that the possibility of a life sentence was implied in the ACCA. See Young's Sentencing Memo at 4 (citing States v. Tisdale, 921 F.2d 1095, 1100 (10th Cir. 1990)). Young argues that the "Court's sentencing power is derived from the legislature and the range is bound by what the legislature has prescribed," Young's Sentencing Memo at 4 (citing Tucker v. United States, 404 U.S. 443, 447 (1972)), and "because Congress has not stated any other possible one, the only sentence set forth in 18 U.S.C § 924(e) is that of fifteen years." Young's Sentencing Memo at 4. Young concludes that "an attempt to sentence outside of that would constitute and illegal sentence." Young's

---

[5] 18 U.S.C. § 924(e)(1) states:

In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

Sentencing Memo at 4.

Next, Young argues that a sentence of more than ten years would be illegal. See Young's Sentencing Memo at 4. Young states that the only crime he was convicted of was being a felon in possession of a firearm, a violation of 18 U.S.C § 944(g)(1). See Young's Sentencing Memo at 4. Young states that the statute bears a maximum sentence of ten years. See Young's Sentencing Memo at 5 (citing 18 U.S.C. § 924(a)(2)). Young argues that a sentence greater than ten years would violate Apprendi v. New Jersey, 530 U.S. 466 (2000)(holding that the Sixth Amendment prohibits a judge from enhancing a criminal sentence beyond the statutory maximum based on any allegation that was not decided by a jury beyond a reasonable doubt). See Young's Sentencing Memo at 5. Young states that, because "there was no jury finding of the necessary aggravating factors to increase the sentence beyond ten years," "a sentence of more than ten years would violate the United States Constitution." Young's Sentencing Memo at 5. Young argues that the Supreme Court has said only that the ACCA contains a maximum of a life sentence in dicta and that the Supreme Court has never ruled on the issue. See Young's Sentencing Memo at 5. Young states "the idea of more than 15 years seems to have become accepted more through blind assumptions than any sort of real analysis." Young's Sentencing Memo at 5 (citing T.J. Matthes, The Armed Career Criminal Act: A Severe Implication Without Explanation, 59 Saint Louis U. L.J. 591 (2015)).

Young concludes that there are factually and legally compelling grounds for a sentence of less than fifteen years. See Young's Sentencing Memo at 10. Additionally, Young asserts that the mandatory nature of his sentence does not fit the crime and "will result in squandering an otherwise productive and worthwhile life in the confines of prison." Young's Sentencing Memo at 10.

3.     **The Young's Sentencing Memo -- Exhibits.**

Young attaches a partial transcript of Officer Harvey's conversation with Young as Exhibit A to Young's Sentencing Memorandum.  See  Officer Harvey Belt Tapes, filed June 10, 2019 (Doc. 203-1).  Young argues that the Officer Harvey Belt Tapes show that Young did not deny having any weapons when asked by police.  See Young's Sentencing Memo at 1.  Young states that the following portions of the conversation support his allegation:

> Officer Harvey:  We'll go check it out.  We're going to check this out real quick.  Is there any guns or weapons we need to know about?
>
> Mr. Young:  Sir?
>
> Officer Harvey: Do you have any weapons on you?
>
> Mr. Young:  A pocketknife.
>
> Officer Harvey:  Just a little pocketknife.  Okay.  Let me just hold onto that for a second while we check everything out.  And just hand out tight right here.  Okay?

Officer Harvey Belt Tapes ¶¶ 12-21, at 2.  Additionally, Young attaches a screenshot of a webpage selling an "Apache Bow Sling" as Exhibit B to his Sentencing Memo to refute the United States' claim that Young owned a personalized rifle sling.  See Young's Sentencing Memo at 3; Apache Bow Sling, filed June 10, 2019 (Doc. 203-2)

Furthermore, Young attaches a transcript of a jail call between him and his mother to support his claim that he did not know the firearms he had in his possession were stolen.  See Jail Call (ending in ac82f), filed June 10, 2019 (Doc. 203-3)("Jail Call").  In the telephone call, Young tells his mother that his uncle owned the firearm for nine years, while the United States asserts that it was stolen a month prior to Young's arrest.  See Jail Call ¶¶ 8-10, at 3.  Young tells his mother that that his uncle bought the firearm at a gun show and has receipts for the firearm.  See Jail Call ¶¶ 14-15, at 3.  Young states:

Until I get caught with it, it was never reported stolen. Because when I, When I bonded out, that's what I told him. I said, "Hey, they're trying to say this gun . . ." He's all, "No," he's all, "if you need it, I got them on my phone right here and I got all the records of me checking and trying," he's like, "I got all nine years' worth."

Jail Call ¶¶ 19-22, at 3.

   **4.    The PSR.**[6]

Regarding Count 1 of Felon in Possession of a Firearm, the PSR states that the base offense level is 24. See PSR ¶ 16, at 9(citing U.S.S.G § 2K2.1(a)(2)). The PSR adds an additional 2 offense levels because "the offense involved three firearms." U.S.S.G § 2K.2.1(b)(1)(A). See PSR ¶ 17, at 9. The PSR adds 2 offense levels because "two of the firearms were stolen." U.S.S.G § 2K2.1(b)(4)(A). See PSR ¶ 18, at 9. The PSR calculates the adjusted offense level for Count 1 to be 28. See PSR ¶ 22, at 9. The PSR applies the Armed Career Criminal enhancement to the offense because "the offense is a violation of 18 U.S.C § 922(g), and [Young] has at least three prior violent felony convictions, which were committed on different occasions." PSR ¶ 23, at 9 (citing 18 U.S.C § 924(e)). The PSR concludes that Young "has not clearly demonstrated acceptance of responsibility for the offense under § 3E1.1" and, therefore, declines to subtract any levels from the total offense level. PSR ¶ 24, at 9. The PSR sets the offense level for Young, an Armed Career Criminal, at 33. See PSR ¶ 23, at 9 (citing U.S.S.G § 4B1.4(b)(3)(B)).

The PSR adds 3 criminal history points for Young's February 16, 2002, conviction of possession of a stolen motor vehicle, shoplifting, reckless driving, resisting, evading, or obstructing an officer, driving while under the influence of intoxicating liquor, concealing identity,

---

[6]The Court takes its facts from the third PSR filed in this case. See Changes to the Presentence Report (3rd PSR), filed December 10, 2020 (Doc. 258). Two earlier PSRs were filed in this matter. See Presentence Investigation Report, filed January 29, 2019 (Doc. 180), and Presentence Investigation Report, filed September 24, 2020 (Doc. 243).

encourage violation of probation, and no driver's license.  See PSR ¶ 29, at 10-11.  The PSR adds

3 criminal history points for Young's September 22, 2005, conviction of aggravated battery.  See

PSR ¶ 32, at 12.  The PSR adds 6 criminal history points for Young's May 4, 2009, conviction of

attempted armed robbery with a weapon, assault and battery with a deadly weapon, robbery with

a weapon, obstructing an officer, and attempted robbery with a firearm.  See PSR ¶ 34, at 13.  The

PSR adds 1 criminal history point for Young's November 7, 2015, conviction for driving while

intoxicated.  See PSR ¶ 35, at 14.  The PSR adds an additional criminal history point for Young's

January 2, 2016 conviction of driving while intoxicated.  See PSR ¶ 36, at 15.  The PSR adds 1

criminal history point for Young's June 19, 2016 conviction for driving while under the influence

of intoxicating liquor.  See PSR ¶ 37, at 15.  The PSR then notes that Young's prior criminal

convictions result in a criminal history score of 15, and that, according to the sentencing table in

U.S.S.G. Chapter 5, Part A, a criminal history category of VI is established.  See PSR ¶¶ 38-39, at

16.  The PSR notes that Young is an Armed Career Criminal; therefore, "the criminal history

category shall be the greatest of the criminal history category applicable under USSG

§§ 4B1.4(c)(1), (2),or (3), which in this case is VI."  PSR ¶ 40, at 16.  Next, the PSR states that,

based on the total offense level of 33 and a criminal history category of VI, the Guideline

imprisonment range is 235 to 293 months.  See PSR ¶ 75, at 22.  Last, the PSR concludes that the

USPO "has not identified any factors that would warrant a departure from the applicable

sentencing Guideline range."  PSR ¶ 90, at 23.

  **5.**  **The April 20, 2020, Letter.**

  In a letter dated April 20, 2020, Young's mother Annie Baca wrote to the Court on the

behalf of her son.  See Annie Baca Letter at 1, dated April 20, 2020, filed January 26, 2021 (Doc.

264)("April 20, 2020 Letter").  Baca asks the Court to be lenient in imposing a sentence on her

son.  See April 20 Letter at 1.  Baca states that she believes that the Court and the United States are "dead set on giving my son a harsh sentence."  April 20 Letter at 1.  Baca states "I know my son better than anyone and he is not the bad, violent person you think he is."  April 20 Letter at 1.  Baca admits that her son has made "some bad choices and committed crimes, but he has paid for his actions and served time for them."  April 20 Letter at 1.  Baca states that "when you get to know Apache and get past his body tattoos, you will find a totally different person."  April 20 Letter at 1.  Baca states that Young is "very kind, always willing to help others, enjoys being around children and loves animals."  April 20 Letter at 1.  Baca then notes that a harsh sentence would be devastating to Young's 91-year-old grandmother, with whom he is very close.  See April 20 Letter at 1.  Baca notes that, at Young's first trial, "some [jurors] who did not think that he is the bad, violent criminal portrayed by the court."  April 20 Letter at 2.  Baca states that she was very upset by some of the statements of the Court regarding Young's childhood and upbringing. See April 20 Letter at 2.  Baca argues that, because of these statements, "Apache would never get a fair and impartial judgement in your court."  April 20 Letter at 2.  Baca concludes that she is "truly hoping that you prove me wrong and be lenient in imposing a sentence."  April 20 Letter at 2.

6.      **The February 1, 2021 Letter**.

In a letter dated February 1, 2021, Young's brother-in-law, Douglas Morrin, Jr., wrote to the Court on Young's behalf.  See Letter from Douglas Morrin to Court (dated Feb. 1, 2021), filed February 11, 2021 (Doc. 271)("Feb. 1 Letter").  D. Morrin states the he has known Young for sixteen years and can "attest for [Young's] positive character."  Feb. 1 Letter at 1.  D. Morrin notes that he has "an older brother type relationship" with Young.  Feb. 1 Letter at 1.  D. Morrin states that, "[a]side from a poor lapse in judgment during his younger years, I have seen him grow and

mature into a strong minded and well-rounded adult." Feb. 1 Letter at 1. D. Morrin continues that

he believes Young has had the "opportunity to reform and grow," and has "done just that and in a

system that is not always conducive to do so." Feb. 1 Letter at 1. D. Morrin notes that he has

"seen the generosity, kindness of heart, and positive character that Apache gives freely and without

judgment to me and others in his life." Feb. 1 Letter at 1. D. Morrin states that he hopes that his

words "give you but a glimpse into the positive nature of which Apache possesses as a reformed

individual." Feb. 1 Letter at 1. D. Morrin concludes by asking the Court for leniency for Young,

because "his past mistakes don't accurately account for the current person you see in front of you."

Feb. 1 Letter at 1.

     **7.**     <u>**February 8, 2021, Letter**</u>.

     In a letter dated February 8, 2021, Young's sister, Veronica Morrin, wrote to the Court on

behalf of her brother. <u>See</u> Veronica Morrin Letter (dated February 8, 2021), filed February 11,

2021 (Doc. 270 )("Feb. 8 Letter"). V. Morrin states that she helped care for Young when he was

a child and remembers him as a "high spirited, curious little boy who was eager to please." Feb.

8 Letter at 1. V. Morrin states that Young "enjoyed helping our grandfather work in his garage

doing various projects." Feb. 8 Letter at 1. V. Morrin notes that one of her fondest memories of

Young was "taking him to the circus at the local rodeo arena." Feb. 8 Letter at 1. V. Morrin states

that she and Young spent a lot of time with their grandparents growing up, "as both of our father's

[sic] were not in the picture and our mother worked hard to keep us clothed and fed, sometimes

having to work multiple jobs each day." Feb. 8 Letter at 1. V. Morrin notes that she and Young

had strong role models "in both our grandparents and our mother." Feb. 8 Letter at 1. V. Morrin

continues: "We may not have had much in materialistic wealth but there was love and support in

our family." Feb. 8 Letter at 1. V. Morrin explains that their grandfather died when Young was a

child, that it "left a hole in our family and left a mark on my brother." Feb. 8 Letter at 1. V. Morrin notes that she believes the loss of his role model "had a major effect on Apache." Feb. 8 Letter at 1. V. Morrin states that "outside negative influences" came into Young's life after his grandfather died. Feb. 8 Letter at 1. V. Morrin notes that she is "not trying to justify the bad choices" that Young has made, but hopes this history gives the Court "a picture of a lost little boy who loved his grandfather and grew up without a strong male presence." Feb. 8 Letter at 1.

Next, V. Morrin states that, "once you get past his physical appearance," Young is "someone who [sic] his younger cousins gravitate towards." Feb. 8 Letter at 1. V. Morrin notes that her brother has a "tender heart," and recalls a time where Young found an injured bird and "tried to care for it as best he could," before contacting a rehabilitation organization and taking the bird to them. Feb. 8 Letter at 1. Morin states that the rehabilitation organization was so impressed with Young that it asked him "to volunteer every now and then, which he did." Feb. 8 Letter at 2. V. Morrin notes that, "[o]ver the last few years, I have seen Apache grow up and mature into a more tolerant person." Feb. 8 Letter at 2. V. Morrin recognizes that Young "is in no way perfect," but notes that Young has "been working on himself and had coping mechanisms which seemed to help his decision making and outlook." Feb. 8 Letter at 2. Next, V. Morrin states that she is "so proud of the way Apache handled the daily updates from the doctors each day" in the wake of their mother's diagnosis of an anoxic brain injury because of Covid-19. Feb. 8 Letter at 2. V. Morrin notes that the way Young "stayed strong for her and stood with me as we both navigated the never-ending decisions that needed to be made for her care" showed "how much he has matured and grown." Feb. 8 Letter at 2.

Next, V. Morrin asks the Court to "take these small snapshots of Apache's life and consider them" during sentencing. Feb. 8 Letter at 2. V. Morrin states that "[e]veryone should be allowed

and given the opportunity for redemption." Feb. 8 Letter at 2. V. Morrin concludes by stating that

Young "has a support system at home and an extended family who love him dearly." Feb. 8 Letter

at 2.

8. **The MOO.**

The Court issued its Memorandum Opinion and Order on Young's Objections on February

11, 2021. See United States v. Young, No. CR 17-0694 JB, 2021 WL 534869 (D.N.M. Feb. 11,

2021)(Browning, J.)("MOO"). The Court overruled all of Young's objections except the objection

relating to Young's alleged December 5, 2000, DUI arrest in Las Vegas, Nevada. See MOO, 2021

WL 534869, at *1. The Court explained:

> The Court concludes that: (i) because both the United States Probation Office
> ("USPO") and Young agree that Young informed Officer Harvey that he had no
> weapons on him, the PSR need not be changed; (ii) Young is subject to a 2-level
> offense enhancement under U.S.S.G. § 2K2.1(b)(4), regardless whether he knew
> the firearm was stolen, because U.S.S.G. § 2K2.1(b)(4) does not contain a scienter
> requirement, as Application Note 8 affirms; (iii) the USPO provided Young with
> notice regarding which convictions qualify him as an Armed Career Criminal; (iv)
> Young does not receive credit for acceptance of responsibility under U.S.S.G. §
> 3E1.1, because he has not demonstrated that he accepted responsibility for
> possessing firearms at trial, and his prison telephone calls indicate that Young
> believes that he did nothing wrong; (v) the preponderance of the evidence indicates
> that Young was not arrested on December 5, 2000, because of inconsistencies in
> his Arrest Reports, missing information, and Young's recurring confusion with
> Daniel Padilla; (vi) Young is an Armed Career Criminal because, before the present
> offense, he committed five violent felonies under the ACCA; (vii) attempted
> robbery in New Mexico is a violent felony, because it involves the use of force, and
> is an enumerated offense under the ACCA's violent felony definition; (viii) the
> convictions associated with Young's May 4, 2009, robbery spree in Tulsa,
> Oklahoma, are separate offenses, because they were committed on separate
> occasions and occurred in different places at different times and involved different
> individuals; (ix) Rehaif[ v. United States, 139 S. Ct. 2191 (2019)] does not prohibit
> Young's classification as an Armed Career Criminal, because the ACCA
> sentencing enhancement contains no mens rea requirement; (x) Young presents no
> new case law or evidence demonstrating that the Court should reconsider its
> previous ruling, United States v. Young, 347 F. Supp. 3d 747 [(D.N.M.
> 2018)(Browning, J.)] denying Young's Motion to Suppress, and, even when the
> Court reconsiders its previous ruling, it confirms the ruling; (xi) Young's

conviction is valid, because the Court had no duty to advise Young that his prior nolo contendere pleas would not be admissible at trial, and Young never indicated to the Court that he was interested in testifying at trial; (xii) there is no evidence that the United States engaged in prosecutorial misconduct or selective prosecution, and Young's filings on this matter are procedurally deficient and extremely tardy; (xiii) Young's claims regarding ineffective assistance of counsel are not timely under rule 33(b)(2) of the Federal Rules of Criminal Procedure; (xiv) Young's monitored jail telephone calls are admissible evidence and do not constitute entrapment because the recordings took place after the events at issue, and Young consented to the recordings by proceeding with his phone calls after a warning that they were subject to recording; (xv) Young's argument that his sentence is procedurally unreasonable is premature, because the Court has not imposed yet a sentence; and (xii).

MOO, 2021 WL 534869, at *1. Accordingly, the Court agreed with the offense level and criminal history categories that the PSR describes and concludes that "Young's Guideline imprisonment range is 235-293 months." MOO, 2021 WL 534869, at *47.

9. **The February 12, 2021, Sentencing Hearing**.

The Court held a sentencing hearing on February 12, 2021. See Transcript of Hearing at 1:22-24 (taken February 12, 2021)(Court)("Tr.").[7] Young began by stating he believed the PSR was incorrect in saying that the shotgun in his possession at the time of his arrest was not stolen. See Tr. at 7:9-14 (Young). The Court then read the disputed sentence in the PSR stating, "[o]n November 15, 2019 an officer executed a search warrant on the vehicle and located a stolen shotgun and a rifle belonging to Young's cousin," Tr. at 8:10-13 (Court), and asked "What's wrong with this sentence?" Tr. at 8:17-18 (Court). Young replied, "The shotgun is not stolen." Tr. at 8:23 (Young). The Court then asked Young if the only thing wrong in the disputed sentence of the PSR was the word "stolen." See Tr. 9:7-8 (Court). Young replied, "Yeah, the only thing that was

---

[7]The Court's citations to the transcripts of the hearing in this Memorandum Opinion and Order refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

stolen was the .45." Tr. at 9:9-11 (Young). The Court then asked the United States if they

disagreed with Young saying it was the pistol that was stolen rather than the shotgun. <u>See</u> Tr.

9:13-14 (Court). The United States replied:

> The Government maintains that the shotgun was stolen but the Government
> would also note the fact that it does not actually have any bearing on the Guidelines
> there are two firearms related enhancements that apply to Mr. Young. One is for
> a stolen firearm, the other is for multiple firearms, which are the three guns that
> we've talked about, and for that enhancement the fact that they're stolen is
> irrelevant. So the Government maintains that there were two stolen firearms and
> that the PSR as written right now is correct but would like to note to the Court that
> this dispute would not have any bearing on the sentence or the Guideline range.

Tr. at 10:9-22 (Schied). Next, the Court asked the United States if there was evidence that the

shotgun was stolen. Tr. at 10:23-24 (Court). The United States responded, "I believe that is from

a police report which Mr. Young seems to take issue with. That police report I believe would have

been provided to probation and that is why that ended up in the PSR." Tr. at 10:25-11:1-4 (Schied).

The Court asked if the police report was the only evidence upon which the United States relies.

<u>See</u> Tr. at 11:5-6 (Court). The USPO responded that "typically that is what we rely on is the police

report." Tr. at 8-9 (Lovato). Next, the Court asked Young, 's counsel "What are your thoughts

Mr. Knoblauch, I think it was your objection that you stated the shotgun was stolen, are you

standing by that statement or do you think that was error." Tr. at 11:10-13 (Court). Young

responded:

> I'm sort of speculating here but I think was probably happened was that the
> shotgun had been stolen some years previously, years and years ago, and it ended
> up being sold as Mr. Young says, at the gun show. It hadn't been entered in NCIC
> and it was acquired in good faith by Mr. Young's relative and no one had any idea
> that the thing might have been stolen.

Tr. at 11:14-21 (Knoblauch). The Court asked, "So you think it was stolen but it was then sold at

a gun show legally to Mr. Young's relative?" Tr. at 11:24-25-12:1 (Court). Young answered,

"Exactly." Tr. at 12:2 (Knoblauch). The Court then stated, "I think probably Mr. Knoblauch's explanation is correct. I don't think it reflects badly on your family members or you, it's just a sometimes people end up with a weapon that's stolen. But I think I'll just leave it where it is." Tr. at 12:14-19 (Court). Young responded, "How the wording is affecting me, you know what I mean, it bugs me to say that I had all kinds of stolen guns where was only one." Tr. at 12:21-24. The Court explained that, although the distinction of the shotgun being stolen does not affect Young's offense level, the Court would add a sentence to the PSR stating that, "for the purpose of the stolen firearm enhancement, I'll not rely on this one, I'll rely on the other one mentioned." Tr. at 12:25-13:1-4 (Court). The United States did not object to the Court's addition to the PSR. See Tr. at 13:5 (Schied). Young did not object to the addition to the PSR. See Tr. at 13:8-9 (Knoblauch).

Next, the USPO and Young agreed that the offense level is 33 and the criminal history category is 6 and the Guideline imprisonment range for Young is 235 to 293 months. See Tr. at 16:8-14 (Lovato, Knoblauch). Young spoke first and stated that, although Young's "criminal history is long and checkered and he's not been a good boy all of his life," that the current offense is non-violent. Tr. at 17:18-23 (Knoblauch). Young noted that, "Because it is a non-violent offense, I think there is also a question of proportionality here." Tr. at18:4-6 (Knoblauch). Next Young stated that, "the appropriate sentence would be at most 15 years under the Armed Career Criminal Act, and basically going outside the Guidelines." Tr. at 18:12-15 (Knoblauch). Young argues that "10 years for a felon in possession of a firearm is more than enough for the 3553 concerns, so it's an appropriate sentence." Tr. at 18:16-18 (Knoblauch). Next, Young argues that he should be credited with accepting responsibility. Tr. at19:1-2 (Knoblauch). Young stated:

> I think it's a matter of confounding not guilty and someone saying that they're innocent. Mr. Young never said he was innocent. He said he was not guilty. Unfortunately, in our system we do not have what the in the Scot's law which is

you have three possible verdicts, you have guilty, not guilty and not proven. So, what Mr. Young essentially was doing is not saying he was innocent. He said he was not guilty, which is an absolute right. But he never ever, to my knowledge, said he did not possess a firearm. Under those grounds, I think he should qualify for accepting responsibility. He said all along that he did have a firearm. He just chose not to testify at trial.

Tr. at 19:2-15 (Knoblauch). Young concluded: "The bottom line, your Honor, is give Mr. Young 15 years under the ACCA. He's about 40 years old now, which would give him time for the old criminal juices to dry up, and he'd then come out and have a fairly normal life." Tr. at 19:15-21 (Knoblauch). The Court then asked Young is there was anything he would like to say to the Court on his own behalf. See Tr. at 21:1-4 (Court). Young[8] stated:

> Your Honor, thank you for everything you've done for me up to this point. I would like to apologize for putting you in a position to cast judgment on me. I'd like to apologize to my fellow citizens in public for putting them in the position to fear me. I grew up different your Honor. I grew up in a mining town, I grew up in a hunting family. And when I would go to school, the mines would blast constant and our windows would shake and things. So I grew up different than the rest of people and later on in life I went the wrong way. I got in the gangs and stuff and I'm not saying that's the right reason to have a gun or anything but during the whole time I did receive four different wounds from different people. I've been shot four times on different occasions. It's not that I need the gun or anything it's just I feel like these days and age everybody has one and I feel like I need to protect myself at all costs.

Tr. at 21:5-23 (Young).

> Young continued:

> But now that I got caught this time, I never denied it. Your Honor, I denied the way the officer said it happened. That was my whole issues with this whole situation and coming this far this long. Then once they started giving me more time and more time and more time, it started at 15 then it went to 18 to 21, 24, 27, that's where it's at right now. Any man in their right mind is going to fight to the fullest to just prove a point or to get the system to look at him fairly. I mean that's all I ask is to be treated fair through this whole situation, you know what I mean? In my time I've been convicted twice of something I haven't did. I've accepted it because in those situations counsel refused to go any farther after they got me the best deal

---

[8]The defendant, rather than counsel, spoke during this portion of the sentencing.

they can get. What is a man to do when you're facing 45 years and they offer you five? I'm not guilty of it but then if I take it to trial and I lose, I'm getting 45 years when they offer the five I'm going to take it because I know I could live with that, you know what I mean? I've accepted it and I've moved on past it. But now that I'm trying to move on here every time, I get a speeding ticket I've had all the charges thrown in my face. How do you expect a person to move on when you keep throwing the charges at me? I've already from served time paid in full what society asked of me, here I am, you know what I mean, still going through it. Here I catch this case and here they are still going again trying to go again and trying to throw a crazy amount of time on me. I'm obligated as a man and a person to feel unjust and being railroaded. How can I say where I want to accept responsibility but follow that that amount of time is really worth it? You know, I understand that I do got to pay for what I did. I have never denied all my stuff, anybody that knows me knows I'm going to man up for what I do in life and some stuff I don't do. . . . I've been convicted twice and served time. . . . I'm already old enough and I'm mature enough that I just need to put all this system behind me. . . . This incarceration stuff. It's the problem it's not the solution, it's the problem, you know what I mean? When you throw me in here and I'm subjected to a whole different set of rules and I'm out and subject to a whole different set of rules society lives by, I'm adapted to these sets of rules and then you see how the systems work. I'm trying to adjust to both things. . . . All I'm asking your Honor is that you see it from my point of view and just give me some mercy. . . . I might not deserve mercy to a certain level to be able to walk away free right now, but I want there to be mercy enough where I can see my mom and see my son grow up. . . . That amount of time it's outrageous and I understand that I do got to serve some of it, but I understand as to that you have the power if you do give me that kind of sentence, that you could do whatever you want with it. If I'm that bad of a person like the world says I am, let me change myself and prove I'm not that person anymore. Give that amount of time as a length if I do ever come in front of you, your Honor, with another charge, give me the rest and I'll man up to you. I'm telling you right now, as a man, give me that chance to prove to you that I'm not that person that I once was. . . . That's when I was a kid, that's when I was in a whole different city, I was losing friends I grew up with. I'm not into the gang life anymore. My probation failed to look at I had two jobs that were legit and I had a side job I was as that time doing, they didn't bother to look at it. I just purchased a house in Rio Rancho, they didn't look up that I made my tax two years in a row. I did everything I was required on Pretrial Services. Yes, I admit to drinking and driving but I had too much freedom that I didn't know what to do with myself and I didn't have the structure that I needed. . . . Now that you've seen 12 years now, you see all this time, there is a misdemeanor, a couple of misdemeanors, then I caught this felony, and all I'm asking is just for some mercy. I'm asking to look at me and look at my character you know. I could have got a whole lot of letters brought in here today, I just don't want the Government or anybody to disrespect my people and call them a liar, because they know what type of person I am. None of you know what type of person I am. None of you know what type of person, you're going by what you

see in that piece of paper. But I'm asking you to take my word for it. . . . Thank you, your Honor.

Tr. 22:1-26:6 (Young).

The United States then asked the Court to impose a sentence of 293 months. See Tr. at 29:14 (Schied). The United States argued that Young's criminal history is "particularly salient to this sentencing." Tr. at 29:22-24 (Schied). The United States noted that "Mr. Young is a prolific criminal, his criminal history in the PSR goes on for six pages." Tr. at 29:24-30:1 (Schied). The United States continued, "Young's criminal history is especially salient because it is especially violent." Tr. at 30:1-2 (Schied). The United States emphasized that Young's criminal history includes a "shooting that hurt multiple people including a young child, it includes a shotgun blast that harmed two individuals during an armed robbery gone bad, it includes a stab in the leg." Tr. at 30:22-31:1 (Schied). The United States urged the Court "to consider the real harm that has been caused by these crimes." Tr. at 31:2-3 (Schied). The United States then noted Young's history of violence. Tr. at 31:3-4 (Schied). The United States noted that "in an interview with homicide detectives, Mr. Young bragged about the retaliatory shooting. He said that he had 'too many victims and not enough time' and the he plays for blood." Tr. at 31:6-10 (Schied). The United States then argues that what makes Young's criminal history especially pertinent is that "he's also insisted that he intends to return to his old ways." Tr. at 31:17-20 (Schied). The United States emphasizes recorded jail calls where, "at various points Young says that he is going to traumatize members of the public, that he's going to make people suffer." Tr. at 31:24-32:1 (Schied). The United States then argues that "a sentence at the high end of the Guidelines will protect the public from any further crimes committed by Mr. Young." Tr. at 33:3-5 (Schied). The United States concluded that "it is rare to have such an explicit statement from the defendant about the threat

that he would pose when released and the United States argues that it is an aggravating factor in this case that justifies a sentence at the high end of the Guidelines." Tr. at 35:22-36:2 (Schied).

Next, the Court imposed a sentence. See Tr. at 36:3-4 (Court). The Court reiterated that Young's offense level is 33, his criminal history category is VI, and the Guideline imprisonment range is 235 to 293 months. See Tr. at 38:1-3 (Court). The Court noted that it did "identify some factors that put downward pressure on the sentence to take it out of the Guideline range to the level the defendant is wanting, which is the mandatory minimum." Tr. at 38:21-25 (Court). The Court noted the crime "that we're looking at is a non-violent offense and so [the Court] understand[s] the arguments proportionality and the fact the mandatory minimum is quite high." Tr. at 39:8-12 (Court). The Court noted that "supervised release could assist Mr. Young with some of the problems." Tr. at 39:21-22 (Court).

The Court then discussed the factors that continue to put pressure to keep the sentence up in the Guideline range. See Tr. at 40:4-6 (Court). The Court noted that Young's criminal history is "prolific" and stated that Young has "just not been a good citizen of our community." Tr. at 40:8-12 (Court). The Court explained "with that criminal history, you have to craft a sentence that reflects the seriousness of the offense and again promote respect for the law and provide just punishment." Tr. at 40:17-20 (Court). The Court then noted "we're dealing with a 40-year-old man and he's just not mature yet, and that's scary on a couple levels." Tr. at 41:14-16 (Court). The Court expressed concern with "the statements he's made, the calls that he's made. He just has a violent nature and he's just a threat and he's a risk if we let him out." Tr. at 41:23-42:1 (Court). The Court noted that, with the combination of the violent crimes in Young's past and the statements Young has made to police and during telephone calls, "there are about 3 dozen factors that continue to put upward pressure" on the sentence. Tr. 42:1-14 (Court). The Court concluded

"that the punishment set forth in the Guidelines is appropriate" for the offense.  Tr. at 42:15-17 (Court).

Next, the Court noted that while it does not think this is a variance case, the Court does not see the aggravating factors to justify going up into the high end of the range.  Tr. at 43:2-5 (Court). The Court emphasizes that "this is still a non-violent offense and he's largely being punished in some ways for his criminal history as much for the offense."  Tr. at 43:5-8 (Court).  The Court concluded that "the bottom of the Guideline range is adequate and necessary to promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and, because it is a Guideline sentence, avoids unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  Tr. at 43:8-15 (Court). Consequently, the Court sentenced Young to a prison term of 235 months and placed Young on supervised release for a term of five years.  Tr. at 44:8-11 (Court).  The Court advised Young of his rights on appeal, and Young indicated that he understood those rights.  <u>See</u> Tr. at 48:22-49:17 (Court, Young).

## <u>LAW REGARDING THE GUIDELINES</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  <u>United States v. Booker</u>, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)　to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)　to afford adequate deterrence to criminal conduct;
>
> (C)　to protect the public from further crimes of the defendant; and
>
> (D)　to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense' nature and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of

many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); <u>United States v. Cage</u>, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"). They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." <u>United States v. Cage</u>, 451 F.3d at 593 (internal quotation marks omitted)(quoting <u>United States v. Terrell</u>, 445 F.3d 1261, 1265 (10th Cir. 2006)). A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). <u>See United States v. Booker</u>, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." <u>United States v. Terrell</u>, 445 F.3d 1261, 1264 (10th Cir. 2006), <u>overruled on other grounds by</u> Rita v. United States, 551 U.S. at 349, <u>as recognized in</u> United States v. Zamora-Solorzano, 528 F.3d 1247, 1251, n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. <u>See Gall v. United States</u>, 552 U.S. 38, 46-47 (2007); <u>Kimbrough v. United States</u>, 552 U.S. 85, 90-91 (2007); <u>Rita v. United States</u>, 551 U.S. at 351. Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[9] Guidelines sentence. <u>See Rita v. United States</u>, 551 U.S. at 351; <u>Gall v. United States</u>,

---

[9]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory. <u>Gall v. United States</u>, 552 U.S. at 46 ("As a result of our decision [in <u>United States v. Booker</u>], the Guidelines are now advisory . . . ."); <u>United States v. Leroy</u>, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); <u>United States v. Sells</u>, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was

based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on

552 U.S. at 46-47; <u>Kimbrough v. United States</u>, 552 U.S. at 90-91.

> While the Supreme Court's decision in <u>United States v. Booker</u> has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-Guideline sentence. Thus, before the sentencing court takes up a defendant's <u>Booker</u> arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are

"in a superior position to find facts and judge their import under § 3553(a) in each particular case."

<u>Kimbrough v. United States</u>, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has

concluded that the case of an illegal immigrant who re-entered the United States to provide for his

two children and two siblings was not materially different from other re-entry cases, and, thus, no

variance from the Guidelines sentence was warranted. See <u>United States v. Almendares-Soto</u>,

No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the

other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17,

2011)(Browning, J.), although the defendant's military service was not present to an unusual

degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate,

because the defendant's military service was "superior and uniformly outstanding," as the

defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."

---

clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

<u>United States v. Nolf</u>, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

2011 WL 831279, at *14.

## LAW REGARDING VARIANCES FROM THE SENTENCING GUIDELINES

After United States v. Booker, 543 U.S. 220 (2005), the sentencing guideline ranges are now advisory and are one of several factors set out in 18 U.S.C. § 3553(a).  Although appellate courts are allowed to assume that within-guidelines sentences are reasonable, subject to rebuttal, see Gall v. United States, 552 U.S. 38, 50-51 (2007), the Supreme Court has made it clear that no presumption of reasonableness attaches at the district court level to the sentence the Guidelines suggest, see Gall v. United States, 552 U.S. at 50 (sentencing judge "may not presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. 338, 351 (2007)("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).  Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the Sentencing Guidelines and policy statements that the Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

<u>**ANALYSIS**</u>

In 18 U.S.C § 3553(a), Congress instructs courts to consider a number of factors when imposing a sentence. In Young's case, these factors indicate that the Court should impose a sentence within the Guidelines' range of 235 to 293 months. <u>See</u> Tr. at 42:15-21 (Court)(explaining that after consideration of the Guidelines "nothing really suggests that the Court ought to vary from the Guidelines for Mr. Young."). This sentence is "sufficient but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2). 18 U.S.C § 3553(a). Accordingly, the Court sentences Young to 235 months imprisonment. <u>See</u> Tr. at 44:7-10 (Court).

The Court has considered the Guidelines, and, in arriving at its sentence, has taken into account the Guidelines and other sentencing goals. Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant. The Court concludes that the punishment set forth in the Guidelines is appropriate for this sort of offense. It has considered the kinds of sentence and remedies that the Guidelines establish. The Court concludes that a sentence of 235 months imprisonment reflects the offense's seriousness, promotes respect for the law, provides just punishment, affords adequate deterrence both at a specific and general level, protects the public, avoids unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and effectively provides the defendant with needed education, training and care and fully reflects each of the factors that 18 U.S.C. § 3553(a) embodies. This sentence is sufficient, but not greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

**I.     A SENTENCE AT THE LOW END OF THE GUIDELINE RANGE IS**

**APPROPRIATE IN YOUNG'S CASE.**

As the Court explained at the hearing, there are fifteen factors that put downward pressure on Young's sentence. See Tr. at 38:21-24 (Court). Young's contrition and the characteristics of the offense placed downward pressure on the sentence. First, Young showed "some contrition" at the sentencing hearing. Tr. at 39:5-6 (Court). Second, the offense at issue is non-violent, and, third, the case was tried twice. See Tr. at 39:8-10 (Court). Fourth, the Court considered Young's arguments regarding the proportionality of the sentence for a non-violent crime, because, fifth, "the mandatory minimum is" already "quite high." Tr. at 39:10-12 (Court). Sixth, the felony conviction itself comes with significant consequences. See Tr. at 39:12-14 (Court).

Seventh, Young's personal characteristics and family ties also place downward pressure on his sentence. See PSR ¶ 56 at 19. For instance, Young was close with his grandfather, who died when Young was twelve years old. See Tr. at 39:17-18 (Court); PSR ¶ 56 at 19. Eighth, the Court considers the letter that Young's mother wrote to the Court asking for a lenient sentence for her son, because "I know my son better than anyone and he is not the bad, violent person you think he is." April 20 Letter at 1. Ninth, Young's sister, V. Morrin, wrote to the Court , explaining that she has seen Young "grow up and mature into a more tolerant person." Feb. 8 Letter at 2. Tenth, Young has cared for his mother in the wake of her complications from COVID-19 by "navigat[ing] the never-ending decisions that needed to be made for her care." Feb. 8 Letter at 2. Eleventh, Young's brother-in-law, D. Morrin, also wrote a letter asking the Court for leniency attesting to Young's "positive character." Feb. 1 Letter at 1.

Twelfth, as the Court noted at the sentencing hearing, Young has "been shot four times" and he felt as though he had "to carry a gun to protect [him]self." Tr. at 39:18-20 (Court). Thirteenth, the Court considered that "supervised release could assist Mr. Young with some of his

problems." Tr. at 39:21-22 (Court). Fourteenth, the Court recognizes that it must craft a reasonable sentence, and, fifteenth, that the sentence "is not greater than necessary to comply with the purposes and promote the goals of 18 U.S.C. § 3553(a)." Tr. at 39:22-40:1 (Court).

At the sentencing hearing, the Court also identified thirty-five factors "that continue to put upward pressure" on Young's sentence, to keep it in the Guideline range. Tr. at 42:12-14 (Court). Some of the factors the Court considers may overlap with each other and with some of the factors that put downward pressure on the sentence. Notably, Young's characteristics and history place upward pressure on his sentence. See 18 U.S.C § 3553(a)(1). The first nine factors address Young's criminal history. Factors ten through twenty-eight, address Young's character. Factors twenty-six through twenty-nine, address Young's conduct and attitude toward law enforcement. The last six factors address other § 3553(a) concerns.

First, Young has a "prolific" criminal history and, second, Young's criminal history contains several instances of violence. Tr. at 40:8-10 (Court). Third, the specific "factual background" of Young's previous violent crimes put upward pressure on his sentence; for instance, some of the crimes involved stabbings and shootings. Tr. at 42:1-3 (Court). Fourth, on April 18, 2005, Young was convicted of "attempted robbery." PSR ¶ 31 at 11. Fifth, on December 1, 2005, Young was convicted of "aggravated battery" for an incident where a "baby, his mother, and two other adults were struck by pellets from the defendant's shotgun-type weapon and were transported to the hospital for treatment of their injuries." PSR ¶ 32 at 12. Next, the Court considers Young's five convictions on March 11, 2010, following three robberies during which Young wielded a knife and a sawed-off shotgun. See PSR ¶ 34 at 13. Sixth, Young was convicted of "armed robbery with a weapon." PSR ¶ 34 at 13. Seventh, Young was convicted of "assault and battery with a deadly weapon." PSR ¶ 34 at 13. Eighth, Young was convicted of "robbery with a

weapon." PSR ¶ 34 at 13. Ninth, Young was convicted of "obstructing an officer." PSR ¶ 34 at 13. Tenth, Young was convicted of "attempted robbery with a firearm." PSR ¶ 34 at 13.

Eleventh, Young has "not been a good citizen of our community." Tr. at 40:11-12 (Court). Twelfth, Young is an Armed Career Criminal; as the Court explained: "You can be a felon, but you've got to work at it to get up into the ACC category." Tr. at 40:14-15 (Court). Thirteenth, Young is "a forty-year-old man and he's just not mature yet." Tr. at 41:14-16 (Court). Fourteenth, because of Young's criminal history, the Court must "craft a sentence that reflects the seriousness of the offense." See Tr. at 40:17-18 (Court). 18 U.S.C. § 3553(a)(2)(A).

Young's conduct in conversations with law enforcement, and on recorded jail telephone calls, demonstrates a lack of respect for the law and thus also places upward pressure on Young's sentence. Fifteenth, the Court must provide a sentence that "promote respect for the law." 18 U.S.C. § 3553(a)(2)(A). See Tr. at 40:19 (Court). Sixteenth, Young's "episodes of wildness," shown in "the documentation, the statements he's made, the calls that he's made," place upward pressure on his sentence. Tr. at 41:21-24 (Court). Seventeenth, in a September 6, 2018, telephone call between Young and his mother Young states "smoking more of their asses is what needs to go down," apparently advocating for the shooting and killing of police officers. Sentencing Memo at 6. Eighteenth, on a September 27, 2018, telephone call, Young, expressing his anger over the United States using his past against him, states: "They ain't gonna like me. They look at the paper and they see it now, eh, that's half the beast that I really am, you know? They ain't gonna like that dude." Sentencing Memo at 6. Nineteenth, in an October 16, 2018, telephone call, Young, in discussing the outcome of his case, stated: "They'll never regret it or they'll never forget it. Shit. I'll make 'em suffer . . . . I'm not gonna let them do this to me and get away with it." Sentencing Memo at 6. Twentieth, in a November 9, 2018, telephone call with his mother Young discussed

the United States using the recorded jail calls against him at trial and stated; "They'll feel the wrath, you know? And they can suck it . . . . I'll still see daylight regardless of what they do to me." Sentencing Memo at 6. Twenty-first, in a November 11, 2018, telephone call, Young appeared to make threats towards members of the criminal justice system, stating: "I don't give a fuck, I'm gonna make sure I get out and I'm gonna fuckin' make everybody regret it, you know? . . . . I can be the person I was, that's all I can say." Sentencing Memo at 7. Twenty-second, "the calls suggest and support that he's not ready to change." Tr. at 42:4-6 (Court). Twenty-third, the calls "continue to suggest that he may make some violence ahead." Tr. at 42:7-8 (Court). Twenty-fourth, Young "knew [the calls] were being recorded" and, twenty-fifth, "they're very troubling." Tr. at 42:11-12 (Court).

Twenty-sixth, statements that Young made directly to police and agents place upward pressure on Young's sentence. Tr. at 42:3-4 (Court). Twenty-seventh, while discussing his 2005 conviction in an interview with a detective from the APD, Young stated he was kicked out of Silver City because "I had too many victims and not enough time." Sentencing Memo at 4. Young's statement indicates that he is not remorseful for his previous crimes. See Sentencing Memo at 4. Twenty-eighth, Young indicates his 2005 conviction was an instance of retaliation gone wrong, stating; "I got out and . . . I told you the killer was still out. So I put some shotgun shells into him and I went and did some time for it." Sentencing Memo at 4. Twenty-ninth Young's sentence must provide adequate deterrence, and, thirtieth, the need to promote respect for the law puts upward pressure on Young's sentence to keep it in the Guideline range. 18 U.S.C. § 3553(a)(B). See Tr. at 41:1-5 (Court).

Thirtieth, the need to protect the public places upward pressure on Young's sentence to keep it in the Guideline range. See 18 U.S.C. § 3553(a)(C). Thirty-first, Young "has a violent

nature" and, thirty-second, "he's just a threat and he's a risk if we let him out." Tr. at 41:24-42:1 (Court). Thirty-third, while Young accepted responsibility for his actions at the hearing, Young's failure to accept responsibility before the sentencing hearing places pressure upward on the sentence to keep it in the Guideline range. See Tr. at 40:21-23 (Court). Section 3553(a)'s remaining factors also support imposing a Guidelines sentence. Thirty-fourth, the need to "provide just punishment" puts upward pressure to keep it a Guideline sentence. Tr. at 40:20 (Court). Thirty-fifth, if the sentence is a Guideline sentence, "it avoids unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Tr. at 43:13-16 (Court). See 18 U.S.C. § 3553(a)(6).

The Court concludes that the factors which put upward pressure on the sentence to keep it in the Guideline range outweigh the factors that put downward pressure to take it below the Guideline range. The Court will decline Young's request to sentence him to less than fifteen years. Also, Young does not merit a variance from the Guideline sentence. The Court typically does not crawl up in the Guideline range unless it sees fit, and the Court does not see such a need in this case. The presence of some aggravating factors support going "up into the high end of the [Guideline] range" and "the bottom of the Guideline range is adequate" to reflect the § 3553(a) factors. Tr. at 43:2-9 (Court). Consequently, the Court has considered these factors and concludes that a sentence at the bottom of the Guideline range is sufficient, but not greater than necessary, to comply with the four purposes that 18 U.S.C. § 3553(a)(2) enumerates. See Tr. at 43:22-25 (Court).

## II.    THE PSR WILL BE UPDATED TO REFLECT THAT THE  PISTOL, AND NOT THE SHOTGUN, WAS STOLEN.

At the hearing, Young expressed concern with the wording of the PSR which states that

the shotgun found in Young's possession was stolen. <u>See</u> Tr. at 7:9-14 (Young). Young asserted that the shotgun was "acquired in good faith by Mr. Young's relative and no one had any idea to think it might have been stolen." Tr. at 11:14-21 (Knoblauch). The Court stated that "probably Mr. Knoblauch's explanation is correct." Tr. at 12:14-15 (Court). The Court then explained that, although "it doesn't affect anything," -- because there is no dispute whether the pistol found in Young's possession was stolen, and, therefore, the stolen firearm enhancement is still applicable -- the Court will rely on the stolen pistol and not the shotgun for the purpose of the stolen firearm enhancement. <u>See</u> Tr. at 12:25-13:4 (Court). Accordingly, the Court instructs the USPO to update the PSR to accurately reflect that the pistol, rather than the shotgun, was stolen.

**IT IS ORDERED** that: (i) the Defendant Apache Young's request for a sentence of fifteen years or less, in the Defendant's Sentencing Memorandum, filed June 10, 2019 (Doc. 203), is denied; (ii) the Plaintiff's request for a sentence at the high end of the Guidelines range, in the United States' Amended Sentencing Memorandum, filed March 15, 2019 (Doc. 190), is denied, and (iii) Young is sentenced to 235 of imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred J. Federici
  Acting United States Attorney
Paul H. Spiers
Kristopher N. Houghton
Paul Edward Schied
    Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff United States of America*

Jennifer J. Wernersbach
Law Offices of Jennifer J. Wernersbach, P.C.
Albuquerque, New Mexico

--and--

Charles E. Knoblauch
Charles E. Knoblauch Attorney at Law
Albuquerque, New Mexico

*Attorneys for the Defendant Apache Young*